Marc E. Dann*
**DannLaw**
15000 Madison Avenue
Lakewood, OH 44107
Phone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

Thomas A. Zimmerman, Jr.*
**Zimmerman Law Offices, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
tom@attorneyzim.com
*Admitted Pro Hac Vice*

*Interim Co-Lead Class Counsel*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Wells Fargo Mortgage Modification Litigation* | Case No. 3:24-cv-01358-MMC |
| | Honorable Maxine M. Chesney |
| | **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

1. Breach of Contract;
2. Intentional Infliction of Emotional Distress;
3. Negligent Reporting;
4. Negligent Undertaking of Loan Modification;
5. Violations of the California Homeowner Bill of Rights;
6. Violations of the California Unfair Competition Law, Cal. Bus. and Prof. Code § 17200, *et seq*.;
7. Violations of the Illinois Consumer Fraud and Deceptive Practices Act;

8. Violations of the Pennsylvania Uniform Trade Practices Act;
9. Violations of the North Carolina Unfair and Deceptive Trade Practices Act;
10. Violations of the District of Columbia Consumer Protection Procedures Act;
11. Violations of the New York Gen. Bus. Law § 349; and
12. Unjust Enrichment.

**DEMAND FOR JURY TRIAL**

Plaintiffs Myron Curry, Darrell Forney, Chester Nelson, Samuel Beloff, John Risconsin, Adrenia Kea, Ruth Vergara, Laurence Peterson, Marcia Peterson, Bradley Liggett, Kyra Liggett, Deanna Clingerman, Brian Keaveny, and Renee Boucher Ferguson, individually and on behalf of all others similarly situated, ("Plaintiffs") bring this Second Amended Consolidated Class Action Complaint against Defendant Wells Fargo Bank, N.A. ("Defendant"). Plaintiffs make these allegations based on personal information as to those allegations pertaining to themselves and their personal circumstances and upon information and belief based upon the investigation of Counsel and facts that are matters publicly known, on all other matters and state as follows:

**NATURE OF THE ACTION**

1. The benefits of homeownership have long been the cornerstone of the American Dream, allowing people, regardless of economic status, to accumulate wealth by gaining access to credit, building equity, and reducing housing costs.[1]

2. This case seeks recourse for the hundreds, if not thousands or tens of thousands, of borrowers who suffered damages as a result of Defendant's "calculation errors," which stemmed from a failure of Defendant's policies, standard operating procedures, and processes, and resulted in

---

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=15efd6d23b55 (last visited July 8, 2024)

Defendant wrongfully denying permanent loss mitigation options for borrowers, or awarding temporary or permanent loss mitigation options based on erroneous calculations that damaged borrowers.

3.     Defendant is one of the largest financial institutions in America and one of the nation's largest residential home mortgage servicers. Among other things, Defendant provides loss mitigation services to consumers who have defaulted on their mortgage.

4.     Defendant uses mortgage loss mitigation tools to create automated calculations and to determine whether consumers in default are eligible for loss mitigation options under Government Sponsored Enterprise ("GSE") and other federal agency requirements.

5.     Between 2008 and the present, Defendant failed to detect or has ignored multiple systematic errors in its automated decision-making software. This software determined customers' eligibility for a government-mandated mortgage modification (and other modifications for which a borrower might be eligible) during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet, Defendant failed to adequately test, audit, and verify that its software was correctly calculating whether customers met threshold requirements for a loss mitigation option. Defendant further failed to regularly and properly audit the software for compliance with government and investor requirements—allowing life-changing errors to remain uncorrected for years.

6.     As a result of Defendant's deficient auditing and compliance procedures, Defendant repeatedly violated the Home Affordable Modification Program ("HAMP") rules and guidelines promulgated by non-governmental investors in loans serviced by Defendant, and other government statutes, regulations, and enforcement orders over a period of at least fourteen years. Moreover, errors were made by Defendant—that Defendant discovered and never fixed—in Defendant's automated method of calculating borrowers' eligibility for loss mitigation, including loan modifications. By this conduct, Defendant denied Plaintiffs and other Class members mortgage modifications that Defendant

was required to review for eligibility which the Defendant wrongfully denied. In some cases, the Defendant's conduct denied some modifications that the Defendant was legally required to offer, and in other cases, the Defendant's conduct approved some modifications based on faulty calculations that were to the detriment of the borrower.

7.      To make matters worse, even after discovering the 2013 error, Defendant continued using the faulty mortgage modification software to assess borrowers' eligibility for modification options for years thereafter. Defendant did not implement new controls until October 2015, but those "controls" did not fix the calculation errors. And, Defendant did not disclose the error to federal regulators or the public until August 2018.

8.      Moreover, despite discovering the error in 2013 and allegedly implementing new "controls" in 2015, Defendant still did not reform its auditing and verification practices. Related calculation errors continued to affect hundreds of additional borrowers thereafter, and were not remedied or disclosed until 2018 or later. Defendant intentionally continued to subject Plaintiffs and Class members to its loss mitigation calculation errors despite knowing that the errors existed and were not corrected.

9.      Defendant's failure to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Defendant and its parent company intentionally abandoned their oversight responsibilities—and did so to a shocking degree. And, until they were caught red handed, they concealed those failures.

10.     Defendant's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced through a formal Cease and Desist Letter that it would prohibit Defendant's parent company from expanding its business until it sufficiently improved its governance and controls.

11.     Finally, during his testimony on March 12, 2019 in the United States House of Representatives Financial Services Committee, former Wells Fargo CEO Timothy Sloan admitted the fundamental allegations of this Complaint: that due to Wells Fargo's actions or inactions, hundreds (later revealed to be thousands), of customers were improperly denied a loan modification between 2010 and 2015, and that over 500 of those had lost their homes to foreclosure. And he also admitted that Wells Fargo did not disclose to those victims that they had been injured through no fault of their own until late 2018.

12.     These disclosed errors led to the filing of two putative class action Complaints against Wells Fargo that resulted in Final Approval of Class Settlement: *Alicia Hernandez, et al. v. Wells Fargo Company, et al.*, N.D. Cal. Case No. 3:18-cv-07354-WHA (the "Hernandez case") and *Ethan Ryder, et al. v. Wells Fargo Bank, N.A.*, S.D. Ohio Case No. 1:19-cv-00638-TSB (the "Ryder case"), and a Consumer Financial Protection Bureau ("CFPB") Consent Order in December 2022.

13.     None of the Plaintiffs have been identified as putative class members in either the Hernandez case or the Ryder case.  Plaintiffs do not reasonably believe that the modification errors committed by Wells Fargo in their loans or the loans of the putative class members in this action are the same errors identified in either the Hernandez case or the Ryder case.

## PARTIES

14.     <u>Representative Plaintiff Myron Curry</u>.  MYRON CURRY is a natural person and citizen of California residing in Los Angeles County, California.  Plaintiff Myron Curry owned certain real property located at 4108 Hayvenhurst Drive, Encino, California 91436-3750 (the "Curry Property") from March 9, 2004 until on or about July 1, 2016 when due to the admittedly erroneous actions of Wells Fargo, he lost the property.

15.     <u>Representative Plaintiff Darrell Forney</u>. DARRELL FORNEY is a natural person and citizen of Maryland residing in Prince George's County, Maryland. Plaintiff Darrell Forney owned certain real property located at 5002 Jay Street NE, Washington, DC 20019 (the "Forney Property") from April 10, 2012 until on or about December 28, 2018, when due to the admittedly erroneous actions of Wells Fargo, he lost the property.

16.     <u>Representative Plaintiff Chester Nelson</u>. CHESTER NELSON is a natural person and citizen of Illinois residing in Cook County, Illinois. Plaintiff Chester Nelson owned certain real property located at 3244 W. 139th Street, Robbins, Illinois 60472 (the "Nelson Property") from March 21, 2011 until on or about May 21, 2018, when due to the admittedly erroneous actions of Wells Fargo, he lost the property.

17.     <u>Representative Plaintiff Samuel Beloff</u>. SAMUEL BELOFF is a natural person and citizen of Ohio residing in Clark County, Ohio. Plaintiff Samuel Beloff owned certain real property located at 624 Riverwood Drive, Dayton, Ohio 43430 (the "Beloff Property") from July 15, 1998 until on or about June 9, 2016, when due to the admittedly erroneous actions of Wells Fargo, he transferred the property via a deed-in-lieu of foreclosure.

18.     <u>Representative Plaintiff John Risconsin</u>. JOHN RISCONSIN is a natural person and citizen of South Carolina. Plaintiff John Risconsin owned certain real property located at 149 Cox Avenue, Morrisville, Pennsylvania 19067 (the "Risconsin Property"), when due to the admittedly erroneous actions of Wells Fargo, he lost the property.

19.     <u>Representative Plaintiff Adrenia Kea</u>. ADRENIA KEA is a natural person and a citizen of North Carolina residing in Bladen County, North Carolina. Plaintiff Adrenia Kea owned certain real property located at 2852 Longspur Drive, Matthew, North Carolina 28105-0116 (the "Kea Property")

until mid-2018 when due to the admittedly erroneous actions of Wells Fargo, she was forced to sell the property in a distressed sale due to a pending foreclosure action.

20. <u>Representative Plaintiff Ruth Vergara</u>. RUTH VERGARA is a natural person and a citizen of Virginia residing in Woodbridge, Virginia. Plaintiff Ruth Vergara owns certain real property located at 14792 Candlewood Court, Woodbridge, Virginia 22191 (the "Vergara Property"), and due to the admittedly erroneous actions of Wells Fargo, she was forced to pay higher amounts on a modified loan.

21. <u>Representative Plaintiffs Laurence Peterson and Marcia Peterson</u>. LAURENCE PETERSON and MARCIA PETERSON are each natural persons and citizens of Illinois residing in South Elgin, Illinois. Plaintiffs Laurence Peterson and Marcia Peterson own certain real property at 421 Dean Drive, South Elgin, Illinois 60177 (the "Peterson Property"), and due to the admittedly erroneous actions of Wells Fargo, they were forced to pay higher amounts on a modified loan.

22. <u>Representative Plaintiffs Bradley Liggett and Kyra Liggett</u>. BRADLEY LIGGETT and KYRA LIGGETT are each natural persons and citizens of California residing in San Luis Obispo, CA. Plaintiffs Bradley Liggett and Kyra Liggett owned certain real property at 1138 Madonna Drive, San Luis Obispo, California 93405 (the "Liggett Property"), when due to the admittedly erroneous actions of Wells Fargo, their loan was modified with an incorrect increased principal balance and/or incorrect increased higher monthly payment.

23. <u>Representative Plaintiff Deanna Clingerman</u>. DEANNA CLINGERMAN is a natural person and a citizen of Ohio residing in Tallmadge, Ohio. Plaintiff Clingerman owns certain real property located at 543 Vinewood Avenue, Tallmadge, Ohio 44278 (the "Clingerman Property"), when due to the admittedly erroneous actions of Wells Fargo, her loan was modified with an incorrect increased principal balance and/or incorrect increased higher monthly payment.

24. <u>Representative Plaintiff Brian Keaveny</u>. BRIAN KEAVENY is a natural person and a citizen of Washington residing in Gig Harbor, Washington. Plaintiff Brian Keaveny owned certain real property located at 159 Denny Way #606, Seattle, Washington 98109 (the "Keaveny Property"), when due to the admittedly erroneous actions of Wells Fargo, his loan was modified with an incorrect increased principal balance and/or incorrect increased higher monthly payment.

25. <u>Representative Plaintiff Renee Boucher Ferguson</u>. RENEE BOUCHER FERGUSON is a natural person and a citizen of New York residing in Saratoga County, New York. Plaintiff Renee Boucher Ferguson owned certain real property located at 191 Kaydeross Avenue, Saratoga Springs, New York 12866 (the "Ferguson Property"), when due to the admittedly erroneous actions of Wells Fargo, her loan was modified with an incorrect increased principal balance and/or incorrect increased higher monthly payment.

26. <u>Defendant Wells Fargo Bank, N.A.</u> WELLS FARGO BANK, NATIONAL ASSOCIATION is a federally-chartered National Banking Association that is organized and exists under the National Banking Act, with its principal place of business located in Sioux Falls, South Dakota ("Defendant"). Defendant is subject to the supervision of the Comptroller of the Currency of the United States Department of the Treasury and is deemed a citizen of South Dakota pursuant to 28 U.S.C. § 1348. Wells Fargo Bank, N.A. provides Wells Fargo & Company personal and commercial banking services and is Wells Fargo & Company's wholly-owned, principal operating subsidiary. Wells Fargo & Company is incorporated in Delaware with its principal place of business and corporate headquarters in San Francisco, California

## JURISDICTION AND VENUE

27. Jurisdiction is proper in this Court under 28 U.S.C. §1332 (diversity jurisdiction). Specifically, this Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. §

1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed Class, and at least one Class member is a citizen of a state different from Defendant.

28.     Supplemental jurisdiction to adjudicate issues pertaining to state law is proper in this Court under 28 U.S.C. §1367.

29.     Defendant routinely conducts business in the State where this district is located, has sufficient minimum contacts in this State and has intentionally availed itself of this jurisdiction by marketing and selling products and services, and by accepting and processing payments for those products and services within this State.

30.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to the claims of the Plaintiffs occurred within this District, and Defendant does business in this Judicial District.

## INTRADISTRICT ASSIGNMENT

31.     Pursuant to Civil L.R. 3-2(c), this case is properly assigned to the San Francisco or Oakland Division because a substantial part of the events or omissions that give rise to Plaintiffs' and Class members' claims occurred in San Francisco County.

## COMMON FACTUAL ALLEGATIONS

32.     Plaintiffs, on behalf of themselves and all similarly situated persons, seek to recover statutory damages, punitive damages, and actual damages resulting from Defendant's wrongful conduct in connection with Plaintiffs' and Class members' residential mortgage loans.

**A. Defendant services residential mortgage loans nationwide.**

33. Defendant is one of the nation's largest providers of residential home mortgage loans. It services, and at all times relevant hereto has serviced, residential home mortgage loans nationwide.

34. Defendant is a loan servicer and lender. It derives income in a number of ways including (a) payments based on a percentage of each borrower's principal balance pool, (b) float interest, (c) late fees, (d) foreclosure fees, (e) property inspection and preservation fees, and (f) broker opinion fees.

35. Defendant is a wholly-owned and controlled subsidiary of Wells Fargo & Company (NYSE: WFC), one of the nation's largest financial institutions. Wells Fargo & Company is a Delaware corporation headquartered in San Francisco, California and a registered bank holding company.

36. Wells Fargo & Company describes itself as a "diversified, community-based financial services company with $1.87 trillion in assets." *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (Nov. 6, 2018). It provides "banking, investment, and mortgage products and services as well as consumer and commercial finance, through 8,050 locations, 13,000 ATMs, digital (online, mobile, and social), and contact centers (phone, email, and correspondence)." *Id.* Wells Fargo & Company employs approximately 262,000 full-time employees in 37 countries and serves "one in three households in the United States." *Id.*

**B. Defendant employs uniform, nationwide loan servicing, loan modification, and foreclosure practices.**

37. Defendant utilizes uniform and standardized loan servicing, loan modification, and foreclosure practices nationwide. Much of Defendant's uniform and standardized loan servicing, loss mitigation, and foreclosure practices are reliant upon automated processes, systems, and tools.

38. Defendant's loan servicing, loss mitigation, and foreclosure practices are governed by federal requirements and obligations.

39. The Federal Housing Administration ("FHA") is an agency within the United States Department of Housing and Urban Development ("HUD") that supplies mortgage insurance to FHA-approved lenders, insuring loans on single-family homes.

40. Mortgage insurance protects lenders from the risk of borrower defaults because the FHA agrees to pay lenders in the event of borrower default.

41. Lenders must be pre-approved to qualify for FHA mortgage insurance. They must also comply with HUD regulations.

42. Defendant is a pre-approved lender that qualifies for FHA mortgage insurance. Defendant is therefore required to comply with HUD regulations.

43. For loans that are protected by FHA mortgage insurance, Defendant and the borrower(s) executed loan documents that incorporate by reference HUD regulations.

44. In 2008, the federal government began the Troubled Asset Relief Program (TARP). Pursuant to TARP, all servicers that receive funding from TARP must participate in HAMP.

45. Defendant received about $25 billion in TARP funds. In return, Defendant agreed to participate in HAMP and be obligated by all Program Documentation (defined below).

46. In 2009, the Secretary of the Treasury implemented the FHA HAMP, which was designed to minimize foreclosures by incentivizing loan modifications. Pursuant to HAMP, HUD has promulgated HAMP guidelines, regulations, and directives.

47. Defendant was required to comply with all Program Documentation, HAMP, and other Department of Treasury directives.

48. Among other things, Defendant was required to review defaulted loans for loss mitigation eligibility prior to proceeding with any foreclosure. Defendant was required to offer to all defaulted borrowers loss mitigation options for which they are eligible prior to conducting any foreclosure. HAMP

guidelines required that the Defendant undertake a number of specific and non-discretionary steps to determine a consumer's eligibility for modification or other relief. If, after completing a formula-driven net present value analysis, the modified loan would be more profitable than the non-modified loan, HAMP guidelines require that Defendant offer a trial period plan modification. If the borrower completes the trial period plan, Defendant is required to permanently modify the loan.

49.     To request a modification, the GSE ("government sponsored enterprise," such as Fannie Mae and Freddie Mac) Published Guidelines and FHA regulations require each borrower to submit standardized form assistance applications, financial worksheets, hardship affidavits, and acknowledgment and agreements (the "Modification Contract"). Pursuant to the standard form Modification Contract, the borrower makes a legal representation as to the material truth of all information provided. The borrower agrees to provide all requested financial and hardship information. Among other things, the borrower also promises to undergo credit counseling if they are so requested. In return, Defendant agrees in the Modification Contract to examine the borrower's eligibility for all available modifications. If the borrower is eligible for any available mandatory modifications, Defendant is required by the Modification Contract (as well as HAMP, other Department of Treasury directives, FHA regulations, and binding GSE guidelines) to extend a trial period plan.[2]

50.     These standardized Modification Contracts incorporate all applicable obligations in the HAMP provisions, regulations, directives, guidelines, procedures, documentation, instructions, bulletins, frequently asked questions, letters, directives, and other communications issued by the Department of Treasury, GSEs, and federal agencies (collectively, "Program Documentation.").

---

[2] In some circumstances, the Fannie Mae, Freddie Mac and FHA regulations and guidelines require lenders like Wells Fargo to evaluate borrowers who do not submit applications using the same criteria as for the underwritten applications, except for the consideration of the borrower's income. Some of these "Streamlined" modifications may also have been impacted by the software errors.

51.     In all relevant communications with borrowers, Defendant represents that it will extend trial period plans to any borrower who is eligible for a mandatory modification under GSE guidelines and the HAMP.

52.     Defendant received incentive payments for every successful modification under the Program Documentation. However, Defendant also benefits from unsuccessful modifications, along with foreclosures. If a federally mandated modification is not required, Defendant can offer modification and temporary payment plans outside of HAMP, often under terms that are less favorable to the borrower than federally-mandated plans. Furthermore, Defendant can continue to obtain foreclosure, late fees, property inspection, preservation, and broker opinion fees. What is more, Defendant receives higher float interest payments for non-modification options such as a short sale or a foreclosure. It further receives higher principal balance pool payments if it does not reduce the principal balance pursuant to Program Documentation requirements. Errors in Defendant's calculation models would also have potentially impacted the eligibility determination of borrowers and result in borrowers being denied loan modifications when they should have been approved, or that resulted in borrowers being required to repay more in unpaid principal balance than they should have been.

53.     Defendant was also obligated under its servicing agreements with investors to review borrowers under certain circumstances for loss mitigation options including loan modifications. Errors in calculation spreadsheets and waterfalls would have also impacted borrowers of non-government backed loans. Errors in Defendant's calculation models would also have potentially impacted the eligibility determination of borrowers and resulted in borrowers being denied for loss mitigation options when they should have been approved, or that resulted in borrowers being required to remit higher periodic payments or repay more in unpaid principal balance than they should have been.

**C. Defendant repeatedly fails to oversee, test, and audit its uniform loan servicing, mortgage modification, and foreclosure practices.**

54. In 2010, the Office of Comptroller of the Currency ("OCC") discovered multiple deficiencies and unsafe and unsound practices in Defendant's residential mortgage servicing, modification, and foreclosure programs. The OCC determined that Defendant failed to oversee, audit, and test its foreclosure and modification tools and practices and failed to comply with applicable laws, prioritizing profits over compliance and causing substantial harm to consumers.

55. The OCC's investigation and related investigations resulted in millions of dollars in fines assessed by the Federal Reserve to Wells Fargo & Company.

56. As a result, Defendant agreed to two consent orders with the OCC, committing to taking all necessary and appropriate steps to remedy the deficiencies and unsafe and unsound practices identified by the OCC. In the consent orders, Defendant agreed to form compliance committees and programs subject to the oversight of the OCC. It agreed to adopt processes to better oversee, audit, and conduct ongoing testing of its loan servicing, modification, and foreclosure tools and practices and ensure legal and regulatory compliance. Some such agreed processes were targeted at better oversight, auditing, and testing of automated tools, modification and foreclosure review, and fee assessments.

57. But Defendant failed to remedy the deficiencies and unsafe and unsound practices identified by the OCC. It failed to adopt adequate oversight, auditing, and testing processes and programs. And it failed to detect and/or correct repeated and systemwide servicing, modification, and foreclosure process errors.

58. In 2015, the OCC again determined that, despite the 2011 consent cease and desist orders, Defendant continued to fail to adequately oversee, audit, and test its servicing, modification, and foreclosure practices for compliance. As a result, the OCC assessed millions of dollars in monetary penalties against Defendant's parent company, Wells Fargo & Company.

59.     In early 2018, the OCC discovered additional and ongoing compliance and conduct failures in Defendant's loan servicing, modification, and foreclosure programs and processes. The OCC determined that Defendant's deficiencies and compliance failures constituted reckless and unsafe or unsound practices in violation of federal law and that Defendant failed to implement and maintain an adequate compliance risk management program. It found that Defendant failed to implement adequate oversight, control, auditing, and testing of its servicing, modification, and foreclosure programs and practices. The OCC also found that Defendant failed to adequately report compliance concerns, compliance failures, and Defendant's efforts to remedy them.

60.     As a result, Wells Fargo & Company and the Defendant entered into a consent cease and desist order with the OCC, again agreeing to adopt system-wide compliance programs and oversight.

61.     The Federal Reserve also issued a consent cease and desist order in early 2018 restricting Defendant's growth until governance, oversight, risk management, auditing, and testing is improved. In its consent cease and desist order, the Federal Reserve reports that it determined Defendant "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."

62.     As a result of the OCC's continued investigations and resulting consent orders, Defendant was and is on notice of serious errors, deficiencies, and unsafe and unsound practices in its loan servicing, modification, and foreclosure processes and practices from 2008 through the present. Defendant was and is likewise aware of the need for oversight, testing and auditing of those processes and practices, including the need for oversight, testing, and auditing of automated tools. Yet Defendant has habitually failed to adopt adequate oversight, testing, and auditing.

63.     Simply put, Defendant knew that its automated calculations contained errors that (i) erroneously caused Defendant to deny Plaintiffs' and Class members' loss mitigation applications that should have been approved, and (ii) erroneously caused Plaintiffs and Class members to pay more money and have higher balances due for loss mitigations that Defendant approved. Nevertheless, until the comprehensive fix occurred in 2018, Defendant knowingly failed to correct those errors, and knowingly continued to (i) erroneously deny Plaintiffs' and Class members' loss mitigation applications that should have been approved, and (ii) erroneously cause Plaintiffs and Class members to pay more money and have higher balances due for loss mitigations that Defendant approved.

**D.    Defendant's automated calculation errors.**

64.     Defendant's deficiencies, unsafe and unsound practices, and failure to conduct adequate oversight, auditing, and testing, resulted in a number of systemic automated calculation errors that greatly affected borrowers.

65.     From 2008 through the present, Defendant utilized automated mortgage loan modification underwriting tools to determine which default borrowers are qualified for a mortgage loan modification or repayment plan.

66.     By its own admissions, Defendant repeatedly failed to test and audit its automated mortgage loan modification underwriting tool, despite the OCC investigations and consent decrees putting it on notice of significant issues with its mortgage practices. Defendant likewise failed to adequately verify that its automated mortgage loan modification tools and standard foreclosure practices complied with consent decree requirements, regulations, and laws.

67.     As a result, Defendant wrongfully failed to approve hundreds of borrowers for appropriate mortgage loan modifications and/or repayment plans.

**E.** **Defendant's "first" automated calculation error.**

68. As a result of its continuing failure to implement adequate oversight, auditing, and test controls, Defendant failed to timely identify a number of automated calculation errors in its mortgage software.

69. As reported by the OCC, between March 2013 and October 2014, an unidentified error caused Defendant to fail to offer modifications to at least 184 borrowers who were entitled to modification trial period plans.

**F.** **Defendant's "second" automated calculation error.**

70. Unbeknownst to the OCC, Defendant's "first" automated calculation error was not its only one.

71. On August 3, 2018, Defendant's parent company Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (August 3, 2018) ("August Report"). In its report, Wells Fargo & Company revealed for the first time that it identified an automated calculation error that caused it to wrongfully deny loan modifications and resulted in hundreds of foreclosures of residential mortgage loans in default between April 13, 2010 and October 20, 2015:

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015, when the error was corrected. **This error in the modification tool caused an automated miscalculation of attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification** pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances, after the loan modification was denied or the**

**customer was deemed ineligible to be offered a loan modification, a foreclosure was completed.**

(Emphasis added).

72.     Defendant's August Report demonstrates that Defendant's loan modification underwriting tool utilized an automated calculation error for more than five years. However, it was not corrected in 2015—contrary to Defendant's misrepresentation that it was corrected—and the automated miscalculations for loan modifications continued until a comprehensive fix was implemented in 2018.

73.     During those years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans, when, in reality, they were wrongfully prohibited from modifying their mortgage payments.

74.     During those years, Defendant also wrongfully foreclosed on the homes of many of the consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

75.     Also during those years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

76.     Moreover, subsequent legal disclosures reveal that Defendant identified its "second" accounting error in August 2013. Defendant's employees discovered the error and escalated the problem to senior management.

77.     It was not until October 2, 2015 that Defendant implemented new controls purporting to address the accounting error and also replaced its system with the LPS/Black Knight Desktop Application. But Defendant did not disclose this accounting error to government regulators, the public,

or affected borrowers until almost three years later, on August 3, 2018 (the "August Report"). Despite detecting this error, Defendant concealed it from the public and the OCC, likely in an attempt to avoid additional fines and further OCC supervision.

78.     Even after discovering the calculation error, Defendant willfully continued to conduct foreclosures on the homes of borrowers negatively affected by its "second" calculation error, as the 2015 "controls" did not correct the calculation errors.

79.     Even after discovering the calculation error, Defendant willfully continued to issue inaccurate periodic statements and notices to borrowers affected by its "second" calculation error, as the 2015 "controls" did not correct the calculation errors.

80.     In its August Report, Defendant committed to dedicating $8 million towards remediating customers who were affected by Defendant's "calculation error."

81.     In or around September 2018, Defendant sent form letters to consumers affected by its "calculation error." In those letters, Defendant informed each consumer that, "[W]hen you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation and we're sorry. If it had been correct, you would have been approved for a trial modification."

82.     Although Defendant's letters state that it "*now* realize[s]" (emphasis added) it has made an error causing it to wrongfully fail to approve the consumer's modification, Defendant's August Report demonstrates that it has known about the error since August 2013.

83.     In short, Defendant's Apology Letters admit that (a) its accounting error caused consumers to be wrongfully denied a loan modification, (b) its accounting error caused consumers harm, (c) its accounting error resulted in inaccurate negative reporting to consumer reporting agencies that

should be corrected, and (d) Defendant had done nothing before September 2018 to remediate consumers and correct inaccurate credit reporting.

**G.      Defendant's "third" automated error.**

84.      Despite being on notice of its automated calculation errors discovered in 2013 and 2014, Defendant still failed to implement adequate oversight, auditing, and testing compliance controls. That failure resulted in additional automated errors causing Defendant to wrongfully refuse to provide loss mitigations to Plaintiffs and Class members or, if approved, wrongfully caused Plaintiffs and Class members to pay higher monthly payments and higher balances due.

85.      On November 6, 2018, Defendant's parent company Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (November 6, 2018) ("November Report"). In its November Report, Wells Fargo & Company disclosed for the first time a third set of related calculation errors affecting an additional 245 consumers, which was identified using a "subsequent expanded review," as follows:

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error regarding foreclosure attorneys' fees affecting certain accounts that were in the foreclosure process between April 3, 2010, and October 2, 2015, when the error was corrected. **A subsequent expanded review identified related errors regarding the maximum allowable foreclosure attorneys' fees permitted for certain accounts that were in the foreclosure process between March 15, 2010, and April 30, 2018, when new controls were implemented. Similar to the initial calculation error, these errors caused an overstatement of the attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises** (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of these errors, taken together and subject to final validation, approximately 870 customers were incorrectly denied a loan modification or were not offered a loan modification or repayment plan in cases where they otherwise would have qualified. In approximately 545 of these instances, after the loan modification was denied or the customer was deemed ineligible to be**

**offered a loan modification or repayment plan, a foreclosure was completed.** The Company has contacted a substantial majority of the approximately 870 affected customers to provide remediation and the option also to pursue no-cost mediation with an independent mediator. Attempts to contact the remaining affected customers are ongoing. Also, the Company's review of these matters is ongoing, including a review of its mortgage loan modification tools.

(Emphasis added).

86. The November Report demonstrates that Defendant's loan modification underwriting tool suffered from the attorneys' fee calculation error for more than eight years.

87. During those eight years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans, when in reality they were wrongfully prohibited from modifying their mortgage payments. And meanwhile, borrowers faced the consequences, including increased borrowing costs, loss of equity and the appreciation of their home, legal fees, devastating impacts to consumer credit, and incidental costs related to the sudden need to move.

88. During those eight years, Defendant also wrongfully foreclosed on the homes of consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

89. Also during those eight years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

90. The November Report also admits that Defendant was aware of the accounting error on or before April 30, 2018. But Defendant did not disclose this accounting error to the public or affected borrowers until over six months later, on November 6, 2018.

91.     Despite knowing that its automated errors harmed consumers (and admitting in its Apology Letter that it was appropriate to request consumer reporting agencies remove any negative reporting), Defendant made no effort before November 2018 to rescind the inaccurate and negative information reported to credit reporting agencies regarding consumers affected by the automated errors.

92.     Every additional week and month that a mortgagor spends in the "default zone" with regard to their mortgage materially and negatively affects the mortgagor's credit. Every additional week and month that a mortgagor is stuck in the "default zone" is another week or month where the mortgagor is limited in ability to pay, purchase, buy, earn, rent, or maybe even obtain or continue gainful employment. Every additional week or month in this "default zone" is another week or month accruing damages that are more difficult to recover from each subsequent week or month.

93.     In Exhibit 13 to its 2019 Form 10-K Annual Report, Defendant disclosed that "[t]his effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

**H.     The *Hernandez* and *Ryder* Litigation.**

94.     Before this action was filed, two putative class actions over the prior calculation errors were filed against Wells Fargo which resulted in final approval of class action settlements: *Alicia Hernandez, et al. v. Wells Fargo Company, et al.*, N.D. Cal. Case No. 3:18-cv-07354-WHA (the "Hernandez case"), and *Ethan Ryder, et al. v. Wells Fargo Bank, N.A.*, S.D. Ohio Case No. 1:19-cv-00638-TSB (the "Ryder case").

95.     In the Order granting Preliminary Approval of the Class Settlement in the Hernandez case, the Court defined the nationwide settlement class as follows:

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable

Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

See *Alicia Hernandez, et al. v. Wells Fargo & Company, et al*, 3:18-cv-07354-WHA, Doc. 277 at pp. 1-2 (N.D. Cal. Apr. 19, 2020).

96.     The Court granted final approval of the settlement in the Hernandez case on October 12, 2020. See *Hernandez*, Doc. 292.

97.     The settlement in the Hernandez case totaled $21,907,778 with over $18.2 million in payments to putative class members. See *Hernandez*, Doc. 344 at pp. 2-3.

98.     In the Order granting Preliminary Approval of the Class Settlement in the Ryder case, the Court defined the nationwide settlement class as follows:

All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), or the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo because of excessive attorneys' fees being included in the loan modification decisioning process; (iii) whose home Wells Fargo did not sell in foreclosure; and (iv) are reflected in the Settlement Class List as defined herein.

See *Ethan Ryder, et al. v. Wells Fargo Bank, N.A.*, 1:19-cv-00638-TSB, Doc. 50 at p. 3.

99.     The Court granted final approval of the settlement in the Ryder case on January 25, 2022. See *Ryder*, Doc. 57.

100.     The settlement in the Ryder case totaled $12,000,000 with over $9,098,900 in payments to putative class members. See *Ryder*, Doc. 55 at p. 16.

101.     The Plaintiffs in this case are not part of the classes who received relief in either the Hernandez case or the Ryder case.

## I. A Consent Order and a new round of Apology Letters

102. Following the resolutions of the *Hernandez* and *Ryder* matters, Wells Fargo entered into a Consent Order with the CFPB on December 20, 2022 in *In re Wells Fargo Bank, N.A.*, Case No. 2022-CFPB-0011 (the "Consent Order").

103. In the Consent Order, Wells Fargo acknowledged that:

a. "Respondent has incorrectly denied mortgage loan modification applications and miscalculated fees and other charges for thousands of mortgage borrowers,..., resulting in at least $195 million in remediation being paid to affected borrowers..."[3]

b. "In one such significant technology and internal controls failure, from at least 2011 through April 2018, Respondent's process for evaluating loan modification applications was affected by errors in the relevant calculation formulas. These errors resulted in an overstatement of the attorneys' fees included in the calculation, which sometimes caused an otherwise qualified borrower not to be offered a loan modification.[4]

c. "Respondent became aware of this problem in late 2013 and, after reviewing the issue, concluded that it did not adversely affect borrowers' ability to obtain loan modifications. Respondent attempted to correct the attorneys' fee calculation, but later determined (in March 2018) that it had not fixed the issue and was continuing to fail to offer some borrowers loan modifications."[5]

d. "Another error occurred from July 2013 until September 2018, when Respondent did not offer no-application modifications to approximately 190 borrowers with

---

[3] *In the Matter of Wells Fargo Bank, N.A.*, C.F.P.B. Admin. Proceeding File No. 2022-CFPB-0011 (2022), ECF No. 1, ¶ 23, pp. 9-10.
[4] *Id.* at ¶ 24, p. 10.
[5] *Id.* at ¶ 25, p. 10.

Government Sponsored Entity (GSE) loans. Respondent erroneously identified these borrowers as deceased and therefore did not assess their eligibility for modifications."[6] and

e.  "Respondent's mortgage servicing operations experienced other errors that resulted in Respondent assessing borrowers unwarranted charges and fees in various situations, including when certain consumers paid off a mortgage that had been subject to a foreclosure judgment; Respondent failed in certain cases to timely pay the appropriate amount of property taxes; Respondent miscalculated the interest rate on certain adjustable rate mortgages after a loan modification ended; and Respondent did not give certain consumers complete information about their ability to stop paying for expensive private mortgage insurance."[7]

104.  On same day as entering the Consent Order, Charlie Scharf, Wells Fargo's Chief Executive Officer, stated publicly that "Our top priority is to continue to build risk and control infrastructure that reflects the size and complexity of Wells Fargo and run the company in a more controlled, disciplined way"[8] and "We remain committed to doing the right thing for our customers…"[9]

105.  Wells Fargo's newfound commitment to doing the right thing for its customers appears to be short-lived however because beginning in early December 2023, Wells Fargo began sending the Plaintiffs and putative class members form letters which state, in part, "During a review of the account, we identified that when the loan was considered for payment assistance options, an error may have occurred. As a result, we are enclosing a check for $200.00." (the "Apology Letters").

---

[6] *Id.* at ¶ 26, pp. 10-11.
[7] *Id.* at ¶ 27, p. 11
[8] https://newsroom.wf.com/English/news-releases/news-release-details/2022/Wells-Fargo-Enters-into-Agreement-with-CFPB-to-Resolve-Multiple-Issues/default.aspx (last visited Mar. 1, 2024)
[9] *Id.*

106.    Although the Apology Letters reference a "review of the account", the Consent Order, the *Hernandez* settlement, the *Ryder* settlement, and affirmative statements made in its 10-K's referenced *supra*, demonstrate that Wells Fargo has known about the calculation errors since at least August 2013.

107.    In short, Defendant's Apology Letters, much like the ones sent in the fall of 2018, admit that (a) its accounting error caused consumers to be wrongfully denied a loss mitigation option, (b) its accounting error caused consumers harm, (c) its accounting error resulted in inaccurate negative reporting to consumer reporting agencies that should be corrected, and (d) Defendant had done nothing before September 2018 to remediate consumers and correct inaccurate credit reporting.

108.    Now, 15 years after the implementation of the HAMP program and almost 10 years after the commencement of the OCC's investigation regarding calculation errors resulting in wrongful denials of modifications, wrongful foreclosures of Wells Fargo customers, and apparently thousands of loan modifications requiring borrowers to pay a larger modified principal balance than they should, Wells Fargo has launched another round of vague Apology Letters including checks of varying amounts beginning in the middle of 2023 and continuing through at least June 2024 referencing vague regrets for unexplained calculation errors.  It is unclear at this time whether these errors were the same ones referenced in the vague Apology Letters from 2018 but addressed to different injured borrowers, or a different error or errors causing the same type of inaccurate calculations resulting in wrongful denials of modifications, wrongful foreclosures, or loss mitigation options that require Wells Fargo customers to pay on a principal balance and related interest that is higher than it should have been.

109.    Upon information and belief, the errors at issue in the instant matter are likely similar in nature to the errors in the Hernandez case and the Ryder case, and involve inaccurate calculations as to amounts due and owing for escrow amounts, attorneys' fees, default servicing fees, and accrued interest.

110.   Upon information and belief, in addition to wrongful denials of loan modifications, the unexplained calculations have led to improper denials or inaccurate calculations for amounts due and owing pursuant to loss mitigation options, including forbearances and partial claims.

111.   Defendant knowingly and intentionally directed its misconduct towards Plaintiffs and Class members, with an intent to mislead them and conceal material facts from them, by, *inter alia*, engaging in the following misconduct:

   a.   Despite discovering the error in 2013 and allegedly implementing new "controls" in 2015, Defendant still did not reform its auditing and verification practices. Related calculation errors continued to affect hundreds of additional borrowers thereafter, and were not remedied or disclosed until 2018 or later. Defendant intentionally continued to subject Plaintiffs and Class members to its loss mitigation calculation errors despite knowing that the errors existed and were not corrected.

   b.   Defendant knew that its automated calculations contained errors that (i) erroneously caused Defendant to deny Plaintiffs' and Class members' loss mitigation applications that should have been approved, and (ii) erroneously caused Plaintiffs and Class members to pay more money and have higher balances due for loss mitigations that Defendant approved. Nevertheless, until the comprehensive fix occurred in 2018, Defendant knowingly failed to correct those errors, and knowingly continued to (i) erroneously deny Plaintiffs' and Class members' loss mitigation applications that should have been approved, and (ii) erroneously cause Plaintiffs and Class members to pay more money and have higher balances due for loss mitigations that Defendant approved.

c. Despite knowing that its automated errors harmed consumers (and admitting in its Apology Letter that it was appropriate to request consumer reporting agencies remove any negative reporting), Defendant made no effort before November 2018 to rescind the inaccurate and negative information reported to credit reporting agencies regarding consumers affected by the automated errors.

d. Even after discovering the calculation error, Defendant willfully continued to conduct foreclosures on the homes of borrowers negatively affected by its "second" calculation error, as the 2015 "controls" did not correct the calculation errors.

e. Even after discovering the calculation error, Defendant willfully continued to issue inaccurate periodic statements and notices to borrowers affected by its "second" calculation error, as the 2015 "controls" did not correct the calculation errors.

f. Wells Fargo willfully and recklessly continued to rely on its software even after (i) the federal government cited it for failing to adequately audit its loss mitigation and foreclosure procedures, (ii) the federal government found a software error had led Wells Fargo to wrongfully deny loss mitigation options in 2013-2014, and (iii) Wells Fargo discovered another software error that caused it to wrongly deny loss mitigation options in 2015.

## PLAINTIFF MYRON CURRY'S FACTUAL ALLEGATIONS

112. On or about March 8, 2004, Plaintiff Curry entered into a mortgage for the Curry Property.

113. In the summer of 2009, Plaintiff Curry began reaching out to Defendant about options to modify his loan.

114. Between 2009 and 2016, Plaintiff Curry submitted between 15 - 20 applications for loss mitigation.

115. Sometime in late 2015/early 2016, Plaintiff Curry was verbally notified that he was approved for a loan modification but he never received a trial payment plan.

116. By spring 2016, Plaintiff Curry received additional correspondence from Wells Fargo notifying him that he did not qualify for a modification.

117. Shortly after receiving the denial correspondence, Plaintiff Curry received correspondence from Defendant notifying him that a Notice of Foreclosure Sale had been initiated on the Curry Property.

118. In an attempt to avoid the financially disastrous consequences of the foreclosure and in an effort to also avoid losing the equity in his property in June 2016, Plaintiff Curry sold the Curry Property.

119. Almost seven and a half years later, on December 15, 2023, Plaintiff Curry received a form Apology Letter from Defendant. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and Defendant "apologize[d] for any inconvenience this caused".

120. Along with the Apology Letter, Defendant enclosed a check for $200.00. This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

121. The Apology Letter was the first time Plaintiff Curry learned that Defendant had committed a calculation error and that his modification request should have been approved. Never in the years since the foreclosure and forced sale of the Curry Property did Defendant attempt to discuss with Plaintiff Curry the calculation error(s) or its wrongful failure to provide mortgage assistance.

122. Shortly after receiving the Apology Letter, Plaintiff Curry contacted Defendant about the letter. That contact led to Plaintiff Curry receiving a second letter from Defendant dated January 2, 2024, in which Defendant notified Plaintiff Curry that:

> "During a review, your account was identified as previously being offered a loan modification. An error may have occurred with that trial offer, which could have affected the trial payment amount. This loan modification was not completed, and your account may not have been impacted by this issue during the trial period. If it was, the difference would have been less than

$200.00. To make this right, we mailed any potentially impacted customers a letter and a check for $200.00…You also requested to know the terms associated with this potential error. We've completed our review of your request. *We've determined the bank cannot ascertain the terms/specific details you have requested; we are unable to provide that information.*" (Emphasis added).

123. Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Curry was eligible by Defendant's own admissions in the Consent Order and again in the January 2, 2024 letter), and Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home, caused Plaintiff Curry significant economic and non-economic damages.

## PLAINTIFF DARRELL FORNEY'S FACTUAL ALLEGATIONS

124. On or about April 10, 2012, Plaintiff Forney entered into a mortgage related to the Forney Property.

125. On or about November 3, 2016, Plaintiff Forney contacted Defendant in anticipation of a proposed default.

126. By the end of November 2016, Plaintiff Forney submitted a facially complete loss mitigation application, with a second facially complete loss mitigation application submitted in mid-August 2017.

127. On or about January 31, 2017, Plaintiff Forney spoke with Defendant's representative who informed him by phone that his November 2016 application had been approved for short-term modification assistance; however, by the time he received that information on January 31, 2017, the ability to accept the assistance had expired.

128. In mid-November 2017, Plaintiff Forney received a letter in response to the mid-August 2017 loss mitigation application from Defendant, which notified him that he was not eligible for any assistance programs except a short sale.

129.    By December 28, 2018, Plaintiff Forney had sold his home in a distressed sale in order to prevent a sale of his home in a judicial foreclosure.

130.    Almost five years later, Defendant sent Plaintiff Forney a form Apology Letter dated December 7, 2023. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error, and that Defendant "apologize[d] for any inconvenience this caused".

131.    This was the first time Plaintiff Forney learned that Defendant had committed a calculation error and that his modification request should have been approved.  Never in the years since losing the property did Defendant attempt to discuss with Plaintiff Forney the calculation error(s) or its wrongful failure to provide mortgage assistance.

132.    Along with the Apology Letter, Defendant enclosed a check for $200.00.  This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

133.    Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Forney was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home caused Plaintiff Forney significant economic and non-economic damages.

### PLAINTIFF CHESTER NELSON'S FACTUAL ALLEGATIONS

134.    On or about March 21, 2011, Plaintiff Nelson entered into a mortgage related to the Nelson Property.

135.    On or about August 25, 2013, Plaintiff Nelson received correspondence from Defendant dated on August 25, 2013, stating that his facially complete modification application had been received and was being processed.

136.    By late 2015/early 2016, after sending other modification applications, Defendant sent written correspondence to Plaintiff Nelson notifying him that he did not qualify for a modification due

to feasibility concerns. Plaintiff Nelson submitted an appeal of his denial in March 2016, but never received any additional correspondence from Defendant related to the denial or his appeal.

137. On June 29, 2015, Defendant initiated a Complaint for Foreclosure in the Cook County (IL) Chancery Court, Case No. 2015 CH 10053 (the "Nelson Foreclosure").

138. The Nelson Property was sold on May 21, 2018, and the Order for Possession was signed on December 3, 2018.

139. Approximately five years from the date that the Order of Possession was signed, Defendant sent Plaintiff Nelson a form Apology Letter dated December 6, 2023. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error, and that Defendant "apologize[d] for any inconvenience this caused".

140. This was the first time Plaintiff Nelson learned that Defendant had committed a calculation error and that his modification request should have been approved. Never in the years since losing the property did Defendant attempt to discuss with Plaintiff Nelson the calculation error(s) or its wrongful failure to provide mortgage assistance.

141. Along with the Apology Letter, Defendant enclosed a check for $200.00. This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

142. Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Nelson was eligible by Defendant's own admissions in the Consent Order), and Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home, caused Plaintiff Nelson significant economic and non-economic damages.

**PLAINTIFF SAMUEL BELOFF'S FACTUAL ALLEGATIONS**

143. On or about July 15, 1998 Plaintiff Beloff entered into a mortgage related to the Beloff Property.

144.    In 2012 shortly after his wife lost her job Plaintiff Beloff began reaching out to Defendant for mortgage assistance.

145.    Shortly after these calls, Plaintiff Beloff began submitting applications for assistance. Defendant never approved any of Plaintiff Beloff's applications for a loan modification. Upon information and belief, Defendant never approved Plaintiff Beloff for a loan modification due to Defendant's automated calculation errors.

146.    On September 24, 2015 the Defendant initiated foreclosure proceedings against Plaintiff Beloff and the Beloff Property in *Wells Fargo Bank, N.A. v. Samuel Beloff, et al.*, Greene County (OH) Court of Common Pleas Case No. 2015 CV 0635 (the "Beloff Foreclosure").

147.    After receiving the foreclosure complaint, Plaintiff Beloff was forced to retain counsel who worked with Defendant's foreclosure counsel and negotiated a deed in lieu which transferred the Beloff Property back to the Defendant on or about June 9, 2016.

148.    Almost six and a half years later Defendant sent Plaintiff Beloff a form Apology Letter in December 2023.The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

149.    This was the first time Plaintiff Beloff learned that the Defendant had committed a calculation error and that his modification request should have been approved.  Never in the years since losing the property did the Defendant attempt to discuss with Plaintiff Beloff the calculation error(s) or its wrongful failure to provide mortgage assistance.

150.    Along with the Apology Letter, Defendant enclosed a check for $200.00.  This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

151.    Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Beloff was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its

error after identifying its automated calculation errors, along with the loss of his home caused Plaintiff Beloff significant economic and non-economic damages.

## PLAINTIFF JOHN RISCONSIN'S FACTUAL ALLEGATIONS

152.    On or about March 31, 2006, Plaintiff Risconsin entered into a mortgage related to the Risconsin Property.

153.    In July 2010, Plaintiff Risconsin was contacted by Defendant who informed him that it would not accept his mortgage payment because of an alleged "missing/updated financial expense report."

154.    In August 2010, Plaintiff Risconsin provided the requested information to Defendant.

155.    On August 27, 2010, and August 30, 2010, Defendant sent Plaintiff Risconsin letters indicating that he was missing his proof of income in the form of paystubs.

156.    After August 30, 2010, Plaintiff Risconsin provided the requested paystubs to Defendant.

157.    Defendant never approved Plaintiff Risconsin for a loan modification. Upon information and belief, Defendant never approved Plaintiff Risconsin for a loan modification due to Defendant's automated calculation errors.

158.    By the end of September 2010, Plaintiff Risconsin was notified that the Risconsin Property was scheduled for a Sheriff's Sale.

159.    By November 12, 2010, Plaintiff Risconsin lost the Risconsin Property via the Sheriff's sale.

160.    Thirteen years later, Defendant sent Plaintiff Risconsin a form Apology Letter dated December 4, 2023. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused."

161.    This was the first time Plaintiff Risconsin learned that Defendant had committed a calculation error and that his modification request should have been approved. Never in the years since losing the Risconsin Property did Defendant attempt to discuss with Plaintiff Risconsin the calculation errors or its wrongful failure to provide mortgage assistance.

162.    Along with the Apology Letter, Defendant enclosed a check for $200.00. This payment is insufficient to compensate Plaintiff Risconsin for the harm he suffered as a result of Defendant's wrongful practices.

163.    Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Risconsin was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his property caused Plaintiff Risconsin significant economic and non-economic damages.

## PLAINTIFF ADRENIA KEA'S FACTUAL ALLEGATIONS

164.    On or about April 6, 2012, Plaintiff Kea entered into a mortgage for the Kea Property with the Defendant.

165.    In early 2017, Plaintiff Kea reached out to Defendant seeking to modify her loan.

166.    By early spring 2017, Plaintiff Kea submitted a facially complete loss mitigation application.

167.    By summer 2017, Plaintiff Kea had performed all of the necessary steps to complete the permanent loan modification offered by Defendant, and the loan was modified by September 2017.

168.    Shortly after resuming her modified mortgage payments to Defendant, Plaintiff Kea lost her employment and she reached out to Wells Fargo preemptively in January 2018 to discuss what, if any, options she had.

169. Sometime in February 2018, Plaintiff Kea submitted a facially complete loss mitigation application to Wells Fargo.

170. Defendant never approved Plaintiff Kea's applications for a loan modification. Upon information and belief, Defendant never approved Plaintiff Kea for a loan modification due to Defendant's automated calculation errors.

171. By early June 2018, Defendant had sent notice to Plaintiff Kea of the Notice of Intent to Foreclosure. In an attempt to avoid the financially disastrous consequences of the foreclosure and in an effort to also avoid losing the equity in her property, Plaintiff Kea sold the Kea Property.

172. Almost six years later, Defendant sent Plaintiff Kea a form Apology Letter dated June 10, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

173. This was the first time Plaintiff Kea learned that Defendant had committed a calculation error and that her modification request should have been approved. Never in the years since losing the property did Defendant attempt to discuss with Plaintiff Kea the calculation error(s) or its wrongful failure to provide mortgage assistance.

174. Along with the Apology Letter, Defendant enclosed a check for $500.00. This payment is insufficient to compensate Plaintiff Kea for the harm she suffered as a result of Defendant's wrongful practices.

175. Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Kea was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of her home caused Plaintiff Kea significant economic and non-economic damages.

**PLAINTIFF RUTH VERGARA'S FACTUAL ALLEGATIONS**

176. In early 2012, Plaintiff Vergara's loan began being serviced by Defendant for the Vergara Property.

177. In mid-2014, Plaintiff Vergara reached out to Defendant seeking to modify her loan.

178. By late 2014, Plaintiff Vergara and Defendant entered into a permanent loan modification.

179. In mid-to-late 2017, Plaintiff Vergara reached out to Defendant again seeking to modify her loan for a second time.

180. By late 2017, Plaintiff Vergara and Defendant entered into a second permanent loan modification.

181. Almost seven and a half years later, Defendant sent Plaintiff Vergara a form Apology Letter dated June 10, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

182. This was the first time Plaintiff Vergara learned that Defendant had committed a calculation error and that her modification payments may have been lower. Never in the years since entering the loan modification with Defendant did Defendant attempt to discuss with Plaintiff Vergara the calculation error(s) and how it may have affected the terms of the mortgage.

183. Along with the Apology Letter, Defendant enclosed a check for $1,000.00. This payment is insufficient to compensate Plaintiff Vergara for the harm she suffered as a result of Defendant's wrongful practices.

184. Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiff Vergara was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with having to pay a higher

mortgage payment and having a higher mortgage balance have caused Plaintiff Vergara significant economic and non-economic damages.

## PLAINTIFFS LAURENCE PETERSON AND MARCIA PETERSON'S
## FACTUAL ALLEGATIONS

185. In 2008, Plaintiffs Laurence Peterson and Marcia Peterson's mortgage on the Peterson Property began to be serviced by Defendant.

186. In mid-2013, Plaintiffs Laurence Peterson and Marcia Peterson reached out to Defendant seeking to modify their loan.

187. After submitting at least one, if not multiple, applications for mortgage assistance over the span of 12 to 14 months, as well as the intervention of the Illinois Attorney General's office, Plaintiffs Laurence Peterson and Marcia Peterson and Defendant entered into a permanent loan modification by early 2015.

188. The modification had to be re-executed in July 2015, and since that time Plaintiffs Laurence Peterson and Marcia Peterson have remained current on the mortgage.

189. Almost eight and one-half years later, Defendant sent Plaintiffs Laurence Peterson and Marcia Peterson a form Apology Letter dated June 21, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

190. This was the first time either Plaintiff Laurence Peterson or Plaintiff Marcia Peterson learned that the Defendant had committed a calculation error and that their modification was miscalculated. Never in the years since modifying the loan did Defendant attempt to discuss with either Plaintiff Laurence Peterson or Marcia Peterson the calculation error(s) or its wrongful failure to provide accurate mortgage assistance.

191.    Along with the Apology Letter, Defendant enclosed a check for $5,148.12.  This payment is insufficient to compensate Plaintiffs Laurence Peterson and Marcia Peterson for the harm they suffered as a result of Defendant's wrongful practices.

192.    Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiffs Laurence Peterson and Plaintiff Marcia Peterson were eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with having to pay a higher mortgage payment and having a higher mortgage balance have caused Plaintiffs Laurence Peterson and Plaintiff Marcia Peterson significant economic and non-economic damages.

### PLAINTIFFS BRADLEY LIGGETT AND KYRA LIGGETT'S
### FACTUAL ALLEGATIONS

193.    In August 2010, Plaintiffs Bradley Liggett and Kyra Liggett entered into a mortgage with the Defendant for the Liggett Property.

194.    In mid-2012, Plaintiffs Bradley Liggett and Kyra Liggett contacted Defendant for a loan modification.

195.    By the end of 2012, Plaintiffs Bradley Liggett and Kyra Liggett and Defendant had modified the loan.

196.    In mid-2015, Plaintiffs Bradley Liggett and Kyra Liggett contacted Defendant for a second loan modification.

197.    By the end of 2015, Plaintiffs Bradley Liggett and Kyra Liggett and Defendant had modified the loan.

198.    Plaintiffs Bradley Liggett and Kyra Liggett sold the Liggett Property in 2021.

199.    Almost nine years later, Defendant sent Plaintiffs Bradley Liggett and Kyra Liggett a form Apology Letter dated June 13, 2024.  The form Apology Letter inaccurately states that Defendant just

now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

200.   This was the first time either Plaintiff Bradley Liggett or Plaintiff Kyra Liggett learned that the Defendant had committed a calculation error and that their modification was miscalculated. Never in the years since modifying the loan did Defendant attempt to discuss with either Plaintiffs Bradley Liggett or Kyra Liggett the calculation error(s) or its wrongful failure to provide accurate mortgage assistance.

201.   Along with the Apology Letter, Defendant enclosed a check for $3,321.20. This payment is insufficient to compensate Plaintiffs Bradley Liggett or Kyra Liggett for the harm they each suffered as a result of Defendant's wrongful practices.

202.   Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiffs Bradley Liggett or Kyra Liggett were eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with having to pay a higher mortgage payment and having a higher mortgage balance have caused Plaintiffs Bradley Liggett and Kyra Liggett significant economic and non-economic damages.

### PLAINTIFF DEANNA CLINGERMAN'S FACTUAL ALLEGATIONS

203.   On or about April 29, 2014, Plaintiff Clingerman entered into a mortgage with the Defendant for the Clingerman Property.

204.   In late 2015, Plaintiff Clingerman reached out to Defendant seeking to modify her loan.

205.   After almost 10 months of submitting a facially complete loss mitigation application, a successful appeal of the denial of loss mitigation eligibility, and completion of trial plan payments, Plaintiff Clingerman and Defendant entered into a permanent modification in early October 2016.

206. Almost seven and a half years later, Defendant sent Plaintiff Clingerman a form Apology Letter dated June 13, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

207. This was the first time Plaintiff Clingerman learned that Defendant had committed a calculation error and that her modification payments may have been lower. Never in the years since entering the loan modification with Defendant did Defendant attempt to discuss with Plaintiff Clingerman the calculation error(s) and how it may have affected the terms of the mortgage.

208. Along with the Apology Letter, Defendant enclosed a check for $569.54. This payment is insufficient to compensate Plaintiff Clingerman for the harm she suffered as a result of Defendant's wrongful practices.

209. Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiff Clingerman was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with having to pay a higher mortgage payment and having a higher mortgage balance have caused Plaintiff Clingerman significant economic and non-economic damages.

**PLAINTIFF BRIAN KEAVENY'S FACTUAL ALLEGATIONS**

210. On or about March 1, 2006, Plaintiff Keaveny entered into a mortgage with the Defendant for the Keaveny Property.

211. In early 2013, Plaintiff Keaveny reached out to Defendant seeking to modify his loan.

212. By mid-June 2013, Plaintiff Keaveny was notified by Defendant that he had submitted a facially complete loss mitigation application for review.

213. By October 2013, Plaintiff Keaveny and Defendant entered into a permanent loan modification.

214. Plaintiff Keaveny sold the home in June 2015.

215. Over eleven and a half years after entering the permanent loan modification, Defendant sent Plaintiff Keaveny a form Apology Letter dated June 13, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

216. This was the first time Plaintiff Keaveny learned that Defendant had committed a calculation error and that his modification payments may have been lower. Never in the years since entering the loan modification with Defendant did Defendant attempt to discuss with Plaintiff Keaveny the calculation error(s) and how it may have affected the terms of the mortgage.

217. Along with the Apology Letter, Defendant enclosed a check for $2,316.23. This payment is insufficient to compensate Plaintiff Keaveny for the harm he suffered as a result of Defendant's wrongful practices.

218. Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiff Keaveny was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with having to pay a higher mortgage payment and having a higher mortgage balance have caused Plaintiff Keavey significant economic and non-economic damages.

## PLAINTIFF RENEE BOUCHER FERGUSON'S FACTUAL ALLEGATIONS

219. At all relevant times, Plaintiff Ferguson's mortgage loan was being serviced by Defendant for the Ferguson Property.

220. In early 2012, Plaintiff Ferguson and Defendant discussed a modification of her loan to lower her mortgage payments.

221.  By mid-2012, Plaintiff Ferguson and Defendant entered into a permanent loan modification, but the modification increased her mortgage payments and principal balance.

222.  Twelve years later, Defendant sent Plaintiff Ferguson a form Apology Letter dated June 11, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

223.  This was the first time Plaintiff Ferguson learned that Defendant had committed a calculation error and that her modification payments may have been lower. Never in the years since entering the loan modification with Defendant did Defendant attempt to discuss with Plaintiff Ferguson the calculation error(s) and how it may have affected the terms of the mortgage.

224.  Along with the Apology Letter, Defendant enclosed a check in the amount of $250. This payment is insufficient to compensate Plaintiff Ferguson for the harm she suffered as a result of Defendant's wrongful practices.

225.  After receiving the Apology Letter, Plaintiff Ferguson contacted Defendant's representatives and expressed her concern about receiving the Apology Letter.  As a result of that call, Defendant sent Plaintiff Ferguson a second Apology Letter and a check for $500, which is also insufficient to compensate Plaintiff Ferguson for the harm she suffered as a result of Defendant's wrongful practices.

226.  Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiff Ferguson was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with having to pay a higher mortgage payment and having a higher mortgage balance have caused Plaintiff Ferguson significant economic and non-economic damages.

## CLASS ALLEGATIONS

227. **The Class:** Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(3), on

behalf of similarly situated individuals and entities ("the Class") defined as follows:

> All persons, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) either were denied a temporary or permanent loss mitigation option by Defendant due to a calculation error in Defendant's loss mitigation decision process, or received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

228. **The Unjust Enrichment Subclass:** Plaintiffs additionally seek to represent a subclass

defined as follows:

> All persons who, as a result of a calculation error in Defendant's loss mitigation decision process, paid or are paying fees or interest greater than what they would have paid or have been paying if not for the calculation error.

229. **The California Subclass.** Plaintiffs Curry, B. Liggett and K. Liggett additionally seek to

represent a subclass defined as follows:

> All persons in California, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) either were denied a temporary or permanent loss mitigation option by Defendant due to a calculation error in Defendant's loss mitigation decision process, or received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

230. **The Illinois Subclass.** Plaintiffs Nelson, L. Peterson, and M. Peterson additionally seeks

to represent a subclass defined as follows:

> All persons in Illinois, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) either were denied a temporary or permanent loss mitigation option by Defendant due to a calculation error in Defendant's loss mitigation decision process, or received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's

loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

231. **The Pennsylvania Subclass**. Plaintiff Risconsin additionally seeks to represent a subclass defined as follows:

All persons in Pennsylvania, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) either were denied a temporary or permanent loss mitigation option by Defendant due to a calculation error in Defendant's loss mitigation decision process, or received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

232. **The North Carolina Subclass.** Plaintiff Kea additionally seeks to represent a subclass defined as follows:

All persons in North Carolina, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) either were denied a temporary or permanent loss mitigation option by Defendant due to a calculation error in Defendant's loss mitigation decision process, or received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

233. **The New York Subclass.** Plaintiff Ferguson additionally seeks to represent a subclass defined as follows:

All persons in New York as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) either were denied a temporary or permanent loss mitigation option from Defendant due to a calculation error in Defendant's loss mitigation decision process, or received a temporary or permanent loss mitigation option by Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

234. **The Washington, DC Subclass.** Plaintiff Forney additionally seeks to represent a subclass defined as follows:

> All persons in Washington, DC, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) either were denied a temporary or permanent loss mitigation option from Defendant due to a calculation error in Defendant's loss mitigation decision process, or received a temporary or permanent loss mitigation option by Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

235. Excluded from the Class and Subclasses are (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

236. Plaintiffs hereby reserve the rights to amend or modify the Class and Subclass definitions with greater specificity or division after having had an opportunity to conduct discovery.

237. **Numerosity.** The members of the Class and Subclasses are so numerous that joinder of all members is impractical as the Class and Subclass are estimated, based upon the Hernandez case and Ryder case to consist of hundreds, if not thousands of borrowers. Class members can easily be identified through Defendant's records, or by other means. A class action is the only feasible method of adjudicating the rights of all affected debtors, and absent allowance of a certification of a class action, a failure of justice will result. The number of putative Class and Subclass members can be readily

ascertained by a review of Defendant's records. Using this information, Class and Subclass members can be identified and ascertained for the purpose of providing notice and ultimate relief.

238. **Commonality and Predominance**. This action involves common questions of law and fact that predominate over any questions affecting individual Class and Subclass members. These common questions are appropriate for class certification because the resolution thereof would substantially advance the disposition of this matter and each party's interests herein. These common questions include:

    a. What calculation and related errors occurred in Defendant's loss mitigation underwriting tool and/or related software since 2008.

    b. What were Defendant's common policies and practices regarding its oversight, inspection, auditing, testing, review, repair, and control of automated loss mitigation tools and related software since 2008.

    c. What were Defendant's common policies and practices regarding the inspection, verification, and reporting of negative information to credit reporting agencies since 2008.

    d. What were Defendant's common policies and practices regarding rescinding or correcting negative information that was erroneously reported to credit reporting agencies since 2008.

    e. How and when did Defendant discover errors in its automated loss mitigation tools and related software.

    f. What actions and/or disclosures did Defendant take and/or make each time it discovered errors in its automated loss mitigation tools and related software.

g. When was Defendant on notice of the risk of errors in its automated loss mitigation tools due to inadequate oversight, auditing, and testing compliance mechanisms.

h. Did Defendant ever undertake any effort to correct its erroneous reporting to credit reporting agencies.

i. Did Defendant owe contractual obligations to Class members by failing to approve them for loss mitigation options for which they were qualified pursuant to the requirements of government sponsored enterprises, the FHA, HAMP, or for private investors.

j. Did Defendant breach those contractual obligations.

k. Was Defendant's conduct extreme and outrageous.

l. Did Defendant intentionally, with substantial certainty, or with reckless indifference cause serious emotional harm to members of the Class.

m. Did Defendant conceal or misrepresent to members of the Class its automated calculation errors and/or their entitlement to loss mitigation options.

n. Was any such concealment or misrepresentation material to Class members' loss mitigation options.

o. Did Defendant conceal or misrepresent material facts with knowledge of the fact's materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity.

p. Was the Class members' property in active foreclosure at the time of the calculation error.

q. Was the mortgage held by Wells Fargo paid in full by the Class member following an application for loss mitigation being denied due to the calculation error.

r. Was the mortgage held by Wells Fargo service transferred and then had foreclosure initiated against the Class member within twelve months of the service transfer following an application for loss mitigation being denied due to the calculation error.

s. Was the mortgage held by Wells Fargo satisfied via short sale proceeds from the Class member following an application for loss mitigation being denied due to the calculation error.

t. Was the Class members' mortgage subsequently modified by Wells Fargo following an application for loss mitigation being denied due to the calculation error.

u. Whether Plaintiffs, Class and Subclass members were injured and suffered damages or other losses because of Defendant's actions as described herein.

v. Whether Plaintiff, Class, and Subclass members are entitled to damages, and the measure and amount of those damages.

239. **Typicality**. Each of the Plaintiffs' claims are typical of those of other Class and Subclass members. Plaintiffs were each a borrower who owned residential real property with a residential mortgage loan that was owned and/or serviced by Wells Fargo since 2008. Each of the Plaintiffs' loans entered loss mitigation review between from 2008 to the present. Each of the Plaintiffs' loans qualified for a loss mitigation option between 2008 and the present. Defendant improperly denied each of the Plaintiffs' loss mitigation reviews for a loss mitigation option, or improperly added unwarranted amounts to the payments, or the balances due and owing, for such loss mitigation options between 2008 and 2018 due to automated calculation and related errors pertaining to Defendant's use of a loss mitigation and underwriting tool. Each of the Plaintiffs received the December 2023 through 2024 Apology Letters from Defendant. As such each of the Plaintiffs' claims arise from the same factual

circumstances as the claims of other Class members, their damages and injuries are akin to those of other Class members, and Plaintiffs are each seeking relief consistent with the relief sought by the Class.

240. **Adequacy**. Each of the Plaintiffs are an adequate representative because each one of them is a member of the Class that they seek to represent, are committed to pursuing this matter against Defendant to obtain relief for the Class, and have no conflicts of interest with the Class. Moreover, Plaintiffs' attorneys are competent and experienced in litigating class actions such as this one. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect Class members' interests.

241. **Superiority**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively modest compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

242. Additionally, Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(c)(4), on behalf of the Class, with respect to the following issues:

      a. Whether calculation and related errors occurred in Defendant's loss mitigation underwriting tool and/or related software since 2008.

a. Whether Defendant had common policies and practices regarding its oversight, inspection, auditing, testing, review, repair, and control of automated loss mitigation tools and related software since 2008.

b. Whether Defendant had common policies and practices regarding the inspection, verification, and reporting of negative information to credit reporting agencies since 2008.

c. Whether Defendant had common policies and practices regarding rescinding or correcting negative information that was erroneously reported to credit reporting agencies since 2008.

d. When did Defendant discover errors in its automated loss mitigation tools and related software.

e. Whether Defendant failed to take any actions and/or make any disclosures each time it discovered errors in its automated loss mitigation tools and related software.

f. When was Defendant on notice of the risk of errors in its automated loss mitigation tools due to inadequate oversight, auditing, and testing compliance mechanisms.

g. Whether Defendant undertook any effort to correct its erroneous reporting to credit reporting agencies.

h. Whether Defendant owed contractual obligations to Class members by failing to approve them for loss mitigation options for which they were qualified pursuant to the requirements of government sponsored enterprises, the FHA, HAMP, or for private investors.

i. Whether Defendant breached those contractual obligations.

j. Whether Defendant's conduct was extreme and outrageous.

k. Whether Defendant intentionally, with substantial certainty, or with reckless indifference cause serious emotional harm to members of the Class.

l. Whether Defendant concealed or misrepresented to members of the Class its automated calculation errors and/or their entitlement to loss mitigation options.

m. Whether any such concealment or misrepresentation was material to Class members' loss mitigation options.

n. Whether Defendant concealed or misrepresented material facts with knowledge of the fact's materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity.

o. Whether the Class members' property was in active foreclosure at the time of the calculation error.

p. Whether the mortgage held by Wells Fargo was paid in full by the Class member following an application for loss mitigation being denied due to the calculation error.

q. Whether the mortgage held by Wells Fargo was service transferred and then had foreclosure initiated against the Class member within twelve months of the service transfer following an application for loss mitigation being denied due to the calculation error.

r. Whether the mortgage held by Wells Fargo was satisfied via short sale proceeds from the Class member following an application for loss mitigation being denied due to the calculation error.

s. Whether the Class members' mortgage was subsequently modified by Wells Fargo following an application for loss mitigation being denied due to the calculation error.

t.  Whether Plaintiffs, Class and Subclass members were injured and suffered damages or other losses because of Defendant's actions as described herein.

u.  Whether Plaintiff, Class, and Subclass members are entitled to damages.

## TOLLING ALLEGATIONS FOR ALL CLAIMS

243.  The causes of actions alleged herein by Plaintiffs and Class members against Defendant did not accrue or were tolled until Plaintiffs and Class members discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to their legal claims. Based upon the allegations contained herein the earliest any of the Plaintiffs or Class members could have learned of their claims was December 5, 2023.

244.  Based upon the allegations contained herein, Plaintiffs and Class members had no realistic possibility, until receiving the Apology Letters, to know that they qualified for a loss mitigation option, and they either (a) were wrongfully denied for a loss mitigation option based on a miscalculation made by Defendant's automated decision-making tool that was exclusively under the control of Defendant at all times (as it remains), and were wrongfully foreclosed upon, or (b) received loss mitigation options with (i) additional unwarranted amounts improperly added to the payments due thereunder, or (ii) improperly increased balances due and owing thereunder.

245.  Based upon the allegations contained herein, Plaintiffs and Class members had no realistic ability to discover any facts only known to Defendant regarding the wrongful denial of loss mitigation options, or miscalculation of increased amounts due and owing for the loss mitigation options, sought between 2008 and 2018. Defendant's automated decision-making tool is not public. The mathematical calculations used to determine eligibility for any loss mitigation option depend solely on variables within Defendant's exclusive control or information provided exclusively to Defendant. The mathematical

calculations used to calculate the amounts due and owing for the loss mitigation options depend solely on variables within Defendant's exclusive control or information provided exclusively to Defendant.

246. Based on the foregoing, any applicable statutes of limitations are also tolled by Defendant's knowing, active, and ongoing concealment of the facts alleged herein. Defendant discovered at least one, if not multiple, software errors no later than August 2013 which contributed to the wrongful denial of loss mitigation options to the Plaintiffs and Class members, and which contributed to the approval of loss mitigation options to Plaintiffs and Class members with improperly inflated amounts due and owing. Based on the allegations contained herein, and each 10-Q issued by Wells Fargo & Company since August 2018, Defendant deliberately concealed any information regarding the wrongful loss mitigation determinations and calculations until September 13, 2018.

247. Defendant has a continuous duty to disclose the truth to Plaintiffs and Class members and, based upon the actions herein, Plaintiffs and Class members reasonably relied on Defendant's ongoing concealment until taking the actions to procure discovery described herein.

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT
**(Brought on behalf of the Plaintiffs, Class and Subclasses)**

248. Plaintiffs incorporate by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

249. When Plaintiffs and Class members financed their homes, they entered into Security Instruments (typically referred to as either a mortgage, deed or trust or security deed) that set forth the conditions under which the lender could accelerate the borrower's payments and foreclosure on the property.

250.   The Security Instruments also set forth conditions on the circumstances and conditions for imposing fees, charges or other amounts, including default servicing fees, attorneys' fees, and escrow items, as well as limitations on them, notably, that such fees, charges, and amounts must be for service actually performed or amounts actually incurred to protect Defendant's or other assignees' interests.[10],[11] All Plaintiffs and Class members with loans secured by Fannie Mae, Freddie Mac, VA, or FHA use uniform Security Instruments that contain substantially similar provisions restricting loan fees and charges to amounts for services actually performed or amounts actually incurred to protect the interests of Defendant or other assignees.

251.   Defendant breached these contractual terms by denying Plaintiffs' and Class members' applications for loss mitigation options or, if approved, miscalculating the amounts due and owing for approved loss mitigation options, based upon faulty automated calculations in determining the trial plan payments and/or permanent loss mitigation option payments. These faulty calculations included charges and amounts for fees, charges or other amounts, including default servicing fees, attorneys' fees, and

---

[10] All loans purchased by Fannie Mae or Freddie Mac must utilize Uniform Instruments provided by such entities. For example, Form 3036 identified as "OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS" contains the following provision: "14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under the Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees...Lender may not charge fees that are expressly prohibited by the Security Instrument or Applicable Law." Loans backed by the U.S. Department of Veterans Affairs ("VA") also utilize these same Uniform Instruments along with a VA Rider containing additional terms.

[11] All loans insured by the FHA must utilize uniform prescribed instruments approved by HUD. For example, FHA Open-End Mortgage with MERS-OH, Form 4/96 Amended 1/02, contains the following provisions:

- "If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2."
- "8. Fees. Lender may collect fees and charges authorized by the Secretary [of Housing and Urban Development]."

escrow items, that were not for service actually performed or amounts actually incurred to protect Defendant's or other assignees' interests.

252. Defendant, as explained *supra*, was required to abide by various servicing guidelines implemented by entities such as Fannie Mae,[12] Freddie Mac,[13] the Secretary of the Department of Housing and Urban Development (the "HUD Secretary"),[14] and the Secretary for the Department of Veterans Affairs (the "VA Secretary"),[15] which similarly set forth additional conditions on the circumstances and conditions for imposing fees, charges or other amounts, including default servicing

---

[12] Fannie Mae maintains a servicing guide accessible at https://servicing-guide.fanniemae.com/. This provides for explicit guidance and limitations on loss mitigation, as well as for recovery for expenses and fees incurred for default related services, including the reimbursement of legal fees. *See*, Servicing Guide, Part E. Fannie Mae maintains an exhibit to its Servicing Guide that prescribes maximum amounts allowable for recovery of attorneys' fees in relation to defaulted loans. *See*, Servicing Guide, Part E-5-04.

[13] Freddie Mac maintains a servicing guide accessible at https://guide.freddiemac.com/. This provides for explicit guidance and limitations on loss mitigation, as well as recovery for expenses and fees incurred for default related services, including the reimbursement of legal fees. *See*, *inter alia*, Servicing Guide, Series 9000, Topics 9200 and 9700.

[14] Plaintiffs' and Class members' Security Instruments for FHA loans contain contractual provisions expressly stating that the regulations of the HUD Secretary limit Defendant's or other assignees' rights to enforce the Security Instruments in the event of default, including prohibiting acceleration or foreclosure if not permitted by such regulations. *See*, for example, FHA Open-End Mortgage with MERS-OH, Form 4/96 Amended 1/02 at 9.(d): "(d) Regulations of HUD Secretary. In many circumstances, regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full or foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary." The FHA Single Family Housing Policy Handbook, SFH Handbook 4000.1, contains servicing guidelines that place limitations on servicers' actions. Beginning March 14, 2016, the SFH Handbook mandated express guidelines for the servicing of loans in default, as well as loss mitigation. *See*, SFH Handbook, I.A.2., published 6/24/2015.

[15] Plaintiffs' and Class members' Security Instruments for VA loans contain contractual provisions expressly stating that the regulations of the VA Secretary govern the rights, duties, and liabilities of the parties to such loans, and that any contractual provisions in the Security Instruments inconsistent with these regulations are amended and supplemented to conform thereto. The VA Handbook M26-4, Servicer Handbook, contains servicing guidelines that place limitations on servicers' actions. For example, on September 30, 2015, the VA issued "Circular 26-15-21 - Property Preservation Requirements and Fees" which placed maximum amounts that could be charged for services actually performed for inspection and maintenance of properties securing delinquent VA Loans. The VA has regularly prescribed other similar limitations on delinquency related fees and charges.

fees, attorneys' fees, and escrow items, as well as limitations on them, and limitations for such amounts that could be included in the evaluation for and calculation of loss mitigation options. Plaintiffs and Class members were intended third-party beneficiaries of these servicing guidelines and regulations and have contractual rights to enforce them. Plaintiffs and Class members are in the class of persons these guidelines and regulations were designed to protect.

253.  Defendant breached these servicing guidelines and regulations by denying Plaintiffs' and Class members' applications for loss mitigation options or, if approved, miscalculating the amounts due and owing for approved loss mitigation options, based upon faulty automated calculations in determining the trial plan payments and/or permanent loss mitigation option payments. These faulty calculations included charges and amounts for fees, charges or other amounts, including default servicing fees, attorneys' fees, and escrow items, that were in excess of the restrictions and limitations for imposing these charges contained in the servicing guidelines and regulations governing Plaintiffs' and Class members' loans.

254.  Wells Fargo was subject to the terms of these Security Instruments, either as the original lender, an assignee, and/or as the mortgage servicer authorized to act on behalf of the lender.

255.  A reasonable interpretation of the Security Instruments required Wells Fargo to provide Plaintiffs and Class members all available options to cure a default at the time a default existed under the terms of the Security Instrument.

256.  Implied in each of these Security Instruments was a duty of good faith and fair dealing, and the duty exists in relation to the performance of a specific contract term which, in this case, was the duty within the Security Instruments to provide Plaintiffs and Class members all available options to cure a default at the time a default existed under the terms of the Security Instrument.

257. Based on the allegations *supra*, Plaintiffs and each member of the Class provided documents, information, and certifications in compliance with the Security Instruments for Defendant to review for their eligibility for loss mitigation options.

258. As a result of receiving these documents from Plaintiffs and Class members, Wells Fargo was required under the terms of the Security Instruments to consider the Plaintiffs and Class members for a loss mitigation option and to provide that loss mitigation option, if appropriate.

259. Based on the allegations *supra*, Defendant reviewed each of the Plaintiffs and Class members for a loss mitigation option.

260. Based on the allegations *supra*, following the review for a loss mitigation option, Defendant either denied Plaintiffs' and Class members' applications for loss mitigation options or, if approved, miscalculated the amounts due and owing for approved loss mitigation options, based upon faulty automated calculations in determining the trial plan payments and/or permanent loss mitigation option payments. These faulty calculations included charges and amounts for fees, charges or other amounts, including default servicing fees, attorneys' fees, and escrow items, that were in excess of the restrictions and limitations for imposing these charges contained in the Security Agreements and/or the servicing guidelines and regulations governing Plaintiffs' and Class members' loans. By doing so, Defendant breached its duty of good faith and fair dealing to Plaintiffs and Class members under the Security Instruments.

261. By Defendant's own admissions in the Consent Order and the Apology Letters, had the automated calculations been correct, Plaintiffs and each of the Class members would have been approved for a loss mitigation option or, if approved, the loss mitigation calculations would have been correct and not inflated.

262.    Defendant's breach impacted Plaintiffs and Class members at a time when they were experiencing extreme hardship. As a result of the faulty automated calculation, Defendant incorrectly provided negative credit information to consumer reporting agencies. Plaintiffs and Class members were either not offered temporary or permanent loss mitigation options, or were offered less beneficial options. Ultimately, Plaintiffs and Class members were damaged by Defendant's breach.

263.    Defendant also breached its duties under the Security Instruments by failing to give Plaintiffs and Class members adequate notice of the mortgage modification.

264.    Defendant discovered its automated calculation errors starting in 2013. Defendant failed to disclose the errors to the public until August 3, 2018, and failed to disclose the errors to individuals they affected until September 2018. Despite admitting its errors and that its errors caused Plaintiffs and Class members to suffer significant harm, Defendant did nothing for several years to mitigate the harm it caused to Plaintiffs and Class members, keeping the accounting errors a secret. On information and belief, after discovering its automated calculation errors, Defendant continued to fail to offer loss mitigation options to Plaintiffs and Class members or, if approved, the loss mitigation options were based on erroneous calculations. By doing so, Defendant breached the duty of good faith and fair dealing it owed to Plaintiffs and Class members.

265.    All of the breaches alleged in this Count additionally demonstrate at least one, if not, multiple, breaches of the implied duty of good faith and fair dealing that Wells Fargo had under the Security Instruments to the Plaintiffs and Class members.

266.    Plaintiffs and members of the Class were injured by Defendant's breach of the Security Instruments, and they suffered damages. In sending Apology Letters to Plaintiffs and Class members, Defendant admitted the breach; the only question that remains, therefore, is the amount of damages, which is to be proven at trial.

## COUNT TWO
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Brought on behalf of the Plaintiffs, Class and Subclasses)

267. Plaintiffs incorporate by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

268. As alleged in this complaint, Defendant engaged in extreme and outrageous conduct. It repeatedly failed to oversee, audit, and test its servicing, loss mitigation, and foreclosure practices, including its automated calculation software. It then used that automated calculation software to make automated decisions about offering loss mitigation options, and whether or not its customers could keep their family homes. As a result of repeated federal investigations, fines, and consent cease and desist orders, Defendant was on notice of its own deficient, unsafe, and unsound practices. Yet, it allowed material errors in its software to persist for years, affecting hundreds of borrowers and causing the unnecessary foreclosure of hundreds of homes and the continued collection of inflated amounts of money from Plaintiffs and Class members.

269. Despite discovering its automated calculation error in 2013, Defendant concealed its errors from government regulators and the public until 2018, when it was subjected to yet another consent cease and desist order. As the Federal Reserve determined, Defendant prioritized profits and growth over compliance.

270. As set forth above, Defendant knowingly and intentionally directed its misconduct towards Plaintiffs and Class members, with an intent to mislead them and conceal material facts from them, by engaging in the foregoing misconduct.

271. As a result of Defendant's long-term actions and inactions, Plaintiffs and Class members suffered severe emotional distress. Defendant knew that Plaintiffs and Class members would suffer severe emotional distress from its misconduct, as the potential loss of a person's home is a devastating

event that leads to severe emotional distress. "Research has shown that being in foreclosure can lead to high rates of depression, anxiety and other mental health challenges. A meta-analysis conducted in 2015 of 35 studies about foreclosure, health and mental health found that 91% of studies concluded that foreclosure had adverse effects on health or mental health."[16] Defendant knew this because Defendant is in the business of loan servicing, but Defendant disregarded this known harm and continued to wrongfully use its erroneous automated calculations in loss mitigation options nevertheless.

272. Contemporaneously with Defendant receiving billions of dollars in HAMP funds from the U.S. Government, Defendant systematically injured Plaintiffs and Class members through loss mitigation denials or, if approved, the loss mitigation options were based on erroneous calculations, stemming from Defendant's heartless cover ups and known and yet unmitigated errors.

273. Defendant knew or should have known that by denying Plaintiffs and Class members a loss mitigation option or, if approved, the loss mitigation options were based on erroneous calculations, its conduct would result in serious emotional distress to Plaintiffs and the other Class members, as the loss or potential loss of a home is an emotionally significant event.

274. Defendant's disregard for such emotional distress was beyond all possible bounds of decency and completely intolerable in a civilized community. Each Plaintiff and Class member suffered severe emotional distress and anxiety as a proximate result of Defendant's misconduct.

275. The U.S. Government's creation of HAMP and other loss mitigation programs show that it intended for no person in a situation similar to Plaintiffs and Class members to have to endure what Defendant forced Plaintiffs and Class members to endure.

---

[16] https://bluehubcapital.org/foreclosure-relief/sun-blog/hidden-mental-health-toll-foreclosure#:~:text=Research%20has%20shown%20that%20being,on%20health%20or%20mental%20health. (last visited Jan. 8. 2025)

276.    Defendant's conduct was intentional and evidences a callous disregard for the rights of its customers and for the risk its actions posed to its customers.

277.    Defendant's intentional extreme and outrageous conduct proximately caused Plaintiffs and Class members to suffer emotional distress and damages, in an amount to be proven at trial.

**COUNT THREE**
**NEGLIGENT REPORTING**
**(Brought on behalf of the Plaintiffs, Class and Subclasses)**

278.    Plaintiffs incorporate by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

279.    Defendant had an obligation to ensure that the information and statements it reported to credit reporting agencies were true and accurate. Defendant had a duty to Plaintiffs and Class members to report fair, honest, and accurate information to the credit reporting agencies.

280.    Defendant made statements to the credit reporting agencies regarding the Plaintiffs' and Class members that were derogatory to their credit. The negative and derogatory information reported by Defendant to the credit reporting agencies was that the Plaintiffs and Class members had experienced a foreclosure or other negative event related to their mortgages.

281.    When Defendant made these negative and derogatory statements about Plaintiffs and Class members, it knew or should have known that the statements were false and/or inaccurate, based upon Defendant's own miscalculations.

282.    The reporting of a negative event related to a mortgage has a serious detrimental effect on credit. The reporting of a foreclosure is taken as an indication of poor creditworthiness. The reporting of a foreclosure or other negative event related to a mortgage reduces one's credit score between 85 to as much as 160 points.

283. Defendant's reporting of a negative event related to a mortgage against the Plaintiffs and Class members had a serious and detrimental effect upon their credit and creditworthiness. Defendant's reporting of a negative event related to a mortgage against Plaintiffs and Class members reduced their credit scores substantially.

284. The effect of Defendant's reporting of a negative event related to a mortgage against the Plaintiffs and members of the Class was not transitory. Upon information and belief, certain negative events related to a mortgage remain on a consumer's credit report for seven years. Defendant's reporting of a negative event related to a mortgage against the Plaintiffs and the members of the Class therefore resulted in long-term damage to their credit, creditworthiness, and credit scores.

285. Defendant's reporting of a negative event related to a mortgage regarding Plaintiffs and Class members was untrue or, in the least, requiring additional information so as to make the reporting of a negative event related to a mortgage not misleading. The communication of a negative event related to a mortgage created a false impression that would be contradicted by the inclusion of omitted facts.

286. Defendant concedes that the negative event related to a mortgage was not correct and that, at the least, Plaintiffs and Class members should have been approved for a loss mitigation option that could have avoided a negative event related to a mortgage. Therefore, the reporting of a negative event related to a mortgage was false or at least gave a misleading impression that would have been contradicted by including the omitted facts of the circumstances of the negative event related to a mortgage.

287. Defendant wrote to Plaintiffs and Class members as follows, showing the untrue and misleading nature of the reporting of a negative event related to a mortgage: "We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been." As set forth herein, Defendant admits it erred.

288.   Defendant's reporting of a negative event related to a mortgage was reckless, or at least negligent, at the time that it was made and, upon information and belief, the reporting of a negative event related to a mortgage was knowingly false not later than 2013. Yet, Defendant failed to take any action to correct its false statements and allowed reports of a negative event related to a mortgage that it knew to be false to tarnish the credit of Plaintiffs and Class members for years.

289.   Upon information and belief, Defendant knew or should have known that there were flaws in its loss mitigation application software as early as 2011 and before the time it foreclosed upon or initiated other negative events related to a mortgage on the homes of Plaintiffs and Class members. Defendant thereby acted recklessly and maliciously.

290.   As set forth herein, the OCC and the Board of Governors of the Federal Reserve warned Defendant and its parent company in 2011 that, *inter alia*, Wells Fargo was engaged in "unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings." The Comptroller advised Wells Fargo that it had failed to devote sufficient resources to the administration of its foreclosure processes, failed to perform adequate oversight, risk management, and audit of those processes, and failed to adequately oversee third-party vendors. The Comptroller, furthermore, specifically required the implementation of "processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the underlying mortgage note" and applicable legal requirements. Therefore, by the time of the negative event related to a mortgage of the homes of Plaintiffs and Class members, Defendant was on notice to correct deficiencies with respect to the calculation of fees charged to borrowers and its failure to do so was reckless and therefore malicious.

291.   Furthermore, upon information and belief, Defendant knew that there were flaws in its mortgage loss mitigation application software as early as 2013, which specifically resulted in the sort of

erroneous denials of loss mitigation options at issue in this case. As set forth herein, Defendant's internal documents show that the software error resulting in the claims in this case was reported to Defendant and known within the organization no later than 2013. Upon information and belief, Defendant therefore knew or should have known that it had wrongly denied applications for loss mitigation options by that time.

292. Once Defendant knew or should have known that it had wrongly denied applications for loss mitigation options, Defendant's report of the Plaintiffs' and Class members' negative events related to a mortgage to credit reporting agencies was not only recklessly untrue, but willfully so. At that point, Defendant was required to disclose information or to make corrective statements in order to make the previous statements that Plaintiffs and Class members had been subject to negative events related to a mortgage not misleading.

293. Therefore, Defendant's statements to credit reporting agencies with respect to the negative event related to a mortgage of Plaintiffs and Class members were both recklessly malicious at the time they were made, and willfully malicious once Defendant knew or should have known that it had wrongly denied applications for loss mitigation options. Defendant's report that Plaintiffs and Class members had experienced negative events related to a mortgage was thus a communication made with malicious and/or willful intent not subject to preemption by the Fair Credit Reporting Act.

294. Further, Defendant willfully, or at least recklessly, failed to correct its statements regarding Plaintiffs and Class members, and to correct the wrong information that it had provided to the credit reporting agencies. It did this with the knowledge of the serious impacts this inaction would have on Plaintiffs and Class members.

295. Plaintiffs and Class members were left to deal with a negative event related to a mortgage on their credit report, that they would have to explain to future mortgage lenders for the rest of their

lives, because they were not offered a loss mitigation option due to Defendant's misconduct, which is a serious derogatory credit item which caused Plaintiffs and Class members damage.

296.    As a result of Defendant's statements affecting their credit, Plaintiffs and Class members suffered damages in an amount subject to proof, including loss of time and money spent in efforts to repair their credit; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher costs of borrowing.

<u>**COUNT FOUR**</u>
**NEGLIGENT UNDERTAKING OF LOAN MODIFICATION**
**(Brought on behalf of the Plaintiffs, Class and Subclasses)**

297.    Plaintiffs incorporate by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

298.    Defendant, as part of its loan servicing responsibilities, also provides loan modifications to its customers who are having difficulties meeting their loan obligations.

299.    In an attempt to minimize foreclosures and assist struggling homeowners, Defendant, in accordance with HAMP and other loan modification programs, considered Plaintiffs and Class members for loan modifications.

300.    Defendant voluntarily engaged with Plaintiffs and Class members to determine whether mortgage loans in distress could be modified.

301.    Defendant contacted Plaintiffs and Class members to determine their eligibility for a loan modification.

302.    Defendant represented to Plaintiffs and Class members that it would determine each Plaintiff's and Class member's eligibility for a loan modification.

303.    Defendant represented to Plaintiffs and Class members that it would determine each Plaintiffs and Class members' eligibility for a loan modification.

304. Defendant agreed to modify Plaintiffs' and Class members' loans if they were eligible in accordance with HAMP, Department of Treasury directives, FHA regulations, and binding GSE guidelines.

305. Defendant voluntarily undertook a duty to Plaintiff and Class members to accurately represent whether Plaintiff and Class members were eligible for a loan modification.

306. Defendant voluntarily undertook a duty to consider the loan modifications in accordance with the above federal and state regulations as well as its own policies.

307. Defendant utilized proprietary software to determine Plaintiffs' and Class members' eligibility, rather than a personalized review of each person's file.

308. Defendant ultimately rejected Plaintiffs' and Class members' loan modifications or, when not rejected, imposed loan modifications that disadvantaged Plaintiffs and Class members.

309. Defendant has admitted to Plaintiffs and Class members that their loan modifications were inaccurate, misleading, and not done in accordance with the above federal and state statutes, guidelines, and regulations, or its own policies.

310. Defendant's failure to accurately represent to Plaintiffs and Class members their eligibility for a loan modification is due, at least in part, to Defendant's utilization of faulty proprietary software to determine Plaintiffs' and Class members' eligibility, rather than a personalized review of each person's file.

311. Defendant, in considering Plaintiffs' and Class members' loan modifications and failing to accurately represent Plaintiffs' and Class members' eligibility, did not meet industry standards.

312. Additionally, Defendant had a legal duty to offer Plaintiffs and Class members loss mitigation options pursuant to its participation in the HAMP Program as well as under its various servicing agreements.

313. Defendant was negligent, reckless, and acted with willful disregard for Plaintiffs' and Class members' rights by:

    a.   Failing to properly consider whether Plaintiffs and Class members were entitled to a loan modification;

    b.   Failing to provide accurate loan modification assistance to Plaintiffs and Class members;

    c.   Failing to oversee its procedures to ensure loan modifications were considered properly;

    d.   Failing to draft appropriate policies to ensure loan modification applications were considered properly;

    e.   Failing to ensure all models and programming utilized to assist in loan modifications were accurately utilized and functioning properly;

    f.   Failing to develop and audit its software to ensure loan modifications were considered properly;

    g.   Failing to oversee its employees to determine whether its policies were implemented appropriately to consider loan modifications;

    h.   Failing to train employees to consider loan modifications;

    i.   Failing to audit and review loan modification applications to ensure compliance with its policies and federal and state statutes, guidelines, and regulations;

    j.   Failing to accurately consider loan modifications for Plaintiffs and Class members when it undertook the obligation to do so; and

    k.   Failing to correct calculation errors in Plaintiffs' and Class members' loan applications.

314. As a result of Defendant's negligence, recklessness, and willful disregard for Plaintiffs' and Class members' rights, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

## COUNT FIVE
### VIOLATIONS OF THE CALIFORNIA HOMEOWNER BILL OF RIGHTS
**(Brought on behalf of Plaintiffs Curry, B. Liggett and T. Liggett
and the California Subclass)**

315.    Plaintiffs Curry, B. Liggett and T. Liggett incorporate by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

316.    Plaintiffs Curry, B. Liggett and T. Liggett bring this claim for relief on behalf of themselves and the California Subclass.

317.    Under the California Homeowner Bill of Rights, Wells Fargo had an obligation to ensure that competent and reliable evidence, including the borrower's loan status and information, supported its right to foreclose before it filed a notice of default or notice or sale in connection with the foreclosure of the real property of Plaintiffs Curry, B. Liggett and T. Liggett and the California Subclass members. Cal. Civ. Code § 2924.17.

318.    Wells Fargo materially and recklessly violated its obligation because Plaintiffs Curry, B. Liggett and T. Liggett's loan information and the California Subclass members' loan information did not support Wells Fargo's right to foreclose. By Wells Fargo's own admissions in the Consent Order and Apology Letters, Plaintiffs Curry, B. Liggett and T. Liggett's loan information and the California Subclass members' loan information showed that they qualified for a loss mitigation option. Wells Fargo was therefore required to offer Plaintiffs Curry, B. Liggett and T. Liggett and California Subclass members the opportunity to cure their default by accepting a loss mitigation option before it could exercise its right to foreclose the Security Instruments of the loans of Plaintiffs Curry, B. Liggett and T. Liggett and California Subclass members.

319.    The software that Wells Fargo used to wrongly determine that Plaintiffs Curry, B. Liggett and T. Liggett and California Subclass members did not qualify for a loss mitigation option and/or the

loss mitigation option was miscalculated was not reliable and Wells Fargo was reckless in using the software and relying upon it to support its right to foreclose. The software's results had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for at least five to eight years, if not longer. Wells Fargo willfully and recklessly continued to rely on its software even after (i) the federal government cited it for failing to adequately audit its loss mitigation and foreclosure procedures, (ii) the federal government found a software error had led Wells Fargo to wrongfully deny loss mitigation options in 2013-2014, and (iii) Wells Fargo discovered another software error that caused it to wrongly deny loss mitigation options in 2015.

320. Defendant was negligent, reckless, and acted with willful disregard for Plaintiffs' and Class members' rights by:

    a. Failing to properly consider whether Plaintiffs and Class members were entitled to a loan modification;

    b. Failing to provide accurate loan modification assistance to Plaintiffs and Class members;

    c. Failing to oversee its procedures to ensure loan modifications were considered properly;

    d. Failing to draft appropriate policies to ensure loan modification applications were considered properly;

    e. Failing to ensure all models and programming utilized to assist in loan modifications were accurately utilized and functioning properly;

    f. Failing to develop and audit its software to ensure loan modifications were considered properly;

    g. Failing to oversee its employees to determine whether its policies were implemented appropriately to consider loan modifications;

    h. Failing to train employees to consider loan modifications;

    i. Failing to audit and review loan modification applications to ensure compliance with its policies and federal and state statutes, guidelines, and regulations;

j. Failing to accurately consider loan modifications for Plaintiffs and Class members when it undertook the obligation to do so; and

k. Failing to correct calculation errors in Plaintiffs' and Class members' loan applications.

321. As a result of Wells Fargo's violation of the Homeowner Bill of Rights, Plaintiffs Curry, B. Liggett and T. Liggett and California Subclass members suffered damages according to proof, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit.

322. Pursuant to California Civil Code section 2924.19(b), Plaintiffs Curry, B. Liggett and T. Liggett and each member of the California Subclass seeks an award of treble actual damages or statutory damages of $50,000, whichever is greater.

**COUNT SIX**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Brought on behalf of the Plaintiffs and Class)**

323. Plaintiffs incorporate by reference all other allegations of paragraphs 1-322 as if fully restated herein.

324. Wells Fargo has violated and continues to violate the California Unfair Competition Law ("UCL"), Cal. Bus. and Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, or fraudulent practices.

325. Plaintiffs bring this claim on behalf of themselves and the Class. The UCL permits claims by out-of-state Plaintiffs against conduct occurring in California. *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 224–225 (1999).

326. Defendant's parent company, Wells Fargo & Company ("WF&Co.") engages in substantial sales and marketing activities in California.

327. Upon information and belief, Defendant's actions and omissions that give rise to this litigation were conceived, designed, facilitated, instigated, overseen, managed, and coordinated by WF&Co.'s leadership in California, and Defendant's uniform conduct at issue in this case emanated from WF&Co. in California, as evidenced by, *inter alia*, the following:

    a. The OCC and the Board of Governors of the Federal Reserve warned Defendant and *its parent company*, WF&Co., in 2011 that, *inter alia*, Wells Fargo was engaged in "unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings."

    b. In 2015, the OCC again determined that, despite the 2011 consent cease and desist orders, Defendant continued to fail to adequately oversee, audit, and test its servicing, modification, and foreclosure practices for compliance. As a result, the OCC assessed millions of dollars in monetary penalties against *Defendant's parent company*, WF&Co.

    c. Defendant's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced through a formal Cease and Desist Letter that it would prohibit *Defendant's parent company*, WF&Co., from expanding its business until it sufficiently improved its governance and controls.

328. Defendant's conduct at issue in this case that, upon information and belief, emanated from WF&Co. in California harmed all Plaintiffs and Class members (including citizens and non-citizens of the State of California) in the same way, such that California law applies to Plaintiffs' and Class

members' claims. California has a substantial interest that its laws be applied to Defendant's (and its parent company's) conduct alleged herein that substantially outweighs any interests of other states.

329.    In the alternative, should the Court determine that out-of-state Plaintiffs cannot maintain this claim against Defendant, Plaintiffs Curry, B. Liggett and T. Liggett bring this claim for relief on behalf of themselves and the California Subclass.

### *"Deceptive" Prong*

330.    An omission is "deceptive" and actionable under the UCL if it is an omission of a fact that the defendant was obliged to disclose.

331.    Defendant was obligated to timely disclose the extent of the "error" committed as to the modification and/or mortgage loan accounts of Plaintiffs and Class members. Defendant failed to do so.

332.    Furthermore, when Defendant eventually disclosed an error, Defendant revealed only half-truths and hid the true nature and basis for the error.

333.    Through its deceptive practices, Defendant improperly denied loan modifications or, if approved, improperly charged inflated amounts and inflated balances due based on automated calculation errors, and retained sums which, in all fairness, should have been disgorged and returned to Plaintiffs and Class members.

334.    Defendant has and will continue to surreptitiously commit undisclosed and undescribed errors (and/or overcharge consumers) in connection with loan modifications, and fail to provide an adequate remedy to those harmed by such business practices. Consequently, the practices of Defendant constitute deceptive business practices within the meaning of the UCL.

335.    Pursuant to the UCL, Plaintiffs and Class members are entitled to preliminary and permanent injunctive relief to order that Defendant cease this deceptive conduct, as well as disgorgement

and restitution to Plaintiffs and Class members of all the revenues associated with this deceptive conduct, or such portion of said revenues as the Court may find applicable.

336. Without a prospective injunction, Plaintiffs and Class members cannot be confident that Defendant will correct its policies and practices and provide adequate relief. Plaintiffs and Class members have suffered concrete and particularized legal harm as a result of Defendant's conduct. There is a sufficient likelihood that they will again be wronged in a similar way, as Defendant failed to provide any accounting to justify the amounts Defendant offered to them in connection with the Apology Letters and, absent a Court order, there is nothing preventing Defendant from continuing to misapply mortgage payments of Plaintiffs and Class members in the future, or otherwise commit undisclosed errors which will result in harm to Plaintiffs and Class members.

337. Plaintiffs and Class members are also entitled to, and seek, public injunctive relief.

### *"Unfair" Prong*

338. A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

339. Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant intentionally and knowingly committed errors in connection with the modification and/or mortgage loan accounts of Plaintiffs and Class members, without their knowledge or consent, and has failed to offer a proper remedy. Wells Fargo further engaged in unfair practices by failing to properly verify or audit the automated software it used to determine whether Plaintiffs and Class members were eligible for a loss mitigation option and/or whether the loss mitigation options were miscalculated. Wells Fargo's faulty verification and auditing practices allowed multiple systemic errors to remain uncorrected

for at least ten years, and persisted even after (i) the federal government cited Wells Fargo for failing to adequately audit its loss mitigation and foreclosure processes, (ii) the federal government found a software error had led Wells Fargo to wrongfully deny mortgage modifications in 2013-2014, and (iii) Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

340.  Through its unfair practices, Defendant improperly denied loan modifications or, if approved, improperly charged inflated amounts and inflated balances due based on automated calculation errors, and retained sums which, in all fairness, should have been disgorged and returned to Plaintiffs and Class members.

341.  The harm to Plaintiffs and Class members grossly outweighs the utility of Defendant's practices, as there is no utility to Defendant's unfair practices.

342.  Defendant has and will continue to surreptitiously commit undisclosed and undescribed errors (and/or overcharge consumers) in connection with loan modifications, and fail to provide an adequate remedy to those harmed by such business practices. Consequently, the practices of Defendant constitute unfair and unlawful business practices within the meaning of the UCL.

343.  Pursuant to the UCL, Plaintiffs and Class members are entitled to preliminary and permanent injunctive relief to order that Defendant cease this unfair and unlawful conduct, as well as disgorgement and restitution to Plaintiffs and Class members of all the revenues associated with this unfair and unlawful conduct, or such portion of said revenues as the Court may find applicable.

344.  Without a prospective injunction, Plaintiffs and Class members cannot be confident that Defendant will correct its policies and practices and provide adequate relief. Plaintiffs and Class members have suffered concrete and particularized legal harm as a result of Defendant's conduct. There is a sufficient likelihood that they will again be wronged in a similar way, as Defendant failed to provide any accounting to justify the amounts Defendant offered to them in connection with the Apology Letters

and, absent a Court order, there is nothing preventing Defendant from continuing to misapply mortgage payments of Plaintiffs and Class members in the future, or otherwise commit undisclosed errors which will result in harm to Plaintiffs and Class members.

345.   Plaintiffs and Class members are also entitled to, and seek, public injunctive relief.

### *"Unlawful" Prong*

346.   By improperly denying loan modifications or, if approved, improperly charging inflated amounts and inflated balances due based on automated calculation errors, Defendant is liable for breach of contract, intentional infliction of emotional distress, negligence, and violations of HAMP and the California Homeowner Bill of Rights.

347.   Defendant's violations of these laws also constitute violations of the UCL, which provides a cause of action for an "unlawful" business act or practice perpetrated on consumers.

348.   As a result of Wells Fargo's violations, Plaintiffs and Class members have suffered injury in fact and lost money and property, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit; loss of money due to making improperly calculated higher payments; and loss of money due to paying improperly calculated higher balances due.

349.   Plaintiffs and Class members reserve the right to allege further conduct that constitutes other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

350.   Pursuant to Cal. Bus. and Prof. Code § 17203, Plaintiffs and Class members seek such orders or judgments as may be necessary to prevent Wells Fargo's future use of its unlawful practices,

and to restore to Plaintiffs and Class members any money or property that may have been acquired by means of Wells Fargo's unlawful conduct, as well as costs and attorneys' fees.

## COUNT SEVEN
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
#### (Brought on behalf of Plaintiffs Nelson, L. Peterson, and M. Peterson and the Illinois Subclass)

351. Plaintiffs Nelson, L. Peterson, and M. Peterson incorporate by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

352. Plaintiffs Nelson, L. Peterson, and M. Peterson bring this claim for relief on behalf of themselves and the Illinois Subclass.

353. The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act") provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception or fraud, false pretenses, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

354. At all times herein, Plaintiffs Nelson, L. Peterson, and M. Peterson and the Illinois Subclass members were a "consumer" as that term is defined by the Act. 815 ILCS 505/1(e).

355. At all times herein, Wells Fargo engaged in trade or commerce as those terms are defined in the Act. 815 ILCS 505/1(f).

356. Under the Act, there is no "intent to deceive" requirement; a plaintiff need only show that the defendant intended that the plaintiff rely on the (intentionally or unintentionally) deceptive information given. Thus, innocent misrepresentations are actionable under the Act. Further, the Act

provides redress "not only for deceptive business practices, but also for business practices that, while not deceptive, are unfair." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574–75 (7th Cir. 2012).

357.  Based on the allegations contained, *supra*, Wells Fargo engaged in unfair acts in its dealings with Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members in violation of law.

358.  Wells Fargo's conduct was directed at consumers generally.

359.  Wells Fargo's conduct needlessly caused consumers, including Plaintiffs Nelson, L. Peterson, and M. Peterson and the Illinois Subclass members, considerable economic damages including the loss of equity in their home, the loss of their home, moving expenses, time associated with loss mitigation efforts and court appearances and other forms of economic loss.

360.  Wells Fargo's conduct also needlessly caused Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members to suffer significant, life-altering, non-economic harm that has defined their lives for years.

361.  All the needless harms suffered by Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members are directly and proximately resulted from Wells Fargo's unfair acts and practices.

## COUNT EIGHT
### VIOLATIONS OF THE PENNSYLVANIA UNIFORM TRADE PRACTICES ACT
### (Brought on behalf of Plaintiff Risconsin and the Pennsylvania Subclass)

362.  Plaintiff Risconsin incorporates by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

363.  Plaintiff Risconsin brings this claim for relief on behalf of himself and the Pennsylvania Subclass.

364. The Pennsylvania Uniform Trade Practices Act (the "Act") provides:

Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 P.S. § 201-9-2.

365. At all times herein, Plaintiff Risconsin and the Pennsylvania Subclass members were a "person" as that term is defined by the Act. 73 P.S. § 201-2.

366. At all times herein, Plaintiff Risconsin and the Pennsylvania Subclass members were provided services and engaged in trade as defined in the Act. 73 P.S. § 201-2.

367. Based on the allegations contained, *supra*, Wells Fargo engaged in unfair deceptive acts or practices in its dealings with Plaintiff Risconsin and Pennsylvania Subclass members in violation of law.

368. Wells Fargo's conduct was directed at persons generally.

369. Wells Fargo's conduct needlessly caused consumers, including Plaintiff Risconsin and the Pennsylvania Subclass members, considerable economic damages including the loss of equity in their home, the loss of their home, moving expenses, time associated with loss mitigation efforts and court appearances and other forms of economic loss.

370. Wells Fargo's conduct also needlessly caused Plaintiff Risconsin and Pennsylvania Subclass members to suffer significant, life-altering, non-economic harm that has defined their lives for years.

371. All the needless harms suffered by Plaintiff Risconsin and Pennsylvania Subclass members are directly and proximately resulted from Wells Fargo's unfair acts and practices.

## COUNT NINE
### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
**(Brought on behalf of Plaintiff Kea and the North Carolina Subclass)**

372. Plaintiff Kea incorporates by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

373. Plaintiff Kea brings this claim for relief on behalf of herself and the North Carolina Subclass.

374. Defendant advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b).

375. Defendant engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, as alleged herein.

376. Wells Fargo knew as early as August 2013 that the automated calculation error was yielding inaccurate determinations as to whether borrowers, like Plaintiff Kea and the North Carolina Subclass members, qualified for a modification and/or the modifications were miscalculated. Instead of admitting these errors, Wells Fargo sent Plaintiff Kea and each North Carolina Subclass member correspondence stating that his or her request for modification had been denied and made no mention of the real causes of the denial or, if approved, that Defendant miscalculated the modifications.

377. Each denial letter sent by Wells Fargo to Plaintiff Kea and the North Carolina Subclass members provided an alleged reason for the denial of a mortgage modification or, if approved, that the offered modification was based on correct calculations, but failed to disclose a material fact: their denials

were based on faulty software, and thus were likely erroneous, or that the modifications were miscalculated.

378. Wells Fargo had a duty to disclose the software error – a material fact – to Plaintiff Kea and North Carolina Subclass members. By informing Plaintiff Kea and North Carolina Subclass members that they were denied mortgage modifications, but not that those denials were based on calculations made by software it knew to be faulty or, if approved, that the modifications were miscalculated, Wells Fargo stated half-truths. One who undertakes to make a statement must not only state the truth, but may not conceal any facts within his knowledge which materially qualifies his statement. Since Wells Fargo chose to speak in stating that Plaintiff Kea and North Carolina Subclass members did not qualify for a modification or, if approved, that the modifications were miscalculated, it was required to make a full disclosure. This is particularly true because Wells Fargo had superior knowledge as to all material facts surrounding the eligibility for a modification, and/or that the modifications were miscalculated, for Plaintiff Kea and North Carolina Subclass members.

379. Wells Fargo knew Plaintiff Kea and North Carolina Subclass members would reasonably rely upon its representations and intended that Plaintiff Kea and North Carolina Subclass members rely upon its statements that Plaintiff Kea and North Carolina Subclass members did not qualify for a mortgage modification or, if approved, that the modifications were not miscalculated.

380. Plaintiff Kea and North Carolina Subclass members reasonably believed Wells Fargo's representation that they did not qualify for a modification or, if approved, that the modifications were not miscalculated. They had no reason to know Wells Fargo based that determination on a software tool that had a material error in it.

381. Had Wells Fargo disclosed the whole truth to Plaintiff Kea and North Carolina Subclass members, they would have been able to seek review of the incorrect decisions on their mortgage

modifications by a competent third party, such as an attorney, agency, or other organization or individual with knowledge of mortgage modification requirements and processes. They would then have become aware that the denials of their mortgage modifications were erroneous, and/or that the modifications were miscalculated, and would have been able to prevent the wrongful foreclosures and other harm that flowed from Wells Fargo's error.

382.    Defendant acted intentionally, knowingly, and maliciously to violate North Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff Kea and North Carolina Subclass members' rights.

383.    As a result of Wells Fargo's fraudulent omissions and failures to disclose, Plaintiff Kea and North Carolina Subclass members have been injured in fact and suffered a loss of money and/or property. Plaintiff Kea and North Carolina Subclass members suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments; loss of money due to making improperly calculated higher payments; and loss of money due to paying improperly calculated higher balances due.

### COUNT TEN
### VIOLATIONS OF THE DISTRICT OF COLUMBIA
### CONSUMER PROTECTION PROCEDURES ACT
**(Brought on behalf of Plaintiff Forney and the Washington D.C. Subclass)**

384.    Plaintiff Forney incorporates by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

385.    Plaintiff Forney brings this claim for relief on behalf of himself and the Washington D.C. Subclass.

386. D.C. Code § 28–3904 prohibits any person to engage in an unfair or deceptive trade practice by making a misrepresentation as to a material fact which has a tendency to mislead; failing to state a material fact if such failure tends to mislead; or use innuendo or ambiguity as to a material fact, which has a tendency to mislead.

387. Defendant engaged in unfair and deceptive acts and practices in or affecting the residents of Washington D.C., in violation of D.C. Code § 28–3904, as alleged herein.

388. Wells Fargo knew as early as August 2013 that the automated calculation error was yielding inaccurate determinations as to whether borrowers, like Plaintiff Forney and the Washington D.C. Subclass members qualified for a modification. Instead of admitting these errors, Wells Fargo sent Plaintiff Forney and each Washington D.C. Subclass member correspondence stating that his or her request for modification had been denied or, if approved, that the modification was not based on erroneous calculations, and made no mention of the real causes of the denial or miscalculation.

389. Each denial letter sent by Wells Fargo to Plaintiff Forney and the Washington D.C. Subclass members provided an alleged reason for the denial of a mortgage modification, or offered them modifications based on erroneous calculations, but failed to disclose a material fact: their denials and miscalculations were based on faulty software, and thus were erroneous.

390. Wells Fargo had a duty to disclose the software error – a material fact – to Plaintiff Forney and the Washington D.C. Subclass members that they were denied mortgage modifications, or offered modifications based on erroneous calculations, but not that those denials and modifications were based on calculations made by software it knew to be faulty, Wells Fargo stated half-truths. One who undertakes to make a statement must not only state the truth, but may not conceal any facts within his knowledge which materially qualifies his statement. Since Wells Fargo chose to speak in stating that Plaintiff Forney and the Washington D.C. Subclass members did not qualify for a modification, or

offered them modifications based on erroneous calculations, it was required to make a full disclosure. This is particularly true because Wells Fargo had superior knowledge as to all material facts surrounding the eligibility for a modification or modification calculations for Plaintiff Forney and the Washington D.C. Subclass members.

391. Wells Fargo knew Plaintiff Forney and Washington D.C. Subclass members would reasonably rely upon its representations and intended that Plaintiff Forney and Washington D.C. Subclass members rely upon its statements that Plaintiff Forney and Washington D.C. Subclass members did not qualify for a mortgage modification or, if approved, the modifications were not based on erroneous calculations.

392. Plaintiff Forney and Washington D.C. Subclass members reasonably believed Wells Fargo's representation that they did not qualify for a modification or, if approved, their modifications were not based on erroneous calculations. They had no reason to know Wells Fargo based that determination on a software tool that had a material error in it.

393. Had Wells Fargo disclosed the whole truth to Plaintiff Forney and Washington D.C. Subclass members, they would have been able to seek review of the incorrect decisions on their mortgage modifications by a competent third party, such as an attorney, agency, or other organization or individual with knowledge of mortgage modification requirements and processes. They would then have become aware that the denials of their mortgage modifications or, if approved, their modifications, were erroneous, and would have been able to prevent the wrongful foreclosures and other harm that flowed from Wells Fargo's error.

394. Defendant acted intentionally, knowingly, and maliciously to violate the District of Columbia Consumer Protection Procedures Act, and recklessly disregarded Plaintiff Forney and Washington D.C. Subclass members' rights.

395. As a result of Wells Fargo's fraudulent omissions and failures to disclose, Plaintiff Forney and Washington D.C. Subclass members have been injured in fact and suffered a loss of money and/or property. Plaintiff Forney and Washington D.C. Subclass members suffered damages, including loss of their homes; loss of equity in their homes; loss of tax benefits; loss of appreciation in their homes' value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into their homes; loss of time and money to find new housing and move their families; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher mortgage payments; loss of money due to making improperly calculated higher payments; and loss of money due to paying improperly calculated higher balances due.

396. D.C. Code § 28-3905(k)(1) provides civil penalties to recover treble damages, punitive damages and, as provided by statute, attorney fees.

**COUNT ELEVEN**
**VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 349**
**(Brought on behalf of Plaintiff Ferguson and the New York Subclass)**

397. Plaintiff Ferguson incorporates by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

398. Plaintiff Ferguson brings this claim for relief on behalf of herself and the New York Subclass.

399. Defendant conducts "business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 349(a).

400. Plaintiff Ferguson and members of the New York Subclass are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

401. Defendant, as part of its loan servicing responsibilities, also provides loan modifications to its customers who are having difficulties meeting their loan obligations.

402. In an attempt to minimize foreclosures and assist struggling homeowners, Defendant, in accordance with HAMP and other loan modification programs, considered Plaintiff Ferguson and New York Subclass members for loan modifications.

403. Defendant voluntarily engaged with Plaintiff Ferguson and New York Subclass members to determine whether mortgage loans in distress could be modified.

404. Defendant contacted Plaintiff Ferguson and New York Subclass members to determine their eligibility for a loan modification.

405. Defendant represented to Plaintiff Ferguson and New York Subclass members that it would determine each Plaintiff's and New York Subclass member's eligibility for a loan modification.

406. Defendant agreed to modify Plaintiff Ferguson's and New York Subclass members' loans, if they were eligible, in accordance with HAMP, Department of Treasury directives, FHA regulations, and binding GSE guidelines.

407. Defendant voluntarily undertook a duty to Plaintiff Ferguson and New York Subclass members to accurately represent whether they were eligible for a loan modification.

408. Defendant voluntarily undertook a duty to consider the loan modifications in accordance with the above federal and state regulations as well as its own policies.

409. Defendant utilized proprietary software to determine Plaintiff Ferguson's and New York Subclass members' eligibility, rather than a personalized review of each person's file.

410. Defendant ultimately rejected Plaintiff Ferguson's and New York Subclass members' loan modifications or, when not rejected, imposed loan modifications that disadvantaged Plaintiff Ferguson and New York Subclass members.

411. Defendant has admitted to Plaintiff Ferguson and New York Subclass members that their loan modifications were inaccurate, misleading, and not done in accordance with the above federal and state statutes, guidelines, and regulations, or its own policies.

412. Defendant's failure to accurately represent to Plaintiff Ferguson and New York Subclass members their eligibility for a loan modification is due, at least in part, to Defendant's utilization of faulty proprietary software to determine their eligibility, rather than a personalized review of each person's file.

413. Defendant, in considering Plaintiff Ferguson's and New York Subclass members' loan modifications and failing to accurately represent their eligibility, did not meet industry standards.

414. Defendant intentionally, recklessly, or negligently omitted, concealed, and misrepresented material information as to Plaintiff Ferguson's and New York Subclass members' loan modification applications.

415. Plaintiff Ferguson and New York Subclass members reasonably relied, to their detriment, on Defendant's false and deceptive representations as to their eligibility for loan modifications.

416. Defendant employed deceptive acts or practices in the conduct of business, trade or commerce by:

    a. Failing to properly consider whether Plaintiff Ferguson and New York Subclass members were entitled to a loan modification;

    b. Failing to provide accurate loan modification assistance to Plaintiff Ferguson and New York Subclass members;

    c. Failing to oversee its procedures to ensure loan modifications were considered properly;

    d. Failing to draft appropriate policies to ensure loan modification applications were considered properly;

    e. Failing to ensure all models and programming utilized to assist in loan modifications were accurately utilized and functioning properly;

f.   Failing to develop and audit its software to ensure loan modifications were considered properly;

g.   Failing to oversee its employees to determine whether its policies were implemented appropriately to consider loan modifications;

h.   Failing to train employees to consider loan modifications;

i.   Failing to audit and review loan modification applications to ensure compliance with its policies and state and federal statutes, guidelines, and regulations;

j.   Failing to accurately consider loan modifications for Plaintiff Ferguson and New York Subclass members when it undertook the obligation to do so; and

k.   Failing to correct calculation errors in Plaintiff Ferguson's and New York Subclass members' loan applications.

417.   Defendant's acts and omissions have also been unfair because they have caused substantial injury to consumers without any countervailing benefit. The conduct has been unethical and unscrupulous.

418.   Defendant knew or should have known that its conduct violated N.Y. Gen. Bus. Law § 349.

419.   Plaintiff Ferguson and New York Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information, including foreclosure, loss of time and money, and emotional distress.

420.   As a direct and proximate result of Defendant's actions described above, Plaintiff Ferguson and New York Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages, punitive damages, reasonable attorneys' fees, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT TWELVE
## UNJUST ENRICHMENT
### (Brought on behalf of the Plaintiffs and Unjust Enrichment Subclass)

421.    Plaintiffs incorporate by reference all prior allegations of paragraphs 1-247 as if fully restated herein.

422.    This Count is pled in the alternative to the extent there is no contract between Defendant and Plaintiffs and Class members.

423.    Plaintiffs and the Unjust Enrichment Subclass have conferred a benefit on the Defendants in the form of increased fees and interest to which Defendant was not entitled but for its calculation errors; thus, denying them the benefits of these funds without their consent.

424.    Defendant appreciated and had knowledge of the benefits conferred upon it.

425.    Under principles of equity and good conscience, Defendant should not be permitted to retain these unjustly received monies.

426.    Plaintiffs, on behalf of themselves and the Unjust Enrichment Subclass, seek restitution and disgorgement of all amounts by which Defendant has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant Wells Fargo Bank, N.A. as follows:

A.      For an Order Certifying the Class and/or Subclasses pursuant to Rule 23(b)(3), and/or the issues pursuant to Rule 23(c)(4), appointing Plaintiffs as Representatives of the Class and/or Subclasses and Plaintiffs' counsel as Class Counsel;

B.      For entry of judgment in favor of Plaintiffs and members of the Class and/or Subclasses against Defendant for damages in an amount to be proven at trial, including statutory, treble and/or punitive damages in accordance with applicable law.

C.     For entry of judgment in favor of Plaintiffs and members of the Class and/or Subclasses against Defendant for reasonable attorneys' fees and costs.

D.     For entry of judgment in favor of Plaintiffs and members of the Class and/or Subclasses for pre-judgment interest on all damages; and

E.     For such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: January 9, 2025

Plaintiffs MYRON CURRY, DARRELL FORNEY, CHESTER NELSON, SAMUEL BELOFF, JOHN RISCONSIN, ADRENIA KEA, RUTH VERGARA, LAURENCE PETERSON, MARCIA PETERSON, BRADLEY LIGGETT, KYRA LIGGETT, BRIAN KEAVENY, DEANNA CLINGERMAN and RENEE BOUCHER FERGUSON, individually and on behalf of all others similarly situated,

By: /s/ Marc E. Dann
Marc E. Dann*
Brian D. Flick*
**DannLaw**
15000 Madison Avenue
Lakewood, OH 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
*notices@dannlaw.com*

Thomas A. Zimmerman, Jr.*
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
*tom@attorneyzim.com*

*Interim Co-Lead Class Counsel*

Alisa Rose Adams (Cal Bar #277697)
**The Dann Law Firm**
26100 Towne Center Drive
Foothill Ranch, CA 92610-3442
Telephone: (949) 200-8755
Facsimile: (866) 843-8308
*notices@dannlaw.com*
*aadams@dannlaw.com*

Mark Javitch (CA Bar #323729)
**Javitch Law Office**
480 S. Ellsworth Avenue
San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 645-0705
*mark@javitchlawoffice.com*

Charles E. Schaffer*
Pennsylvania Bar No. 76259
Daniel C. Levin*
Pennsylvania Bar No. 80013
**Levin Sedran & Berman LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500

D. Aaron Rihn*
PA Bar ID No.: 85752
**Robert Peirce & Associates, P.C.**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
Telephone: (412) 281-7229
Facsimile: (412) 281-4229
*arihn@peircelaw.com*

Jennifer S. Czeisler
**Sterlington, PLLC**
One World Trade Center, 85th Floor
New York, NY 10007
Telephone: (212) 433-2993
*jen.czeisler@sterlingtonlaw.com*

James M. Evangelista
**Evangelista Worley LLC**
10 Glenlake Parkway
South Tower Suite 130

Atlanta, GA 30328
Telephone: (404) 205-8400
Facsimile: (404) 205-8395
*jim@ewlawllc.com*

*\* Admitted Pro Hac Vice*

*Attorneys for Plaintiffs and the Putative Class and Subclasses*