Marc E. Dann*
**DannLaw**
15000 Madison Avenue
Lakewood, OH 44107
Phone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

Thomas A. Zimmerman, Jr.*
**Zimmerman Law Offices, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
tom@attorneyzim.com
*Admitted Pro Hac Vice*

*Interim Co-Lead Class Counsel*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Wells Fargo Mortgage Modification Litigation* | Case No. 3:24-cv-01358-MMC |
| | Honorable Maxine M. Chesney |
| | **THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

1. Breach of Contract;
2. Violations of the California Unfair Competition Law, Cal. Bus. and Prof. Code § 17200, *et seq.*;
3. Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act;
4. Violations of the Pennsylvania Uniform Trade Practices Act;
5. Violations of the North Carolina Unfair and Deceptive Trade Practices Act;
6. Violations of the District of Columbia Consumer Protection Procedures Act;
7. Violations of the New York Gen. Bus. Law § 349; and

8.  Unjust Enrichment.

**DEMAND FOR JURY TRIAL**

Plaintiffs Myron Curry, Darrell Forney, Chester Nelson, Samuel Beloff, John Risconsin, Adrenia Kea, Ruth Vergara, Laurence Peterson, Marcia Peterson, Bradley Liggett, Kyra Liggett, Deanna Clingerman, Brian Keaveny, and Renee Boucher Ferguson (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), bring this Third Amended Consolidated Class Action Complaint against Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo"). Plaintiffs make these allegations based on personal information as to those allegations pertaining to themselves and their personal circumstances and upon information and belief based upon the investigation of Counsel and facts that are matters publicly known, on all other matters and state as follows:

**<u>NATURE OF THE ACTION</u>**

1.    In response to the 2008 mortgage crisis, the federal government adopted new statutory and regulatory measures designed to protect and assist homeowners. These measures included new oversight requirements of the Federal Reserve and the Office of the Comptroller of the Currency, obligations related to cash infusions from the Troubled Asset Relief Program ("TARP"), the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), and regulation promulgated by the Consumer Financial Protection Bureau ("CFPB").

2.    Relevant here, the aforementioned federal laws and regulations require Wells Fargo to identify residential mortgage loans that its mortgage customers are struggling to pay. Once these troubled loans are identified, Wells Fargo must determine whether "loss mitigation" options are available to help avoid foreclosure. If a loss mitigation option is available, Wells Fargo must then offer it to the customer.

3.    The process of identifying troubled loans, evaluating eligibility, and calculating and

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

offering loss mitigation options consists of multiple steps. Unfortunately, Wells Fargo has a long history of bungling the loss mitigation evaluation process to the detriment of homeowners. Indeed, as a corporate policy, Wells Fargo purposefully under-invests in the back-office operations necessary to adequately evaluate borrowers for loss mitigation options, choosing instead to address problems *after* they arise, and *only* if Wells Fargo is forced to do so.

4.     This case involves Wells Fargo's latest (known) round of harming customers as a result of its inadequate loss mitigation identification and remediation process. Specifically, in an apparent effort to reduce the burdens associated with evaluating whether its customers were eligible for particular loss mitigation options, Wells Fargo chose to automate each step of this process by creating and utilizing pre-set formulas, and then applying those formulas to loan-specific and borrower-specific information readily available to Wells Fargo.

5.     Although the decision to automate the loss mitigation evaluation process may have been a boon to Wells Fargo's bottom-line, it ultimately hurt the borrowers that the federal government was trying to protect with the enactment/creation of TARP, Dodd-Frank, and the CFPB. Relevant here, Wells Fargo's automated formulas erroneously included certain fees and charges—such as servicing fees, attorneys' fees, and escrow items—into the amounts that borrowers would be required to pay pursuant to the terms of the loss mitigation options presented to them. As a result, borrowers were offered loss mitigation options that improperly *increased* the amount they owed on their homes, thus undermining the effectiveness and/or defeating the very purpose of the loss mitigation options offered.

6.     The fact that Wells Fargo's loss mitigation evaluation process does not work well is not in dispute, as Wells Fargo has repeatedly been the subject of successful regulatory actions and class action litigation arising from its bungled efforts.

7.     Seeing the writing on the wall, Wells Fargo has engaged in several different "apology

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

letter" campaigns—wherein it admits to committing errors during the loss mitigation evaluation process—hoping to short-circuit litigation regarding its deficient practices. These campaigns follow a similar pattern, and consist of Wells Fargo sending letters to affected customers stating that it found errors in applying its loss mitigation process, and then offers those customers some nominal (but inadequate) compensation in order to limit is liability.

8.    This is one of those cases, as Wells Fargo admits it harmed Plaintiffs and the other Class members, but again deceptively seeks to avoid liability by undercompensating them for their losses. Beginning in the middle of 2023 and continuing through at least June 2024, Wells Fargo sent apology letters to Plaintiffs and the other Class members ("Apology Letters") conceding it made calculation errors in applying the formulas it used in connection with the loss mitigation evaluation process—in violation of its legal obligations to perform those evaluations accurately.

9.    Specifically, the formulas employed by Wells Fargo inflated the amounts that borrowers would be required to pay under the loss mitigation options offered by including certain fees and charges—such as servicing fees, attorneys' fees, and escrow items—into the amount owed on their loans. In other words, Wells Fargo's miscalculations led to Plaintiffs and Class members being offered loss mitigation options that featured higher principal balances (and monthly payments) than should otherwise have been offered. These inflated loss-mitigation options benefited Wells Fargo in several different ways.

10.    First, many customers—who were at risk of losing their homes and felt as though they had no other option—accepted the inflated loss mitigation options presented by Wells Fargo, and agreed to pay excessive monthly mortgage charges. These customers were able to (and did) pay these excessive charges, resulting in more money flowing to Wells Fargo that it otherwise would have received had it properly calculated the amount owed.

11.    Second, other customers were unable to afford the inflated loss mitigation options presented by Wells Fargo, and chose to forgo loss mitigation altogether. These customers ended up losing their homes through foreclosure—or through other similar methods, such as providing Wells Fargo with the deed to their homes in lieu of foreclosure—allowing Wells Fargo to obtain an asset that it otherwise would not have received had it properly calculated the amount owed.

12.    Third, as a hybrid of the foregoing, some customers—who were at risk of losing their homes and felt as though they had no other option—accepted the inflated loss mitigation options presented by Wells Fargo, only to later lose their homes when the inflated payments proved unsustainable. Thus, in the short term, Wells Fargo received additional money from these customers in the form of monthly payments which were greater than they otherwise should have been. Then, in the longer term, Wells Fargo obtained an asset (*i.e.*, the customer's home) that Wells Fargo otherwise would not have received had it properly calculated the amount owed.

13.    As more fully explained below, Defendant's deficient auditing and compliance procedures led to repeated violations of the Home Affordable Modification Program ("HAMP") rules and guidelines promulgated by non-governmental investors in loans serviced by Defendant, and other government statutes, regulations, and enforcement orders over a period of at least fourteen years. Moreover, errors were made by Defendant—that Defendant discovered and never fixed—in Defendant's automated method of calculating borrowers' payment obligations pursuant to loss mitigation options, including loan modifications and partial claims.

14.    Defendant's approval of loan modifications based on faulty calculations were to the detriment of individual borrowers. As a result, Plaintiffs and putative Class members were injured not just because Well Fargo got those calculations wrong but because Wells Fargo consciously failed to invest the necessary resources to get them right.

15.    To make matters worse, even after discovering the 2013 calculation errors, Defendant continued using the faulty mortgage modification software to assess borrowers' eligibility for modification options and to determine the payment terms thereunder for years thereafter. Although Defendant implemented new "controls" in October 2015, those controls still did not fix the calculation errors, and they continued to persist. And, on top of all of that, Defendant did not even begin to disclose these errors to federal regulators or the public until August 2018, which further impaired innocent homeowners' ability to stave off financial ruin.

16.    Based on the foregoing, Defendant intentionally—or, at the very least, extremely recklessly—continued to subject Plaintiffs and Class members to its loss mitigation calculation errors despite knowing that the errors existed and were not corrected.

17.    Finally, during his testimony on March 12, 2019 in the United States House of Representatives Financial Services Committee, former Wells Fargo CEO Timothy Sloan admitted the fundamental allegations of this Complaint: that due to Wells Fargo's actions or inactions, hundreds (later revealed to be thousands), of customers were improperly denied a loan modification between 2010 and 2015, and that over 500 of those had lost their homes to foreclosure. And he also admitted that Wells Fargo did not disclose to those victims that they had been injured through no fault of their own until late 2018.

18.    These disclosed errors led to the filing of two putative class action complaints against Wells Fargo that resulted in final approval of class settlements: *Alicia Hernandez, et al. v. Wells Fargo Company, et al.*, N.D. Cal. Case No. 3:18-cv-07354-WHA (the "Hernandez case"), and *Ethan Ryder, et al. v. Wells Fargo Bank, N.A.*, S.D. Ohio Case No. 1:19-cv-00638-TSB (the "Ryder case"), and a CFPB Consent Order in December 2022.

19.    The Hernandez case and the Ryder case were focused on borrowers that were *denied*

*eligibility* for loss mitigation options due to these calculation errors, and who subsequently either lost their homes to foreclosure or were approved for a subsequent loss mitigation option. Here, in contrast, Plaintiffs and Class members were *approved* for loan modifications or trial payment plans featuring unfair and inflated terms.

20.    Put another way, while the *source* of the calculation errors committed by Wells Fargo in connection with Plaintiffs' and putative Class members' loans are the same (*e.g.*, Wells Fargo's erroneous loss mitigation formulas), the *effects* of these errors are distinctly different from those identified in either the Hernandez case or the Ryder case.

21.    Since Wells Fargo's miscalculations did not lead to loss mitigation denials—as occurred in the Hernandez case and the Ryder case—none of the Plaintiffs named in this lawsuit has been identified as a class member in either the Hernandez case or the Ryder case. Nevertheless, Plaintiffs and Class members were still injured, as detailed above.

22.    In light of the foregoing, Plaintiffs bring this case on behalf of themselves and those who also received an Apology Letter (*i.e.*, the Class). Plaintiffs, individually, and on behalf of the Class, seek, among other relief, damages, injunctive relief, and, as appropriate, restitution.

## PARTIES

23.    Representative Plaintiff Myron Curry. MYRON CURRY is a natural person and citizen of California residing in Los Angeles County, California. Plaintiff Myron Curry owned certain real property located at 4108 Hayvenhurst Drive, Encino, California 91436-3750 (the "Curry Property") from March 9, 2004 until on or about July 1, 2016, when due to the admittedly erroneous actions of Wells Fargo, he lost the property.

24.    Representative Plaintiff Darrell Forney. DARRELL FORNEY is a natural person and citizen of Maryland residing in Prince George's County, Maryland. Plaintiff Darrell Forney owned

certain real property located at 5002 Jay Street NE, Washington, DC 20019 (the "Forney Property") from April 10, 2012 until on or about December 28, 2018, when due to the admittedly erroneous actions of Wells Fargo, he lost the property.

25.     Representative Plaintiff Chester Nelson.  CHESTER NELSON is a natural person and citizen of Illinois residing in Cook County, Illinois.  Plaintiff Chester Nelson owned certain real property located at 3244 W. 139th Street, Robbins, Illinois 60472 (the "Nelson Property") from March 21, 2011 until on or about May 21, 2018, when due to the admittedly erroneous actions of Wells Fargo, he lost the property.

26.     Representative Plaintiff Samuel Beloff.  SAMUEL BELOFF is a natural person and citizen of Ohio residing in Clark County, Ohio.  Plaintiff Samuel Beloff owned certain real property located at 624 Riverwood Drive, Dayton, Ohio 43430 (the "Beloff Property") from July 15, 1998 until on or about June 9, 2016, when  he transferred the property via a deed-in-lieu of foreclosure.

27.     Representative Plaintiff John Risconsin. JOHN RISCONSIN is a natural person and citizen of South Carolina. Plaintiff John Risconsin owned certain real property located at 149 Cox Avenue, Morrisville, Pennsylvania 19067 (the "Risconsin Property"), when he sold the property.

28.     Representative Plaintiff Adrenia Kea. ADRENIA KEA is a natural person and a citizen of North Carolina residing in Bladen County, North Carolina.  Plaintiff Adrenia Kea owned certain real property located at 2852 Longspur Drive, Matthew, North Carolina 28105-0116 (the "Kea Property") until mid-2018, when due in part to the admittedly erroneous actions of Wells Fargo, she was forced to sell the property in a distressed sale due to a pending foreclosure action.

29.     Representative Plaintiff Ruth Vergara.  RUTH VERGARA is a natural person and a citizen of Virginia residing in Woodbridge, Virginia.  Plaintiff Ruth Vergara owned certain real property located at 14792 Candlewood Court, Woodbridge, Virginia 22191 (the "Vergara Property"), and due to

the admittedly erroneous actions of Wells Fargo, she was forced to pay higher amounts on a modified loan.

30. <u>Representative Plaintiffs Laurence Peterson and Marcia Peterson</u>. LAURENCE PETERSON and MARCIA PETERSON are each natural persons and citizens of Illinois residing in South Elgin, Illinois. Plaintiffs Laurence Peterson and Marcia Peterson owned certain real property at 421 Dean Drive, South Elgin, Illinois 60177 (the "Peterson Property"), and due to the admittedly erroneous actions of Wells Fargo, they were forced to pay higher amounts on a modified loan.

31. <u>Representative Plaintiffs Bradley Liggett and Kyra Liggett</u>. BRADLEY LIGGETT and KYRA LIGGETT are each natural persons and citizens of California residing in San Luis Obispo, CA. Plaintiffs Bradley Liggett and Kyra Liggett owned certain real property at 1138 Madonna Drive, San Luis Obispo, California 93405 (the "Liggett Property"), when due to the admittedly erroneous actions of Wells Fargo, their loan was modified with an incorrect increased principal balance and/or incorrect increased higher monthly payment.

32. <u>Representative Plaintiff Deanna Clingerman</u>. DEANNA CLINGERMAN is a natural person and a citizen of Ohio residing in Tallmadge, Ohio. Plaintiff Deanna Clingerman owned certain real property located at 543 Vinewood Avenue, Tallmadge, Ohio 44278 (the "Clingerman Property"), when due to the admittedly erroneous actions of Wells Fargo, her loan was modified with an incorrect increased principal balance and/or incorrect increased higher monthly payment.

33. <u>Representative Plaintiff Brian Keaveny</u>. BRIAN KEAVENY is a natural person and a citizen of Washington residing in Gig Harbor, Washington. Plaintiff Brian Keaveny owned certain real property located at 159 Denny Way #606, Seattle, Washington 98109 (the "Keaveny Property"), when due to the admittedly erroneous actions of Wells Fargo, his loan was modified with an incorrect increased principal balance and/or incorrect increased higher monthly payment.

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

9

34. <u>Representative Plaintiff Renee Boucher Ferguson</u>. RENEE BOUCHER FERGUSON is a natural person and a citizen of New York residing in Saratoga County, New York. Plaintiff Renee Boucher Ferguson owned certain real property located at 191 Kaydeross Avenue, Saratoga Springs, New York 12866 (the "Ferguson Property"), when due to the admittedly erroneous actions of Wells Fargo, her loan was modified with an incorrect increased principal balance and/or incorrect increased higher monthly payment.

35. <u>Defendant Wells Fargo Bank, N.A.</u> WELLS FARGO BANK, NATIONAL ASSOCIATION is a federally-chartered National Banking Association that is organized and exists under the National Banking Act, with its principal place of business located in Sioux Falls, South Dakota. Defendant is subject to the supervision of the Comptroller of the Currency of the United States Department of the Treasury, and is deemed a citizen of South Dakota pursuant to 28 U.S.C. § 1348. Defendant Wells Fargo Bank, N.A. provides Wells Fargo & Company ("WF&Co.") personal and commercial banking services and is WF&Co.'s wholly-owned, principal operating subsidiary. WF&Co. is incorporated in Delaware with its principal place of business and corporate headquarters in San Francisco, California.

**JURISDICTION AND VENUE**

36. Jurisdiction is proper in this Court under 28 U.S.C. §1332 (diversity jurisdiction). Specifically, this Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed Class, and at least one Class member is a citizen of a state different from Defendant.

37. Defendant routinely conducts business in the State where this District is located, has sufficient minimum contacts in this State and has intentionally availed itself of this jurisdiction by

marketing and selling products and services, and by accepting and processing payments for those products and services within this State.

38.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to the claims of the Plaintiffs occurred within this District, and Defendant does business in this District.

## INTRADISTRICT ASSIGNMENT

39.     Pursuant to Civil L.R. 3-2(c), this case is properly assigned to the San Francisco or Oakland Division because a substantial part of the events or omissions that give rise to Plaintiffs' and Class members' claims occurred in San Francisco County.

## COMMON FACTUAL ALLEGATIONS

40.     Plaintiffs, on behalf of themselves and all similarly situated persons, seek to recover statutory damages, punitive damages, actual damages, and restitution resulting from Defendant's wrongful conduct in connection with Plaintiffs' and Class members' residential mortgage loans.

**A.     Defendant services residential mortgage loans nationwide.**

41.     Defendant is one of the nation's largest providers and servicers of residential home mortgage loans. At all times relevant hereto, it was the servicer of the home mortgage loans at issue here.

42.     Defendant derives income in a number of ways including (a) payments based on a percentage of each borrower's principal balance pool, (b) float interest, (c) late fees, (d) foreclosure fees, (e) property inspection and preservation fees, and (f) broker opinion fees.

43.     Defendant is a wholly-owned and controlled subsidiary of WF&Co. (NYSE: WFC), one of the nation's largest financial institutions. WF&Co. is a registered bank holding company.

44.     WF&Co. describes itself as a "diversified, community-based financial services company

with $1.87 trillion in assets." *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (Nov. 6, 2018). It provides "banking, investment, and mortgage products and services as well as consumer and commercial finance, through 8,050 locations, 13,000 ATMs, digital (online, mobile, and social), and contact centers (phone, email, and correspondence)." *Id.* WF&Co. employs approximately 262,000 full-time employees in 37 countries and serves "one in three households in the United States." *Id.*

**B.    Defendant employs uniform, nationwide loan servicing, loan modification, and foreclosure practices.**

45.    Defendant utilizes uniform and standardized residential mortgage loan servicing, loan modification, loss mitigation, and foreclosure practices nationwide. These activities are primarily automated, using systems and tools to perform the work Wells Fargo is obligated to perform as a loan servicer.

46.    Defendant's loan servicing, loss mitigation, and foreclosure practices are governed by federal requirements and obligations.

47.    The Federal Housing Administration ("FHA") is an agency within the United States Department of Housing and Urban Development ("HUD") that supplies mortgage insurance to FHA-approved lenders, insuring loans on single-family homes.

48.    Mortgage insurance protects lenders from the risk of borrower defaults because the FHA agrees to pay lenders in the event of borrower default.

49.    Lenders must be pre-approved to qualify for FHA mortgage insurance. They must also comply with HUD regulations.

50.    Defendant is a pre-approved lender that qualifies for FHA mortgage insurance. Defendant is therefore required to comply with HUD regulations.

51.    For loans that are protected by FHA mortgage insurance, Defendant and the borrower(s)

executed loan documents that incorporate by reference HUD regulations.

52.    In 2008, the federal government began the TARP program. Pursuant to TARP, all servicers that receive funding from TARP must participate in HAMP.

53.    Defendant received about $25 billion in TARP funds. In return, Defendant agreed to participate in HAMP and be obligated by all Program Documentation (defined below).

54.    In 2009, the Secretary of the Treasury implemented the FHA HAMP, which was designed to minimize foreclosures by incentivizing loan modifications. Pursuant to HAMP, HUD has promulgated HAMP guidelines, regulations, and directives.

55.    "Home loan servicers, including [defendant Wells Fargo Bank, N.A.], signed Servicer Participation Agreements with Treasury that entitled them to $1,000 for each permanent modification they made, but required them to follow Treasury guidelines and procedures." *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 880 (9th Cir. 2013) (per curiam).

56.    In 2011, however, after "an examination of the residential real estate mortgage foreclosure processes of Wells Fargo Bank, N.A.," the Office of the Comptroller of the Currency "identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings." *Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, AA-EC-11-19, #2011-051 (Dep't of Treasury, Comptroller of Currency, Apr. 13, 2011) (consent order), https://www.occ.gov/static/enforcement-actions/ea2011-051.pdf. The Comptroller and the bank entered into a consent order, whereby Wells Fargo agreed, among other things, to implement an "action plan" to "ensure compliance with…servicing guides of the Government Sponsored Enterprises or investors, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program…" *Id.*

57.    Defendant was required to comply with all Program Documentation, HAMP, and other

Department of Treasury directives.

58.    Among other things, Defendant was required to review distressed and defaulted loans for loss mitigation eligibility and offer loss mitigation options to eligible borrowers prior to proceeding with any foreclosure. HAMP guidelines required that Defendant undertake a number of specific and non-discretionary steps to determine a consumer's eligibility for modification or other relief. If, after completing a formula-driven net present value analysis, the modified loan would be more profitable than the non-modified loan, HAMP guidelines require that Defendant offer a trial period plan modification. If the borrower completes the trial period plan, Defendant is required to permanently modify the loan.

59.    To request a modification, borrowers must submit standard form applications, financial worksheets, hardship affidavits, and acknowledgements that conform to GSE ("government sponsored enterprise," such as Fannie Mae and Freddie Mac) Published Guidelines and FHA regulations (the "Modification Contract"). Pursuant to the Modification Contract, borrowers (including Plaintiffs and Class members) make a legal representation as to the material truth of all information provided. The borrower agrees to provide all requested financial and hardship information. Among other things, the borrower also promises to undergo credit counseling if they are so requested. In return, Defendant agrees in the Modification Contract (as required by HAMP guidelines and rules) to examine the borrower's eligibility for all available modifications. If the borrower is eligible for any available mandatory modifications, Defendant is required by the Modification Contract (as well as HAMP, other Department of Treasury directives, FHA regulations, and binding GSE guidelines) to offer a trial period plan, which if completed successfully, entitles the borrower to the modification.[1]

---

[1] In some circumstances, the Fannie Mae, Freddie Mac and FHA regulations and guidelines require lenders like Wells Fargo to evaluate borrowers who do not submit applications using the same criteria as for the underwritten applications, except for the consideration of the borrower's income. Some of these "Streamlined" modifications may also have been impacted by the software errors.

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*
14

60.     These standardized Modification Contracts incorporate all applicable obligations in the HAMP provisions, regulations, directives, guidelines, procedures, documentation, instructions, bulletins, frequently asked questions, letters, directives, and other communications issued by the Department of Treasury, GSEs, and federal agencies (collectively, "Program Documentation.").

61.     In all relevant communications with borrowers, Defendant represents that it will extend trial period plans to any borrower who is eligible for a mandatory modification under GSE guidelines and the HAMP.

62.     Defendant received incentive payments for every successful modification under the Program Documentation. However, Defendant also benefited from unsuccessful or delayed modifications, along with foreclosures. If a federally mandated modification is not required, Defendant can offer modification and temporary payment plans outside of HAMP, often under terms that are less favorable to the borrower than federally-mandated plans. Furthermore, Defendant can continue to obtain foreclosure, late fees, property inspection, preservation, and broker opinion fees. Defendant further receives higher principal balance pool payments if it does not reduce the principal balance pursuant to Program Documentation requirements. Errors in Defendant's calculation models would also have potentially resulted in borrowers being required to pay more in unpaid principal balance than they would have had their modification application been processed correctly and in accordance with regulatory directives.

63.     Defendant was also obligated under its servicing agreements with investors to review borrowers under certain circumstances for loss mitigation options including loan modifications. Errors in calculation spreadsheets and waterfalls would have also impacted borrowers of non-government backed loans. Errors in Defendant's calculation models would also have potentially resulted in borrowers being required to remit higher periodic payments or pay more in unpaid principal balance

than they should have had their modification application been processed correctly and in accordance with regulatory directives.

**C.    Defendant repeatedly fails to oversee, test, and audit its uniform loan servicing, mortgage modification, and foreclosure practices.**

64.    In 2010, the Office of Comptroller of the Currency ("OCC") discovered multiple deficiencies and unsafe and unsound practices in Defendant's residential mortgage servicing, modification, and foreclosure programs. The OCC determined that Defendant failed to oversee, audit, and test its foreclosure and modification tools and practices and failed to comply with applicable laws, prioritizing profits over compliance and causing substantial harm to consumers.

65.    The OCC's investigation and related investigations resulted in millions of dollars in fines assessed by the Federal Reserve to Defendant's parent company, WF&Co.

66.    As a result, Defendant agreed to two consent orders with the OCC, committing to taking all necessary and appropriate steps to remedy the deficiencies and unsafe and unsound practices identified by the OCC. In the consent orders, Defendant agreed to form compliance committees and programs subject to the oversight of the OCC. Defendant agreed to adopt processes to better oversee, audit, and conduct ongoing testing of its loan servicing, modification, and foreclosure tools and practices and ensure legal and regulatory compliance. Some such agreed processes were targeted at better oversight, auditing, and testing of automated tools, modification and foreclosure review, and fee assessments.

67.    But Defendant failed to remedy the deficiencies and unsafe and unsound practices identified by the OCC. Defendant failed to adopt adequate oversight, auditing, and testing processes and programs. And Defendant failed to detect and/or correct repeated and systemwide servicing, modification, and foreclosure process errors.

68.    In 2015, the OCC again determined that, despite the 2011 consent orders, Defendant

continued to fail to adequately oversee, audit, and test its servicing, modification, and foreclosure practices for compliance. As a result, the OCC assessed millions of dollars in monetary penalties against Defendant's parent company, WF&Co.

69. Finally, in 2016, the Comptroller found:

> Between March 2013 through October 2014, the Bank made escrow calculation errors in 76,720 accounts due to an error in a proprietary loan decisioning software tool. . . . [¶] The escrow calculation errors also led to approximately 184 incorrect loan modification denials.

Wells Fargo Bank, N.A., Sioux Falls, South Dakota, AA-EC-11-19, #2016-055 (Dep't of Treasury, Comptroller of Currency, May 24, 2016) (consent order for civil money penalty), https://www.occ.gov/static/enforcement-actions/ea2016-055.pdf. The bank agreed to pay a $70 million penalty and the consent order was terminated. *Id.*; Wells Fargo Bank, N.A., Sioux Falls, South Dakota, AA-EC-11-19, #2016-056 (Dep't of Treasury, Comptroller of Currency, May 24, 2016) (termination order), https://www.occ.gov/static/enforcement-actions/ea2016-056.pdf.

70. In early 2018, the OCC discovered additional and ongoing compliance and conduct failures in Defendant's loan servicing, modification, and foreclosure programs and processes. The OCC determined that Defendant's deficiencies and compliance failures constituted reckless and unsafe or unsound practices in violation of federal law and that Defendant failed to implement and maintain an adequate compliance risk management program. It found that Defendant failed to implement adequate oversight, control, auditing, and testing of its servicing, modification, and foreclosure programs and practices. The OCC also found that Defendant failed to adequately report compliance concerns, compliance failures, and Defendant's efforts to remedy them.

71. As a result, WF&Co. and Defendant entered into a consent cease and desist order with the OCC, again agreeing to adopt system-wide compliance programs and oversight.

72. The Federal Reserve also issued a consent cease and desist order in early 2018 restricting

Defendant's growth until governance, oversight, risk management, auditing, and testing is improved. In its consent cease and desist order, the Federal Reserve reports that it determined Defendant "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."

73.    As a result of the OCC's continued investigations and resulting consent orders, Defendant was and is on notice of serious errors, deficiencies, and unsafe and unsound practices in its loan servicing, modification, and foreclosure processes and practices from 2008 through the present. Defendant was and is likewise aware of the need to implement and maintain sufficient oversight, testing, and auditing of its processes and practices, including the need for oversight, testing, and auditing of automated tools. Yet, Defendant has habitually failed to adopt adequate oversight, testing, and auditing in a consistent pattern of misconduct that prioritized short-term growth, profits, and incentive compensation over compliance.

74.    Simply put, Defendant knew that its automated formula and calculations contained errors that caused Plaintiffs and Class members to pay more money and have higher balances due for loss mitigations that Defendant approved. Nevertheless, Defendant knowingly failed to correct those errors, and knowingly continued to erroneously cause Plaintiffs and Class members to pay more money and have higher balances due for loss mitigations that Defendant approved.

**D.    Defendant's automated calculation errors.**

75.    Defendant's deficiencies, unsafe and unsound practices, and failure to conduct adequate oversight, auditing, and testing, resulted in a number of systemic automated calculation errors that greatly affected borrowers, including Plaintiffs and Class members.

76.    From 2008 through the present, Defendant utilized automated mortgage loan

modification underwriting tools—which feature pre-set formulas—to determine which borrowers are qualified for a mortgage loan modification or repayment plan, and, if so, the duration, frequency, amount of the payments that borrowers would be required to make pursuant to the terms of their re-calculated loans.

77.    By its own admissions, Defendant repeatedly failed to test and audit its automated mortgage loan modification underwriting tool, despite the OCC investigations and consent decrees putting it on notice of significant issues with its mortgage practices and requiring Defendant to correct the errors. Defendant likewise failed to adequately verify that its automated mortgage loan modification tools and standard foreclosure practices complied with consent decree requirements, regulations, and laws, which they failed to do.

78.    As a result, Defendant wrongfully (1) denied hundreds of borrowers' applications for mortgage loan modifications and/or repayment plans for which they qualified, and (2) approved hundreds of borrowers for modification plans that overcharged them under burdensome and unwarranted terms.

79.    According to the OCC, between March 2013 and October 2014, an unidentified error caused Defendant to fail to offer modifications to at least 184 borrowers who were entitled to modification trial period plans.

80.    Unbeknownst to the OCC, however, this calculation error extended to many more borrowers—including Plaintiffs and Class members—because Defendant employs uniform and standard processes to assess loss mitigation eligibility for each borrower.

81.    Despite learning of this systemic calculation error in 2013—which legal disclosures reveal was escalated by certain of Defendant's employees to senior management—it was not until October 2015 that Defendant implemented new "controls" purporting to address it, and replaced its system with

the LPS/Black Knight Desktop Application.

82.    On top of that, Defendant did not disclose this calculation error to government regulators, the public, or affected borrowers until almost three years later. Specifically, on August 3, 2018, Defendant's parent company WF&Co issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (August 3, 2018) ("August Report"). In its August Report, WF&Co revealed for the first time that it identified an automated calculation error that caused it to wrongfully deny loan modifications and resulted in hundreds of foreclosures of residential mortgage loans in default between April 13, 2010 and October 20, 2015:

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015, when the error was corrected. **This error in the modification tool caused an automated miscalculation of attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification** pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification, a foreclosure was completed.**

> *See*, August Report (emphasis added).

83.    Moreover, although, in October 2015, Defendant ostensibly implemented new "controls" purporting to address the aforementioned systemic calculation error, and replaced its system with the LPS/Black Knight Desktop Application, these measures were *still* inadequate, and the systemic calculation error continued to persist.

84.    The inadequacy of Defendant's October 2015 response was revealed in November 2018,

when Defendant admitted that the systemic calculation error had continued to detrimentally affect

borrowers into April 2018. Specifically, on November 6, 2018, Defendant's parent company WF&Co

issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

*Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange

Act of 1934 (Form 10-Q), p. 3, (November 6, 2018) ("November Report"). In its November Report,

WF&Co disclosed that the aforementioned systemic calculation error affected an *additional* 245

consumers, which was identified using a "subsequent expanded review," as follows:

> An internal review of the Company's use of a mortgage loan modification
> underwriting tool identified a calculation error regarding foreclosure attorneys'
> fees affecting certain accounts that were in the foreclosure process between April
> 3, 2010, and October 2, 2015, when the error was corrected. **A subsequent
> expanded review identified related errors regarding the maximum allowable
> foreclosure attorneys' fees permitted for certain accounts that were in the
> foreclosure process between March 15, 2010, and April 30, 2018, when new
> controls were implemented. Similar to the initial calculation error, these
> errors caused an overstatement of the attorneys' fees that were included for
> purposes of determining whether a customer qualified for a mortgage loan
> modification or repayment plan pursuant to the requirements of government-
> sponsored enterprises** (such as Fannie Mae and Freddie Mac), the Federal
> Housing Administration (FHA) and the U.S. Department of Treasury's Home
> Affordable Modification Program (HAMP). Customers were not actually charged
> the incorrect attorneys' fees. **As a result of these errors, taken together and
> subject to final validation, approximately 870 customers were incorrectly
> denied a loan modification or were not offered a loan modification or
> repayment plan in cases where they otherwise would have qualified. In
> approximately 545 of these instances, after the loan modification was denied
> or the customer was deemed ineligible to be offered a loan modification or
> repayment plan, a foreclosure was completed.** The Company has contacted a
> substantial majority of the approximately 870 affected customers to provide
> remediation and the option also to pursue no-cost mediation with an independent
> mediator. Attempts to contact the remaining affected customers are ongoing. Also,
> the Company's review of these matters is ongoing, including a review of its
> mortgage loan modification tools.

> *See*, November Report (emphasis added).

85.    Put another way, the November Report indicates that the systemic calculation error was

*not*, in fact, corrected in 2015—as claimed in the August Report—and that automated miscalculations

for loan modifications continued until at least April 30, 2018, if not longer.[2]

86.    In sum, Defendant failed to implement adequate oversight, auditing, and test controls, and allowed a systemic calculation error to persist in its mortgage software for over eight years.

87.    Even after learning of this systemic error in 2013, Defendant failed to timely and adequately correct it for over five years, assuming it has been corrected at all.

88.    Defendant subsequently failed to disclose the existence of this systemic error for another three years, and even then, falsely represented that it had been corrected in 2015, and understated of the scope of this error and the number of borrowers affected by it. Defendant's concealment the aforementioned error from the public and the OCC was an obvious attempt to avoid additional fines and further OCC supervision.

89.    Between 2010 and 2018 (at the earliest), Defendant wrongfully foreclosed on the homes of many of the consumers affected by its systemic calculation error—*i.e.*, consumers who should have been offered loan modifications instead of facing foreclosure, but were erroneously deemed to be ineligible.

90.    Moreover, because Defendant's systemic calculation error affected all borrowers who were evaluated for loan modifications, Defendant's actions and inactions also harmed borrowers who *were* offered loan modifications. This group of borrowers includes Plaintiffs and Class members, who were offered and approved for loan modification plans that included the erroneous fees. These customers were either (1) overcharged pursuant to the loan modification plans they accepted, (2) could not afford

---

[2] Although, to date, Defendant has only admitted that the error persisted until April 30, 2018, it is substantially likely that this error continued to affect borrowers thereafter. Indeed, given that the August Report falsely claimed that this error was corrected in 2015, and understated the number of borrowers affected by it, Defendant's assertions as to when the error was correct, if at all, simply cannot be credited. Additionally, in Exhibit 13 to its 2019 Form 10-K Annual Report, Defendant disclosed that its "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

the loan modification plans they were offered, due to their inclusion of unnecessarily burdensome and unwarranted terms, and lost their homes, or (3) both.

91.     In other words, Defendant's systemic calculation error wrongfully caused Plaintiffs and Class members to be offered and/or pay higher monthly payments and loan balances than they otherwise should have been offer and/or required to pay.

92.     Finally, as a result of the automated calculation error referenced herein, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information—namely, the erroneous and inflated amount due.

**E.     The *Hernandez* and *Ryder* Litigation.**

93.     Before this action was filed, two putative class actions related to the calculation errors were filed against Wells Fargo which resulted in final approval of class action settlements: *Alicia Hernandez, et al. v. Wells Fargo Company, et al.*, N.D. Cal. Case No. 3:18-cv-07354-WHA (the "Hernandez case"), and *Ethan Ryder, et al. v. Wells Fargo Bank, N.A.*, S.D. Ohio Case No. 1:19-cv-00638-TSB (the "Ryder case").

94.     In the Order granting Preliminary Approval of the Class Settlement in the Hernandez case, the Court defined the nationwide settlement class as follows:

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

See *Alicia Hernandez, et al. v. Wells Fargo & Company, et al*, 3:18-cv-07354-WHA, Doc. 277 at pp. 1-2 (N.D. Cal. Apr. 19, 2020).

95.     The Court granted final approval of the settlement in the Hernandez case on October 12,

2020. See *Hernandez*, Doc. 292.

96.     The settlement in the Hernandez case totaled $21,907,778 with over $18.2 million in payments to putative class members. See *Hernandez*, Doc. 344 at pp. 2-3.

97.     In the Order granting Preliminary Approval of the Class Settlement in the Ryder case, the Court defined the nationwide settlement class as follows:

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), or the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo because of excessive attorneys' fees being included in the loan modification decisioning process; (iii) whose home Wells Fargo did not sell in foreclosure; and (iv) are reflected in the Settlement Class List as defined herein.

See *Ethan Ryder, et al. v. Wells Fargo Bank, N.A.*, 1:19-cv-00638-TSB, Doc. 50 at p. 3.

98.     The Court granted final approval of the settlement in the Ryder case on January 25, 2022. See *Ryder*, Doc. 57.

99.     The settlement in the Ryder case totaled $12,000,000 with over $9,098,900 in payments to putative class members. See *Ryder*, Doc. 55 at p. 16.

100.     Plaintiffs and Class members in this case are *not* part of the classes who received relief in either the Hernandez case or the Ryder case because the uniform calculation errors did not directly result in a denial of eligibility for the loss mitigation options. Rather, these same calculation errors resulted in Plaintiffs and Class members to be approved for modification plans that featured monthly mortgage payments and principal balances that were *greater* than what was actually owed.

**F.     A Consent Order and a new round of Apology Letters.**

101.     Following the resolutions of the Hernandez case and Ryder case, Wells Fargo entered into a Consent Order with the CFPB on December 20, 2022 in *In re Wells Fargo Bank, N.A.*, Case No. 2022-CFPB-0011 (the "Consent Order").

102. In the Consent Order, Wells Fargo acknowledged that:

a. "Respondent has incorrectly denied mortgage loan modification applications and miscalculated fees and other charges for thousands of mortgage borrowers,..., resulting in at least $195 million in remediation being paid to affected borrowers…"[3]

b. "In one such significant technology and internal controls failure, from at least 2011 through April 2018, Respondent's process for evaluating loan modification applications was affected by errors in the relevant calculation formulas. These errors resulted in an overstatement of the attorneys' fees included in the calculation, which sometimes caused an otherwise qualified borrower not to be offered a loan modification.[4]

c. "Respondent became aware of this problem in late 2013 and, after reviewing the issue, concluded that it did not adversely affect borrowers' ability to obtain loan modifications. Respondent attempted to correct the attorneys' fee calculation, but later determined (in March 2018) that it had not fixed the issue and was continuing to fail to offer some borrowers loan modifications."[5]

d. "Another error occurred from July 2013 until September 2018, when Respondent did not offer no-application modifications to approximately 190 borrowers with Government Sponsored Entity (GSE) loans. Respondent erroneously identified these borrowers as deceased and therefore did not assess their eligibility for modifications."[6]

e. "Respondent's mortgage servicing operations experienced other errors that resulted in

---

[3] *In the Matter of Wells Fargo Bank, N.A.*, C.F.P.B. Admin. Proceeding File No. 2022-CFPB-0011 (2022), ECF No. 1, ¶ 23, pp. 9-10.
[4] *Id.* at ¶ 24, p. 10.
[5] *Id.* at ¶ 25, p. 10.
[6] *Id.* at ¶ 26, pp. 10-11.

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*
25

Respondent assessing borrowers unwarranted charges and fees in various situations, including when certain consumers paid off a mortgage that had been subject to a foreclosure judgment; Respondent failed in certain cases to timely pay the appropriate amount of property taxes; Respondent miscalculated the interest rate on certain adjustable rate mortgages after a loan modification ended; and Respondent did not give certain consumers complete information about their ability to stop paying for expensive private mortgage insurance."[7]

103.    On the same day as entering the Consent Order, Charlie Scharf, Wells Fargo's Chief Executive Officer, stated publicly that "[o]ur top priority is to continue to build risk and control infrastructure that reflects the size and complexity of Wells Fargo and run the company in a more controlled, disciplined way"[8] and "We remain committed to doing the right thing for our customers…"[9]

104.    Wells Fargo's newfound commitment to doing the right thing for its customers appears to be short-lived, however, because beginning in early December 2023, Wells Fargo began sending the Plaintiffs and Class members form letters which state, in part, "During a review of the account, we identified that when the loan was considered for payment assistance options, an error may have occurred. As a result, we are enclosing a check for $200.00." (the "Apology Letters").

105.    Although the Apology Letters reference a purported "review of the account", the Consent Order, the *Hernandez* settlement, the *Ryder* settlement, and affirmative statements made in its 10-K's referenced *supra* demonstrate that Wells Fargo has known about the calculation errors since at least August 2013.

---

[7] *Id.* at ¶ 27, p. 11
[8]   https://newsroom.wf.com/English/news-releases/news-release-details/2022/Wells-Fargo-Enters-into-Agreement-with-CFPB-to-Resolve-Multiple-Issues/default.aspx (last visited Mar. 1, 2024)
[9] *Id.*

106.   Now, 15 years after the implementation of the HAMP program and almost 10 years after the commencement of the OCC's investigation regarding calculation errors resulting in wrongful denials of modifications and wrongful foreclosures of Wells Fargo customers, Wells Fargo has launched another round of vague Apology Letters including checks of varying amounts beginning in the middle of 2023 and continuing through at least June 2024 referencing vague regrets for unexplained calculation errors that apparently caused thousands of loan borrowers to pay a larger modified principal balance than they should through miscalculated loss mitigation options.

107.   In short, Defendant's Apology Letters, much like the ones sent in the fall of 2018, admit that (a) its accounting error caused consumers harm, (b) its accounting error resulted in inaccurate negative reporting to consumer reporting agencies that should be corrected, and (c) Defendant had done nothing before September 2018 to remediate consumers and correct inaccurate credit reporting.

108.   Upon information and belief, the calculation errors at issue in the instant matter are the same calculation errors at issue in the Hernandez case and the Ryder case, and involve inaccurate calculations as to amounts due and owing for escrow amounts, attorneys' fees, default servicing fees, and/or accrued interest.

109.   Upon information and belief, in addition to wrongful denials of loan modifications, the unexplained calculations have led to inaccurate calculations for amounts due and owing and demand for payment of the same pursuant to loss mitigation options, including forbearances and partial claims, for which Plaintiffs and Class members were personally responsible to pay or which otherwise negatively impacted the equity in their properties.

110.   Defendant knowingly and intentionally directed its misconduct towards Plaintiffs and Class members, with an intent to mislead them and conceal material facts from them, by, *inter alia*, engaging in the following misconduct:

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

a. Despite discovering the systemic calculation error in 2013 and allegedly implementing new "controls" in 2015, Defendant failed to actually fix it, and did not reform its auditing and verification practices to ensure that it had been fixed. As a result, the systemic calculation errors continued to affect hundreds of additional borrowers thereafter, and were not remedied or disclosed until 2018 (or later). Defendant intentionally continued to subject Plaintiffs and Class members to its systemic loss mitigation calculation errors despite knowing that the errors existed and were not corrected.

b. Defendant knowingly failed to correct its systemic calculation errors, which (i) resulted in the wrongful denial of borrowers for loss mitigation options that should have been approved, (ii) led Defendant to offer Plaintiffs and Class members loss mitigation options that required them to pay more money and have higher balances due than otherwise should have been the case, (iii) erroneously caused some Plaintiffs and Class members to pay more money and have higher balances due for loss mitigations that Defendant approved, and (iv) misled some Plaintiffs and Class members into believing that they could not afford to avail themselves of particular loss mitigation options offered.

c. Even after discovering the systemic calculation errors, and despite knowing that the 2015 "controls" did not correct the errors, Defendant willfully continued to conduct foreclosures on the homes of borrowers negatively affected by it.

d. Even after discovering the systemic calculation errors, and despite knowing that the 2015 "controls" did not correct the errors, Defendant willfully continued to issue inaccurate periodic statements and notices to borrowers affected by the errors.

e.   Defendant willfully and recklessly continued to rely on its software and its automated calculation formula even after (i) the federal government cited it for failing to adequately audit its loss mitigation and foreclosure procedures, (ii) the federal government found a software error had led Wells Fargo to wrongfully deny loss mitigation options in 2013-2014, and (iii) discovering that the systemic errors had not been corrected in 2015.

## PLAINTIFF MYRON CURRY'S FACTUAL ALLEGATIONS

111.   On or about March 8, 2004, Plaintiff Curry entered into a mortgage for the Curry Property.

112.   In the summer of 2009, Plaintiff Curry began reaching out to Defendant about options to modify his loan.

113.   Between 2009 and 2016, Plaintiff Curry submitted between 15 to 20 applications for loss mitigation.

114.   Sometime in late 2015/early 2016, Plaintiff Curry was verbally notified that he was approved for a loan modification but he never received a trial payment plan.

115.   By spring 2016, Plaintiff Curry received additional correspondence from Wells Fargo notifying him that he did not qualify for a modification.

116.   Shortly after receiving the denial correspondence, Plaintiff Curry received correspondence from Defendant notifying him that a Notice of Foreclosure Sale had been initiated on the Curry Property.

117.   In an attempt to avoid the financially disastrous consequences of the foreclosure and in an effort to also avoid losing further equity in his property, Plaintiff Curry sold the Curry Property in June 2016.

118.   Almost seven and a half years later, on December 15, 2023, Plaintiff Curry received a

form Apology Letter from Defendant. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize[s] for any inconvenience this caused".

119. Along with the Apology Letter, Defendant enclosed a check for $200.00. This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

120. The Apology Letter was the first time Plaintiff Curry learned that Defendant had committed a calculation error. Never in the years since the foreclosure and forced sale of the Curry Property did Defendant attempt to discuss with Plaintiff Curry the calculation error(s).

121. Shortly after receiving the Apology Letter, Plaintiff Curry contacted Defendant about the letter. That contact led to Plaintiff Curry receiving a second letter from Defendant dated January 2, 2024, in which Defendant notified Plaintiff Curry that:

> During a review, your account was identified as previously being offered a loan modification. An error may have occurred with that trial offer, which could have affected the trial payment amount. This loan modification was not completed, and your account may not have been impacted by this issue during the trial period. If it was, the difference would have been less than $200.00. To make this right, we mailed any potentially impacted customers a letter and a check for $200.00…You also requested to know the terms associated with this potential error. We've completed our review of your request. *We've determined the bank cannot ascertain the terms/specific details you have requested; we are unable to provide that information.*

(Emphasis added).

122. Defendant's repeated failure to provide mortgage assistance with an accurately calculated payment (as expressly admitted in the Consent Order and again in the January 2, 2024 letter), and Defendant's refusal to timely and fully correct its error after identifying its automated calculation errors, caused Plaintiff Curry significant economic and non-economic damages.

## PLAINTIFF DARRELL FORNEY'S FACTUAL ALLEGATIONS

123.   On or about April 10, 2012, Plaintiff Forney entered into a mortgage related to the Forney Property.

124.   On or about November 3, 2016, Plaintiff Forney contacted Defendant in anticipation of a proposed default.

125.   By the end of November 2016, Plaintiff Forney submitted a facially complete loss mitigation application, with a second facially complete loss mitigation application submitted in mid-August 2017.

126.   On or about January 31, 2017, Plaintiff Forney spoke with Defendant's representative who informed him by phone that his November 2016 application had been approved for short-term modification assistance; however, by the time he received that information on January 31, 2017, the ability to accept the assistance had expired.

127.   In mid-November 2017, Plaintiff Forney received a letter in response to the mid-August 2017 loss mitigation application from Defendant, which notified him that he was not eligible for any assistance programs except a short sale.

128.   By December 28, 2018, Plaintiff Forney had sold his home in a distressed sale in order to prevent a sale of his home in a judicial foreclosure.

129.   Almost five years later, Defendant sent Plaintiff Forney a form Apology Letter dated December 7, 2023. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error, and that Defendant "apologize[s] for any inconvenience this caused".

130.   This was the first time Plaintiff Forney learned that Defendant had committed a calculation error and that his modification request should have been approved.  Never in the years since losing the property did Defendant attempt to discuss with Plaintiff Forney the calculation error(s) or its

wrongful failure to provide mortgage assistance.

131.    Along with the Apology Letter, Defendant enclosed a check for $200.00.  This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

132.    Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Forney was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home, caused Plaintiff Forney significant economic and non-economic damages.

## PLAINTIFF CHESTER NELSON'S FACTUAL ALLEGATIONS

133.    On or about March 21, 2011, Plaintiff Nelson entered into a mortgage related to the Nelson Property.

134.    Plaintiff Nelson subsequently became delinquent on his obligations under the loan and sought loss mitigation assistance from Defendant in late 2012.

135.    Defendant approved Plaintiff Nelson for a trial loan modification in 2012 which eventually resulted in his approval for a permanent loan modification. Upon information and belief, Defendant miscalculated the amount of default-related fees that were due and owing on Plaintiff Nelson's mortgage loan which wrongfully increased amounts claimed due and owing for such trial payments that he remitted as well as for the subsequent permanent modification.

136.    By late 2015/early 2016, after sending other modification applications, Defendant sent written correspondence to Plaintiff Nelson notifying him that he did not qualify for a modification due to feasibility concerns.  Plaintiff Nelson submitted an appeal of his denial in March 2016, but never received any additional correspondence from Defendant related to the denial or his appeal.

137.    On June 29, 2015, Defendant initiated a Complaint for Foreclosure in the Cook County (IL) Chancery Court, Case No. 2015 CH 10053 (the "Nelson Foreclosure").

138.   The Nelson Property was sold on May 21, 2018, and the Order for Possession was signed on December 3, 2018.

139.   Approximately five years from the date that the Order of Possession was signed, Defendant sent Plaintiff Nelson a form Apology Letter dated December 6, 2023. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error, and that Defendant "apologize[s] for any inconvenience this caused".

140.   This was the first time Plaintiff Nelson learned that Defendant had committed a calculation error and that his modification request should have been approved.  Never in the years since losing the property did Defendant attempt to discuss with Plaintiff Nelson the calculation error(s) or its wrongful failure to provide mortgage assistance.

141.   Along with the Apology Letter, Defendant enclosed a check for $200.00.  This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

142.   Defendant's repeated refusal to provide accurate loss mitigation assistance (to which Defendant admitted in the Consent Order), and Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home, caused Plaintiff Nelson significant economic and non-economic damages.

### PLAINTIFF SAMUEL BELOFF'S FACTUAL ALLEGATIONS

143.   On or about July 15, 1998 Plaintiff Beloff entered into a mortgage related to the Beloff Property.

144.   In 2012, shortly after his wife lost her job, Plaintiff Beloff began reaching out to Defendant for mortgage assistance.

145.   Shortly after these calls, Plaintiff Beloff began submitting applications for assistance. Defendant never approved any of Plaintiff Beloff's applications for a loan modification.  Upon

information and belief, Defendant never approved Plaintiff Beloff for a loan modification due to Defendant's automated calculation errors.

146.    On September 24, 2015 the Defendant initiated foreclosure proceedings against Plaintiff Beloff and the Beloff Property in *Wells Fargo Bank, N.A. v. Samuel Beloff, et al.*, Greene County (OH) Court of Common Pleas Case No. 2015 CV 0635 (the "Beloff Foreclosure").

147.    After receiving the foreclosure complaint, Plaintiff Beloff was forced to retain counsel who worked with Defendant's foreclosure counsel and negotiated a deed in lieu which transferred the Beloff Property back to the Defendant on or about June 9, 2016.

148.    Almost six and a half years later, Defendant sent Plaintiff Beloff a form Apology Letter in December 2023. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize[s] for any inconvenience this caused".

149.    This was the first time Plaintiff Beloff learned that the Defendant had committed a calculation error and that his modification request should have been approved or otherwise should have been approved with more favorable terms.  Never in the years since losing the property did the Defendant attempt to discuss with Plaintiff Beloff the calculation error(s) or its wrongful failure to provide accurate mortgage assistance.

150.    Along with the Apology Letter, Defendant enclosed a check for $200.00.  This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

151.    Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiff Beloff was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home caused Plaintiff Beloff significant economic and non-economic damages.

## PLAINTIFF JOHN RISCONSIN'S FACTUAL ALLEGATIONS

152.   On or about March 31, 2006, Plaintiff Risconsin entered into a mortgage related to the Risconsin Property.

153.   In July 2010, Plaintiff Risconsin was contacted by Defendant who informed him that it would not accept his mortgage payment because of an alleged "missing/updated financial expense report."

154.   In August 2010, Plaintiff Risconsin provided the requested information to Defendant.

155.   On August 27, 2010, and August 30, 2010, Defendant sent Plaintiff Risconsin letters indicating that he was missing his proof of income in the form of paystubs.

156.   After August 30, 2010, Plaintiff Risconsin provided the requested paystubs to Defendant.

157.   Defendant never approved Plaintiff Risconsin for a loan modification. Upon information and belief, Defendant never approved Plaintiff Risconsin for a loan modification due to Defendant's automated calculation errors.

158.   By the end of September 2010, Plaintiff Risconsin was notified that the Risconsin Property was scheduled for a sheriff's sale.

159.   By November 12, 2010, Plaintiff Risconsin lost the Risconsin Property via the sheriff's sale.

160.   Thirteen years later, Defendant sent Plaintiff Risconsin a form Apology Letter dated December 4, 2023. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize[s] for any inconvenience this caused."

161.   This was the first time Plaintiff Risconsin learned that Defendant had committed a calculation error and that his modification request should have been approved or should have been approved with more favorable terms. Never in the years since losing the Risconsin Property did

Defendant attempt to discuss with Plaintiff Risconsin the calculation errors or its wrongful failure to provide mortgage assistance.

162.    Along with the Apology Letter, Defendant enclosed a check for $200.00. This payment is insufficient to compensate Plaintiff Risconsin for the harm he suffered as a result of Defendant's wrongful practices.

163.    Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Risconsin was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his property caused Plaintiff Risconsin significant economic and non-economic damages.

## PLAINTIFF ADRENIA KEA'S FACTUAL ALLEGATIONS

164.    On or about April 6, 2012, Plaintiff Kea entered into a mortgage for the Kea Property with the Defendant.

165.    In early 2017, Plaintiff Kea reached out to Defendant seeking to modify her loan.

166.    By early spring 2017, Plaintiff Kea submitted a facially complete loss mitigation application.

167.    By summer 2017, Plaintiff Kea had performed all of the necessary steps to complete the permanent loan modification offered by Defendant, and the loan was modified by September 2017.

168.    Upon information and belief, Defendant miscalculated the amount of interest, escrow, or default-related fees that were due and owing on Plaintiff Kea's mortgage loan which wrongfully increased amounts claimed due and owing for trial payments that she remitted as well as for the subsequent permanent modification.

169.    Shortly after resuming her modified mortgage payments to Defendant, Plaintiff Kea lost her employment and she reached out to Wells Fargo preemptively in January 2018 to discuss what, if

any, options she had.

170.    Sometime in February 2018, Plaintiff Kea submitted a facially complete loss mitigation application to Wells Fargo.

171.    Defendant never approved Plaintiff Kea's applications for a subsequent loan modification.

172.    By early June 2018, Defendant had sent notice to Plaintiff Kea of the Notice of Intent to Foreclosure. In an attempt to avoid the financially disastrous consequences of the foreclosure and in an effort to also avoid losing the equity in her property, Plaintiff Kea sold the Kea Property.

173.    Almost six years later, Defendant sent Plaintiff Kea a form Apology Letter dated June 10, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize[s] for any inconvenience this caused".

174.    This was the first time Plaintiff Kea learned that Defendant had committed a calculation error and that her modification should have been approved with more favorable terms.  Never in the years since losing the property did Defendant attempt to discuss with Plaintiff Kea the calculation error(s) or its wrongful failure to provide mortgage assistance.

175.    Along with the Apology Letter, Defendant enclosed a check for $500.00.  This payment is insufficient to compensate Plaintiff Kea for the harm she suffered as a result of Defendant's wrongful practices.

176.    Defendant's repeated refusal to provide accurate loss mitigation  assistance (to which Plaintiff Kea was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, caused Plaintiff Kea significant economic and non-economic damages.

**PLAINTIFF RUTH VERGARA'S FACTUAL ALLEGATIONS**

177.    In early 2012, Plaintiff Vergara's loan began being serviced by Defendant for the Vergara

Property.

178.   In mid-2014, Plaintiff Vergara reached out to Defendant seeking to modify her loan.

179.   By late 2014, Plaintiff Vergara and Defendant entered into a permanent loan modification.

180.   Upon information and belief, Defendant miscalculated the amount of interest, escrow, or default-related fees that were due and owing on Plaintiff Vergara's mortgage loan which wrongfully increased amounts claimed due and owing for trial payments she remitted as well as for the permanent modification.

181.   Almost ten years later, Defendant sent Plaintiff Vergara a form Apology Letter dated June 10, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

182.   This was the first time Plaintiff Vergara learned that Defendant had committed a calculation error and that her modification payments and the amounts due and owing under the same should have been lower.  Never in the years since entering the loan modification with Defendant did Defendant attempt to discuss with Plaintiff Vergara the calculation error(s) and how it may have affected the terms of the mortgage.

183.   Along with the Apology Letter, Defendant enclosed a check for $1,000.00. This payment is insufficient to compensate Plaintiff Vergara for the harm she suffered as a result of Defendant's wrongful practices.

184.   Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiff Vergara was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with having to pay a higher mortgage payment and having a higher mortgage balance have caused Plaintiff Vergara significant economic and non-economic damages.

**PLAINTIFFS LAURENCE PETERSON AND MARCIA PETERSON'S**
**FACTUAL ALLEGATIONS**

185.  In 2008, Plaintiffs Laurence Peterson and Marcia Peterson's mortgage on the Peterson Property began to be serviced by Defendant.

186.  In mid-2013, Plaintiffs Laurence Peterson and Marcia Peterson reached out to Defendant seeking to modify their loan.

187.  After submitting at least one, if not multiple, applications for mortgage assistance over the span of 12 to 14 months, as well as the intervention of the Illinois Attorney General's office, Plaintiffs Laurence Peterson and Marcia Peterson and Defendant entered into a permanent loan modification by early 2015, which had to be re-executed in July 2015.

188.  Upon information and belief, because of the delay in the review for, approval of, and implementation of the modification, and related calculation issues, the amount of interest, escrow, or default-related fees, including attorneys' fees, that were due and owing on Plaintiffs Petersons' mortgage loan was overstated and wrongfully increased amounts claimed due and owing for trial payments they remitted as well as for the permanent modification.

189.  Since that time Plaintiffs Laurence Peterson and Marcia Peterson have remained current on the mortgage.

190.  Almost eight and one-half years later, Defendant sent Plaintiffs Laurence Peterson and Marcia Peterson a form Apology Letter dated June 21, 2024.  The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize[s] for any inconvenience this caused".

191.  This was the first time either Plaintiff Laurence Peterson or Plaintiff Marcia Peterson learned that the Defendant had committed a calculation error and that their modification was miscalculated.  Never in the years since modifying the loan did Defendant attempt to discuss with either

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

Plaintiff Laurence Peterson or Marcia Peterson the calculation error(s) or its wrongful failure to provide accurate mortgage assistance.

192. Along with the Apology Letter, Defendant enclosed a check for $5,148.12. This payment is insufficient to compensate Plaintiffs Laurence Peterson and Marcia Peterson for the harm they suffered as a result of Defendant's wrongful practices.

193. Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiffs Laurence Peterson and Plaintiff Marcia Peterson were eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with charging a higher mortgage payment and imposing a higher mortgage balance have caused Plaintiffs Laurence Peterson and Plaintiff Marcia Peterson significant economic and non-economic damages.

## PLAINTIFFS BRADLEY LIGGETT AND KYRA LIGGETT'S
## FACTUAL ALLEGATIONS

194. In August 2010, Plaintiffs Bradley Liggett and Kyra Liggett entered into a mortgage with the Defendant for the Liggett Property.

195. In mid-2012, Plaintiffs Bradley Liggett and Kyra Liggett contacted Defendant for a loan modification.

196. By the end of 2012, Plaintiffs Bradley Liggett and Kyra Liggett and Defendant had modified the loan.

197. In mid-2015, Plaintiffs Bradley Liggett and Kyra Liggett contacted Defendant for a second loan modification.

198. By the end of 2015, Plaintiffs Bradley Liggett and Kyra Liggett and Defendant had modified the loan.

199. Upon information and belief, because of a delay in the review for, approval of, and

implementation of the modification and related calculation issues, the amount of default-related fees, including attorneys' fees, that were due and owing on Plaintiffs Liggetts' mortgage loan was overstated and wrongfully increased amounts claimed due and owing for trial payments they remitted as well as for the permanent modification.

200.    Plaintiffs Bradley Liggett and Kyra Liggett sold the Liggett Property in 2021.

201.    Almost nine years after modifying the loan, Defendant sent Plaintiffs Bradley Liggett and Kyra Liggett a form Apology Letter dated June 13, 2024.  The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize[s] for any inconvenience this caused".

202.    This was the first time either Plaintiff Bradley Liggett or Plaintiff Kyra Liggett learned that the Defendant had committed a calculation error and that their modification was miscalculated. Never in the years since modifying the loan did Defendant attempt to discuss with either Plaintiffs Bradley Liggett or Kyra Liggett the calculation error(s) or its wrongful failure to provide accurate mortgage assistance.

203.    Along with the Apology Letter, Defendant enclosed a check for $3,321.20. This payment is insufficient to compensate Plaintiffs Bradley Liggett or Kyra Liggett for the harm they each suffered as a result of Defendant's wrongful practices.

204.    Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiffs Bradley Liggett or Kyra Liggett were eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with charging a higher mortgage payment and imposing a higher mortgage balance have caused Plaintiffs Bradley Liggett and Kyra Liggett significant economic and non-economic damages.

## PLAINTIFF DEANNA CLINGERMAN'S FACTUAL ALLEGATIONS

205.  On or about April 29, 2014, Plaintiff Clingerman entered into a mortgage with the Defendant for the Clingerman Property.

206.  In late 2015, Plaintiff Clingerman reached out to Defendant seeking to modify her loan.

207.  Almost 10 months after submitting a facially complete loss mitigation application, a successful appeal of the denial of loss mitigation eligibility, and completion of trial plan payments, Plaintiff Clingerman and Defendant entered into a permanent modification in early October 2016.

208.  Upon information and belief, because of a delay in the review for, approval of, and implementation of the modification and related calculation issues, the amount of default-related fees, including attorneys' fees, that were due and owing on Plaintiff Clingerman's mortgage loan was overstated and wrongfully increased amounts claimed due and owing for trial payments she remitted as well as for the permanent modification.

209.  Almost seven and a half years later, Defendant sent Plaintiff Clingerman a form Apology Letter dated June 13, 2024.  The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize[s] for any inconvenience this caused".

210.  This was the first time Plaintiff Clingerman learned that Defendant had committed a calculation error and that her modification payments should have been lower.  Never in the years since entering the loan modification with Defendant did Defendant attempt to discuss with Plaintiff Clingerman the calculation error(s) and how it affected the terms of the mortgage.

211.  Along with the Apology Letter, Defendant enclosed a check for $569.54.  This payment is insufficient to compensate Plaintiff Clingerman for the harm she suffered as a result of Defendant's wrongful practices.

212.  Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiff

Clingerman was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with charging a higher mortgage payment and imposing a higher mortgage balance have caused Plaintiff Clingerman significant economic and non-economic damages.

## PLAINTIFF BRIAN KEAVENY'S FACTUAL ALLEGATIONS

213.    On or about March 1, 2006, Plaintiff Keaveny entered into a mortgage with the Defendant for the Keaveny Property.

214.    In early 2013, Plaintiff Keaveny reached out to Defendant seeking to modify his loan.

215.    By mid-June 2013, Plaintiff Keaveny was notified by Defendant that he had submitted a facially complete loss mitigation application for review.

216.    By October 2013, Plaintiff Keaveny and Defendant entered into a permanent loan modification.

217.    Upon information and belief, because of a delay in the review for, approval of, and implementation of the modification and related calculation issues, the amount of default-related fees, including attorneys' fees, that were due and owing on Plaintiff Keaveny's mortgage loan was overstated and wrongfully increased amounts claimed due and owing for trial payments he remitted as well as for the permanent modification option into which he entered.

218.    Plaintiff Keaveny sold the home in June 2015.

219.    Over eleven and a half years after entering the permanent loan modification, Defendant sent Plaintiff Keaveny a form Apology Letter dated June 13, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize[s] for any inconvenience this caused".

220.    This was the first time Plaintiff Keaveny learned that Defendant had committed a

calculation error and that his modification payments may have been lower.  Never in the years since entering the loan modification with Defendant did Defendant attempt to discuss with Plaintiff Keaveny the calculation error(s) and how it affected the terms of the mortgage.

221.   Along with the Apology Letter, Defendant enclosed a check for $2,316.23. This payment is insufficient to compensate Plaintiff Keaveny for the harm he suffered as a result of Defendant's wrongful practices.

222.   Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiff Keaveny was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along withcharging a higher mortgage payment and imposing a higher mortgage balance have caused Plaintiff Keavey significant economic and non-economic damages.

**PLAINTIFF RENEE BOUCHER FERGUSON'S FACTUAL ALLEGATIONS**

223.   At all relevant times, Plaintiff Ferguson's mortgage loan was being serviced by Defendant for the Ferguson Property.

224.   In early 2012, Plaintiff Ferguson and Defendant discussed a modification of her loan to lower her mortgage payments.

225.   By mid-2012, Plaintiff Ferguson and Defendant entered into a permanent loan modification, but the modification increased her mortgage payments and principal balance.

226.   Upon information and belief, because of a delay in the review for, approval of, and implementation of the modification and related calculation issues, the amount of default-related fees, including attorneys' fees, that were due and owing on Plaintiff Ferguson's mortgage loan was overstated and wrongfully increased amounts claimed due and owing for trial payments she remitted as well as for the permanent modification option into which she entered.

227.    Twelve years later, Defendant sent Plaintiff Ferguson a form Apology Letter dated June 11, 2024. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize[s] for any inconvenience this caused".

228.    This was the first time Plaintiff Ferguson learned that Defendant had committed a calculation error and that her modification payments may have been lower. Never in the years since entering the loan modification with Defendant did Defendant attempt to discuss with Plaintiff Ferguson the calculation error(s) and how it may have affected the terms of the mortgage.

229.    Along with the Apology Letter, Defendant enclosed a check in the amount of $250.00. This payment is insufficient to compensate Plaintiff Ferguson for the harm she suffered as a result of Defendant's wrongful practices.

230.    After receiving the Apology Letter, Plaintiff Ferguson contacted Defendant's representatives and expressed her concern about receiving the Apology Letter.  As a result of that call, Defendant sent Plaintiff Ferguson a second Apology Letter and a check for $500.00, which is also insufficient to compensate Plaintiff Ferguson for the harm she suffered as a result of Defendant's wrongful practices.

231.    Defendant's repeated refusal to provide accurate mortgage assistance (to which Plaintiff Ferguson was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with charging a higher mortgage payment and imposing a higher mortgage balance have caused Plaintiff Ferguson significant economic and non-economic damages.

## CLASS ALLEGATIONS

232.    **The Class:** Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(3), on behalf of similarly situated individuals and entities ("the Class") defined as follows:

All persons, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

233.    **The Unjust Enrichment Subclass**:  Plaintiffs additionally seek to represent a subclass defined as follows:

All persons who, as a result of a calculation error in Defendant's loss mitigation decision process, paid or are paying fees or interest greater than what they would have paid or have been paying if not for the calculation error.

234.    **The California Subclass**.  Plaintiffs Curry, B. Liggett and K. Liggett additionally seek to represent a subclass defined as follows:

All persons in California, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

235.    **The Illinois Subclass.**  Plaintiffs Nelson, L. Peterson, and M. Peterson additionally seeks to represent a subclass defined as follows:

All persons in Illinois, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

236.    **The Pennsylvania Subclass**. Plaintiff Risconsin additionally seeks to represent a subclass defined as follows:

All persons in Pennsylvania, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January

1, 2008 (i) qualified for a loss mitigation option, (ii) received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

237.    **The North Carolina Subclass.** Plaintiff Kea additionally seeks to represent a subclass defined as follows:

> All persons in North Carolina, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) received a temporary or permanent loss mitigation option from Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

238.    **The New York Subclass.** Plaintiff Ferguson additionally seeks to represent a subclass defined as follows:

> All persons in New York as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) received a temporary or permanent loss mitigation option by Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

239.    **The Washington, DC Subclass.** Plaintiff Forney additionally seeks to represent a subclass defined as follows:

> All persons in Washington, DC, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee or servicer, in the United States who since January 1, 2008 (i) qualified for a loss mitigation option, (ii) received a temporary or permanent loss mitigation option by Defendant based on inaccurate calculations due to a calculation error in Defendant's loss mitigation decision process, and (iii) were sent an apology letter from Defendant stating that an error may have occurred related to their loss mitigation option.

240.    Excluded from the Class and Subclasses are (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendant, Defendant's subsidiaries, parents,

successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

241.   Plaintiffs hereby reserve the rights to amend or modify the Class and Subclass definitions with greater specificity or division after having had an opportunity to conduct discovery.

242.   **Numerosity.**  The members of the Class and Subclasses are so numerous that joinder of all members is impractical as the Class and Subclass are estimated, based upon the Hernandez case and Ryder case to consist of hundreds, if not thousands of borrowers.  Class members can easily be identified through Defendant's records, or by other means. A class action is the only feasible method of adjudicating the rights of all affected debtors, and absent allowance of a certification of a class action, a failure of justice will result.  The number of putative Class and Subclass members can be readily ascertained by a review of Defendant's records. Using this information, Class and Subclass members can be identified and ascertained for the purpose of providing notice and ultimate relief.

243.   **Commonality and Predominance**.  This action involves common questions of law and fact that predominate over any questions affecting individual Class and Subclass members. These common questions are appropriate for class certification because the resolution thereof would substantially advance the disposition of this matter and each party's interests herein.  These common questions include:

a.   What calculation and related errors occurred in Defendant's loss mitigation underwriting tool and/or related software since 2008.

b.   What processes and decisions did Defendant take when designing, creating, and

writing the formulas and processes in its automated loss mitigation tools and related software since 2008.

c.   What were Defendant's common policies and practices regarding its oversight, inspection, auditing, testing, review, repair, and control of automated loss mitigation tools and related software since 2008.

d.   What were Defendant's common policies and practices regarding the inspection, verification, and reporting of negative information to credit reporting agencies since 2008.

e.   What were Defendant's common policies and practices regarding rescinding or correcting negative information that was erroneously reported to credit reporting agencies since 2008.

f.   How and when did Defendant discover errors in its automated loss mitigation tools and related software.

g.   What actions and/or disclosures did Defendant take and/or make each time it discovered errors in its automated loss mitigation tools and related software.

h.   When was Defendant on notice of and knew of errors in its automated loss mitigation tools due to inadequate oversight, auditing, and testing compliance mechanisms.

i.   Did Defendant ever undertake any effort to correct its erroneous reporting to credit reporting agencies.

j.   Did Defendant owe contractual obligations to Class members by failing to approve them for loss mitigation options for which they were qualified pursuant to the requirements of government sponsored enterprises, the FHA, HAMP, or for private investors.

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

k.  Did Defendant breach those contractual obligations.

l.  Was Defendant's conduct extreme and outrageous.

m.  Did Defendant conceal or misrepresent to members of the Class its automated calculation errors and/or their entitlement to loss mitigation options.

n.  Was any such concealment or misrepresentation material to Class members' loss mitigation options.

o.  Did Defendant conceal or misrepresent material facts with knowledge of the fact's materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity.

p.  Was the Class members' property in active foreclosure at the time of the calculation error.

q.  Was the mortgage held by Wells Fargo paid in full by the Class member following an application for loss mitigation being denied due to the calculation error.

r.  Was the mortgage held by Wells Fargo service transferred and then had foreclosure initiated against the Class member within twelve months of the service transfer following an application for loss mitigation being denied due to the calculation error.

s.  Was the mortgage held by Wells Fargo satisfied via short sale proceeds from the Class member following an application for loss mitigation being denied due to the calculation error.

t.  Was the Class members' mortgage subsequently modified by Wells Fargo following an application for loss mitigation being denied due to the calculation error.

u.  Whether Plaintiffs, Class and Subclass members were injured and suffered damages or other losses because of Defendant's actions as described herein.

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

v.  Whether Plaintiff, Class, and Subclass members are entitled to damages, and the measure and amount of those damages.

244.  **Typicality**.  Each of the Plaintiffs' claims are typical of those of other Class and Subclass members.  Plaintiffs were each a borrower who owned residential real property with a residential mortgage loan that was owned and/or serviced by Wells Fargo since 2008. Each of the Plaintiffs' loans entered loss mitigation review between from 2008 to the present. Each of the Plaintiffs' loans qualified for a loss mitigation option between 2008 and the present. Defendant improperly denied each of the Plaintiffs' loss mitigation reviews for a loss mitigation option, or improperly added unwarranted amounts to the payments, or the balances due and owing, for such loss mitigation options between 2008 and the present due to automated calculation and related errors pertaining to Defendant's use of a loss mitigation and underwriting tool. Each of the Plaintiffs received the December 2023 through 2024 Apology Letters from Defendant.  As such, each of the Plaintiffs' claims arise from the same factual circumstances as the claims of other Class members, their damages and injuries are akin to those of other Class members, and Plaintiffs are each seeking relief consistent with the relief sought by the Class.

245.  **Adequacy**. Each of the Plaintiffs are an adequate representative because each one of them is a member of the Class that they seek to represent, are committed to pursuing this matter against Defendant to obtain relief for the Class, and have no conflicts of interest with the Class. Moreover, Plaintiffs' attorneys are competent and experienced in litigating class actions such as this one. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect Class members' interests.

246.  **Superiority**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to

justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively modest compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

247.    Additionally, Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(c)(4), on behalf of the Class, with respect to the following issues:

    a.   Whether calculation and related errors occurred in Defendant's loss mitigation underwriting tool and/or related software since 2008.

    b.   Whether Defendant had common policies and practices regarding its oversight, inspection, auditing, testing, review, repair, and control of automated loss mitigation tools and related software since 2008.

    c.   Whether Defendant had common policies and practices regarding the inspection, verification, and reporting of negative information to credit reporting agencies since 2008.

    d.   Whether Defendant had common policies and practices regarding rescinding or correcting negative information that was erroneously reported to credit reporting agencies since 2008.

    e.   When did Defendant discover errors in its automated loss mitigation tools and related software.

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

f.  Whether Defendant failed to take any actions and/or make any disclosures each time it discovered errors in its automated loss mitigation tools and related software.

g.  When was Defendant on notice of the risk of errors in its automated loss mitigation tools due to inadequate oversight, auditing, and testing compliance mechanisms.

h.  Whether Defendant undertook any effort to correct its erroneous reporting to credit reporting agencies.

i.  Whether Defendant owed contractual obligations to Class members by failing to approve them for loss mitigation options for which they were qualified pursuant to the requirements of government sponsored enterprises, the FHA, HAMP, or for private investors.

j.  Whether Defendant breached those contractual obligations.

k.  Whether Defendant's conduct was extreme and outrageous.

l.  Whether Defendant concealed or misrepresented to members of the Class its automated calculation errors and/or their entitlement to loss mitigation options.

m.  Whether any such concealment or misrepresentation was material to Class members' loss mitigation options.

n.  Whether Defendant concealed or misrepresented material facts with knowledge of the fact's materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity.

o.  Whether the Class members' property was in active foreclosure at the time of the calculation error.

p.  Whether the mortgage held by Wells Fargo was paid in full by the Class member following an application for loss mitigation being denied due to the calculation error.

q.   Whether the mortgage held by Wells Fargo was service transferred and then had foreclosure initiated against the Class member within twelve months of the service transfer following an application for loss mitigation being denied due to the calculation error.

r.   Whether the mortgage held by Wells Fargo was satisfied via short sale proceeds from the Class member following an application for loss mitigation being denied due to the calculation error.

s.   Whether the Class members' mortgage was subsequently modified by Wells Fargo following an application for loss mitigation being denied due to the calculation error.

t.   Whether Plaintiffs, Class and Subclass members were injured and suffered damages or other losses because of Defendant's actions as described herein.

u.   Whether Plaintiff, Class, and Subclass members are entitled to damages.

## TOLLING ALLEGATIONS FOR ALL CLAIMS

248.   The causes of actions alleged herein by Plaintiffs and Class members against Defendant did not accrue or were tolled until Plaintiffs and Class members discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to their legal claims. Based upon the allegations contained herein the earliest any of the Plaintiffs or Class members could have learned of their claims was December 5, 2023.

249.   Based upon the allegations contained herein, Plaintiffs and Class members had no realistic possibility, until receiving the Apology Letters, to know that they qualified for a loss mitigation option, and they either (a) were wrongfully denied for a loss mitigation option based on a miscalculation made by Defendant's automated decision-making tool that was exclusively under the control of Defendant at all times (as it remains), and were wrongfully foreclosed upon, or (b) received loss mitigation options

with (i) additional unwarranted amounts improperly added to the payments due thereunder, or (ii) improperly increased balances due and owing thereunder.

250.   Based upon the allegations contained herein, Plaintiffs and Class members had no realistic ability to discover any facts only known to Defendant regarding the wrongful denial of loss mitigation options, or miscalculation of increased amounts due and owing for the loss mitigation options, sought between 2008 and 2018. Defendant's automated decision-making tool is not public. The mathematical calculations used to determine eligibility for any loss mitigation option depend solely on variables within Defendant's exclusive control or information provided exclusively to Defendant. The mathematical calculations used to calculate the amounts due and owing for the loss mitigation options depend solely on variables within Defendant's exclusive control or information provided exclusively to Defendant.

251.   Based on the foregoing, any applicable statutes of limitations are also tolled by Defendant's knowing, active, and ongoing concealment of the facts alleged herein. Defendant discovered at least one, if not multiple, software errors no later than August 2013 which contributed to the wrongful denial of loss mitigation options to the Plaintiffs and Class members, and which contributed to the approval of loss mitigation options to Plaintiffs and Class members with improperly inflated amounts due and owing. Based on the allegations contained herein, and each 10-Q issued by Wells Fargo & Company since August 2018, Defendant deliberately concealed any information regarding the wrongful loss mitigation determinations and calculations until September 13, 2018.

252.   Defendant has a continuous duty to disclose the truth to Plaintiffs and Class members and, based upon the actions herein, Plaintiffs and Class members reasonably relied on Defendant's ongoing concealment until taking the actions to procure discovery described herein.

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT
#### (Brought on behalf of the Plaintiffs, Class and Subclasses)

253.   Plaintiffs incorporate by reference all prior allegations of paragraphs 1-252 as if fully restated herein.

254.   When Plaintiffs and Class members financed their homes, they entered into Security Instruments (typically referred to as either a mortgage, deed or trust or security deed) that set forth the conditions under which the lender could accelerate the borrower's payments and/or foreclose on the property.

255.   The Security Instruments also set forth conditions on the circumstances and conditions for imposing fees, charges, or other amounts, including default servicing fees, attorneys' fees, and escrow items, as well as limitations on them.

256.   In particular, the Security Instruments provide that any fees, charges, and amounts must be for service actually performed or amounts actually incurred to protect Defendant's or other assignees' interests.[10,11]

---

[10] All loans purchased by Fannie Mae or Freddie Mac must utilize Uniform Instruments provided by such entities. For example, Form 3036 identified as "OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS" contains the following provision: "14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under the Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees...Lender may not charge fees that are expressly prohibited by the Security Instrument or Applicable Law." Loans backed by the U.S. Department of Veterans Affairs ("VA") also utilize these same Uniform Instruments along with a VA Rider containing additional terms.

[11] All loans insured by the FHA must utilize uniform prescribed instruments approved by HUD. For example, FHA Open-End Mortgage with MERS-OH, Form 4/96 Amended 1/02, contains the following provisions:
- "If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in

257.   All Plaintiffs and Class members with loans secured by Fannie Mae, Freddie Mac, VA, or FHA use uniform Security Instruments that contain substantially similar provisions restricting loan fees and charges to amounts for services actually performed or amounts actually incurred to protect the interests of Defendant or other assignees.

258.   As explained above, the faulty automated formulas that Defendant used to determine the trial plan payments and/or permanent loss mitigation option payments it presented to Plaintiffs and Class members *overstated* the amount of default servicing fees, attorneys' fees, escrow fees, etc. that Plaintiffs and Class members owed in connection with their loans. In other words, the amounts Defendant claimed were due and owing for approved loss mitigation options for Plaintiffs' and Class members' loans included fees, charges, or other amounts that were not for services actually performed or amounts actually incurred to protect Defendant's or other assignees' interests as these amounts were incorrect or inflated.

259.   Thus, Defendant breached the contractual terms of Plaintiffs' and Class members' respective Security Instruments—which prohibited the imposition of fees and charges for services not actually performed or amounts not actually incurred to protect Defendant's or other assignees' interests—by including such fees and charges in the amounts ostensibly due and owing under the loss mitigation options it presented to Plaintiffs and Class members.

260.   Put another way, Defendant's use of faulty automated calculations in determining the trial plan payments and/or permanent loss mitigation option payments led to the inflation of the amounts due and owing on Plaintiffs' and Class members' loans (by including amounts that were not actually due

---

bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2."

- "8. Fees. Lender may collect fees and charges authorized by the Secretary [of Housing and Urban Development]."

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

and owing). The payments to be made by Plaintiffs and Class members under the approved loss mitigation options offered to them by Defendant were based on these inflated and miscalculated figures. Therefore, Defendant's miscalculations resulted in Defendant imposing and collecting unearned/unwarranted fees and charges in violation of the express terms of Plaintiffs' and Class members' respective Security Instruments.

261. Moreover, as explained *supra*, as part of Defendant's participation in HAMP and TARP, it agreed to be legally bound by various servicing guidelines implemented by entities such as Fannie Mae,[12] Freddie Mac,[13] the Secretary of the Department of Housing and Urban Development (the "HUD Secretary"),[14] and the Secretary for the Department of Veterans Affairs (the "VA Secretary").[15] *See,*

---

[12] Fannie Mae maintains a servicing guide accessible at https://servicing-guide.fanniemae.com/. This provides for explicit guidance and limitations on loss mitigation, as well as for recovery for expenses and fees incurred for default related services, including the reimbursement of legal fees. *See*, Servicing Guide, Part E. Fannie Mae maintains an exhibit to its Servicing Guide that prescribes maximum amounts allowable for recovery of attorneys' fees in relation to defaulted loans. *See*, Servicing Guide, Part E-5-04.

[13] Freddie Mac maintains a servicing guide accessible at https://guide.freddiemac.com/. This provides for explicit guidance and limitations on loss mitigation, as well as recovery for expenses and fees incurred for default related services, including the reimbursement of legal fees. *See*, *inter alia*, Servicing Guide, Series 9000, Topics 9200 and 9700.

[14] Plaintiffs' and Class members' Security Instruments for FHA loans contain contractual provisions expressly stating that the regulations of the HUD Secretary limit Defendant's or other assignees' rights to enforce the Security Instruments in the event of default, including prohibiting acceleration or foreclosure if not permitted by such regulations. *See*, for example, FHA Open-End Mortgage with MERS-OH, Form 4/96 Amended 1/02 at 9.(d): "(d) Regulations of HUD Secretary. In many circumstances, regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full or foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary." The FHA Single Family Housing Policy Handbook, SFH Handbook 4000.1, contains servicing guidelines that place limitations on servicers' actions. Beginning March 14, 2016, the SFH Handbook mandated express guidelines for the servicing of loans in default, as well as loss mitigation. *See*, SFH Handbook, I.A.2., published 6/24/2015.

[15] Plaintiffs' and Class members' Security Instruments for VA loans contain contractual provisions expressly stating that the regulations of the VA Secretary govern the rights, duties, and liabilities of the parties to such loans, and that any contractual provisions in the Security Instruments inconsistent with these regulations are amended and supplemented to conform thereto. The VA Handbook M26-4, Servicer Handbook, contains servicing guidelines that place limitations on servicers' actions. For example, on

*e.g.*, *Corvello*, 728 F.3d at 880 (noting that "Wells Fargo[] signed Servicer Participation Agreements [which] required [it] to follow Treasury guidelines and procedures" with respect to loan modifications).

262.    These servicing guidelines set forth additional conditions on the circumstances and conditions for imposing fees, charges, or other amounts, including default servicing fees, attorneys' fees, and escrow items, as well as limitations on them, and limitations for such amounts that could be included in the evaluation for and calculation of loss mitigation options.

263.    All Plaintiffs and Class members with loans secured by Fannie Mae, Freddie Mac, VA, or FHA use uniform Security Instruments containing language providing that Wells Fargo's rights and obligations are subject to the requirements and limitations imposed by applicable law.[16] Accordingly, the aforementioned servicing guidelines are expressly incorporated into the terms of Plaintiffs' and Class members' Security Instruments.

264.    Alternatively, Plaintiffs and Class members were, at the very least, intended third-party beneficiaries of these servicing guidelines and regulations and have contractual rights to enforce them, as Plaintiffs and Class members are in the class of persons these guidelines and regulations were designed to protect.

265.    Defendant breached these servicing guidelines and regulations by miscalculating the amounts due and owing for approved loss mitigation options for Plaintiffs and Class members, based

---

September 30, 2015, the VA issued "Circular 26-15-21 - Property Preservation Requirements and Fees" which placed maximum amounts that could be charged for services actually performed for inspection and maintenance of properties securing delinquent VA Loans. The VA has regularly prescribed other similar limitations on delinquency related fees and charges.

[16] For example, Paragraph 17 of Form 3036 identified as "OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS" states that "all rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law" (which is defined as "all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions").

upon faulty automated calculations in determining the trial plan payments and/or permanent loss mitigation option payments. As explained above, these faulty calculations included charges and amounts for fees, charges, or other amounts, including default servicing fees, attorneys' fees, and escrow items, that were in excess of the restrictions and limitations for imposing these charges contained in the servicing guidelines and regulations governing Plaintiffs' and Class members' loans, and, by extension, in violation of the provisions in the Security Instruments providing that Wells Fargo's rights and obligations are subject to the requirements and limitations imposed by applicable law.

266.    Wells Fargo was subject to the terms of these Security Instruments, either as the original lender, an assignee, and/or as the mortgage servicer authorized to act on behalf of the lender.

267.    In light of the foregoing, the Security Instruments required Wells Fargo to provide Plaintiffs and Class members all available options to cure a default at the time a default existed under the terms of the Security Instrument, and ensure that those options accurately reflected the proper amounts owed (*i.e.*, did not include inflated and excess fees that were prohibited).

268.    Moreover, implied in each of Plaintiffs' and Class members' Security Instruments was a duty of good faith and fair dealing, which exists in relation to the performance of a specific contract term.

269.    As noted above, the Security Instruments *expressly* limited the circumstances and conditions under which Wells Fargo could impose fees, charges, or other amounts, including default servicing fees, attorneys' fees, and escrow items, and *expressly* prohibited Wells Fargo from imposing fees and charges for services not actually performed or amounts not actually incurred to protect the interests of Defendant or other assignees.

270.    The Security Instruments also *expressly* required Wells Fargo to comply with the requirements and limitations imposed by applicable law, which, relevant here, includes the

aforementioned servicing guidelines promulgated by, *inter alia*, Fannie Mae, Freddie Mac, the HUD Secretary, and the VA Secretary.

271. Based on the foregoing, Wells Fargo's duty of good faith and fair dealing required it to ensure that any fees and charges imposed upon Plaintiffs and Class members were for services actually performed or amounts actually incurred to protect the interests of Defendant or any other assignee, as well as to offer Plaintiffs and Class members loss mitigation options that were calculated in a manner consistent with the applicable servicing guidelines and regulations.

272. Based on the allegations *supra*, Plaintiffs and each member of the Class provided documents, information, and certifications in compliance with the Security Instruments for Defendant to review for their eligibility for loss mitigation options.

273. Following receipt of these documents from Plaintiffs and Class members, Wells Fargo was required under the terms of the Security Instruments to consider the Plaintiffs and Class members for loss mitigation options and to provide them with any appropriate loss mitigation options for which they qualified.

274. Defendant reviewed Plaintiffs and Class members for loss mitigation options, but, in doing so, miscalculated the amounts due and owing for approved loss mitigation options, based upon faulty automated calculations in determining the trial plan payments and/or permanent loss mitigation option payments. These faulty calculations included charges and amounts for fees, charges, or other amounts, including default servicing fees, attorneys' fees, and escrow items, that were in excess of the restrictions and limitations for imposing these charges contained in the Security Agreements and/or the servicing guidelines and regulations governing Plaintiffs' and Class members' loans.

275. As noted above, Wells Fargo was not permitted by the Security Instruments to impose fees against Plaintiffs' and Class members' loans through these loss mitigation options that are contrary

to the terms of the Security Instruments and/or the servicing guidelines and regulations governing Plaintiffs' and Class members' loans.

276.     In light of Defendant's duty of good faith and fair dealing, it was not enough for Defendant to provide each Plaintiff and Class member with *a* loss mitigation option; Defendant was required to provide each Plaintiff and Class member with ***an accurately calculated*** loss mitigation option.

277.     Thus, by miscalculating the amounts due and owing for approved loss mitigation options, Defendant breached its duty of good faith and fair dealing to Plaintiffs and Class members under the Security Instruments.

278.     By Defendant's own admissions in the Consent Order and the Apology Letters, had the automated calculations been correct, Plaintiffs and each of the Class members would have been approved for a loss mitigation option or, if approved, the loss mitigation calculations would have been correct and not inflated.

279.     As a result of the faulty automated calculations, Plaintiffs and Class members were offered less beneficial options at a time when Plaintiffs and Class members were experiencing extreme hardship. Ultimately, Plaintiffs and Class members were damaged by Defendant's breach while at their most vulnerable.

280.     Defendant discovered its automated calculation errors starting in 2013. Defendant failed to disclose the errors to the public until August 3, 2018, and failed to disclose the errors to individuals they affected until September 2018. Despite admitting its errors and that its errors caused Plaintiffs and Class members to suffer significant harm, Defendant did nothing for several years to mitigate the harm it caused to Plaintiffs and Class members, keeping the accounting errors a secret. On information and belief, after discovering its automated calculation errors, Defendant continued to offer loss mitigation options to Plaintiffs and Class members based on the erroneous calculations about which Defendant

knew at the time Defendant was offering loss mitigation options to Plaintiffs and Class members. Defendant also breached the duty of good faith and fair dealing it owed to Plaintiffs and Class members by concealing this information for years.

281.  All of the breaches alleged in this Count additionally demonstrate at least one, if not, multiple, breaches of the implied duty of good faith and fair dealing that Wells Fargo had under the Security Instruments to the Plaintiffs and Class members.

282.  Plaintiffs and members of the Class were injured by Defendant's breach of the Security Instruments, and they suffered damages. In sending Apology Letters to Plaintiffs and Class members, Defendant admitted the breach; the only question that remains, therefore, is the amount of damages, which is to be proven at trial.

## COUNT TWO
### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
#### (Brought on behalf of the Plaintiffs and Class)

283.  Plaintiffs incorporate by reference all other allegations of paragraphs 1-252 as if fully restated herein.

284.  Wells Fargo has violated and continues to violate the California Unfair Competition Law ("UCL"), Cal. Bus. and Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, or fraudulent practices.

285.  Plaintiffs bring this claim on behalf of themselves and the Class. The UCL permits claims by out-of-state Plaintiffs against conduct occurring in California. *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 224–225 (1999).

286.  Defendant's parent company, WF&Co., engages in substantial sales and marketing activities in California.

287.  Upon information and belief, Defendant's actions and omissions that give rise to this

litigation were conceived, designed, facilitated, instigated, overseen, managed, and coordinated by WF&Co.'s leadership in California, and Defendant's uniform conduct at issue in this case emanated from WF&Co. in California, as evidenced by, *inter alia*, the following:

    a.  The OCC and the Board of Governors of the Federal Reserve warned Defendant and *its parent company*, WF&Co., in 2011 that, *inter alia*, Wells Fargo was engaged in "unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings."

    b.  In 2015, the OCC again determined that, despite the 2011 consent cease and desist orders, Defendant continued to fail to adequately oversee, audit, and test its servicing, modification, and foreclosure practices for compliance. As a result, the OCC assessed millions of dollars in monetary penalties against *Defendant's parent company*, WF&Co.

    c.  Defendant's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced through a formal Cease and Desist Letter that it would prohibit *Defendant's parent company*, WF&Co., from expanding its business until it sufficiently improved its governance and controls.

288.  More specifically, upon information and belief, the erroneous formulas used by Wells Fargo—which led to the miscalculations at issue—were conceived, designed, and/or approved by WF&Co.'s leadership in California. This allegation is supported by the fact that the OCC and the Board of Governors of the Federal Reserve repeatedly took action against WF&Co. (and not *just* Defendant) for legal violations related to *Defendant's* mortgage servicing procedures.

289.  Thus, Defendant's conduct at issue in this case emanated from WF&Co. in California, and

harmed all Plaintiffs and Class members (including citizens and non-citizens of the State of California) in the same way, such that California law applies to Plaintiffs' and Class members' claims. California has a substantial interest that its laws be applied to Defendant's (and its parent company's) conduct alleged herein that substantially outweighs any interests of other states.

290.    In the alternative, should the Court determine that out-of-state Plaintiffs cannot maintain this claim against Defendant, Plaintiffs Curry, B. Liggett and T. Liggett bring this claim for relief on behalf of themselves and the California Subclass.

### *"Deceptive" Prong*

291.    A claim under the UCL's "deceptive" prong "is distinct from common law fraud and does not require a plaintiff to plead and prove the elements of a tort." *E.g.*, *Kowalsky v. Hewlett-Packard Co.*, 771 F.Supp.2d 1156, 1159 (N.D. Cal. 2011). Thus, "a business practice may be deemed fraudulent in the context of [the UCL] if the public is likely to be deceived," even in the absence of intent or reliance. *E.g.*, *Meixner v. Wells Fargo Bank, N.A.*, 101 F.Supp.3d 938, 959-60 (E.D. Cal. 2015); *In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009); *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861, 877 (1999).

292.    Here, Defendant provided Plaintiffs and Class members with loan modification options which affirmatively misstated the total balances owed and the amounts of their monthly payments due to the systemic calculation errors referenced *supra*.

293.    Given that Defendant knew of the systemic calculation errors referenced *supra*, Defendant knew that the re-calculated loan terms offered to Plaintiffs and Class members were incorrect at the time Defendant was offering loss mitigation options to Plaintiffs and Class members, but Defendant nevertheless misrepresented to Plaintiffs and Class members that they were the actual amounts due on their respective loans.

294.    In reliance on the Defendant's false representations, Plaintiffs and Class members either (1) accepted loan modifications and made payments towards loans with inflated monthly payment amounts and balances due, (2) could not afford the loan modifications offered because the terms thereof were unaffordable and unnecessarily onerous, and lost their homes as a result, or (3) both.

295.    As a result of these deceptive practices, Defendant obtained assets and sums from Plaintiffs and Class members to which it was not entitled. Defendant's retention of these benefits is unfair, and thus, these benefits should be disgorged from Defendant, and returned to Plaintiffs and Class members.

### *"Unfair" Prong*

296.    A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

297.    Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant intentionally and knowingly committed errors in connection with the modification and/or mortgage loan accounts of Plaintiffs and Class members, without their knowledge or consent, and has failed to offer a proper remedy. Wells Fargo further engaged in unfair practices by failing to properly verify or audit the automated software it used to determine whether Plaintiffs and Class members were eligible for a loss mitigation option and/or whether the loss mitigation options were miscalculated. Wells Fargo's faulty verification and auditing practices allowed multiple systemic errors to remain uncorrected for at least ten years, and persisted even after (i) the federal government cited Wells Fargo for failing to adequately audit its loss mitigation and foreclosure processes, (ii) the federal government found a software error had led Wells Fargo to wrongfully deny mortgage modifications in 2013-2014, and (iii)

Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

298.    As a result of Defendant's unfair practices, Plaintiffs and Class members either (1) accepted loan modifications and made payments towards loans with inflated monthly payment amounts and balances due, (2) could not afford the loan modifications offered because the terms thereof were unaffordable and unnecessarily onerous, and lost their homes as a result, or (3) both.

299.    As a result of these unfair practices, Defendant obtained assets and sums from Plaintiffs and Class members to which it was not entitled. Defendant's retention of these benefits is unfair, and thus, these benefits should be disgorged from Defendant, and returned to Plaintiffs and Class members

300.    The harm to Plaintiffs and Class members grossly outweighs the utility of Defendant's practices, as there is no utility to Defendant's unfair practices.

**COUNT THREE**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**BUSINESS PRACTICES ACT**
**(Brought on behalf of Plaintiffs Nelson, L. Peterson, and M. Peterson**
**and the Illinois Subclass)**

301.    Plaintiffs Nelson, L. Peterson, and M. Peterson incorporate by reference all prior allegations of paragraphs 1-252 as if fully restated herein.

302.    Plaintiffs Nelson, L. Peterson, and M. Peterson bring this claim for relief on behalf of themselves and the Illinois Subclass.

303.    The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act") provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception or fraud, false pretenses, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

> 815 ILCS 505/2.

304.   At all times herein, Plaintiffs Nelson, L. Peterson, and M. Peterson and the Illinois Subclass members were a "consumer" as that term is defined by the Act. 815 ILCS 505/1(e).

305.   At all times herein, Wells Fargo engaged in trade or commerce as those terms are defined in the Act. 815 ILCS 505/1(f).

306.   Under the Act, there is no "intent to deceive" requirement; a plaintiff need only show that the defendant intended that the plaintiff rely on the (intentionally or unintentionally) deceptive information given. Thus, innocent misrepresentations are actionable under the Act. Further, the Act provides redress "not only for deceptive business practices, but also for business practices that, while not deceptive, are unfair." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574–75 (7th Cir. 2012).

307.   Based on the allegations contained, *supra*, Wells Fargo engaged in unfair acts in its dealings with Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members in violation of law.

308.   Specifically, Defendant provided Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members with loan modification options which affirmatively misstated the total balances owed and the amounts of their monthly payments due to the systemic calculation error referenced herein.

309.   Given that Defendant knew of the systemic calculation errors referenced herein, Defendant knew that the re-calculated loan terms offered to Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members were incorrect at the time Defendant was offering loss mitigation options to Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members, but Defendant nevertheless represented to Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members that they were the actual amounts due on their respective loans.

310.   In reliance on the Defendant's false representations, Plaintiffs Nelson, L. Peterson, and

M. Peterson and Illinois Subclass members either (1) accepted loan modifications and made payments towards loans with inflated monthly payment amounts and balances due, (2) could not afford the loan modifications offered because the terms thereof were unaffordable and unnecessarily onerous, and lost their homes as a result, or (3) both.

311.    Wells Fargo knew or was in conscious disregard of the fact that its process for deciding modification applications was riddled with errors when it considered the applications of Plaintiffs Nelson, L. Peterson, and M. Peterson and the Illinois Subclass members. Wells Fargo knew of numerous errors in its process at the very latest when the OCC took regulatory action with respect to them. Once the OCC scrutinized Wells Fargo's processes, Wells Fargo exhibited conscious disregard for the impacts of the quality and compliance of its processes and never audited, tested, monitored, or conducted any quality assurance on its methods, instead relying on the OCC to take repeated regulatory actions to detect its errors. Wells Fargo continued to use the flawed processes knowing that they contained errors that injured consumers, including Plaintiffs Nelson, L. Peterson, and M. Peterson and the Illinois Subclass members.

312.    Wells Fargo's conduct was unfair and unlawful under HAMP. All loans purchased by Fannie Mae or Freddie Mac must utilize Uniform Instruments provided by such entities. For example, Form 3036 identified as "OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS" contains the following provision: "14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under the Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees...Lender may not charge fees that are expressly prohibited by the Security Instrument or Applicable Law." Loans backed by the U.S. Department of Veterans Affairs ("VA") also utilize these same Uniform Instruments along with a VA Rider containing additional

terms. When Wells Fargo imposed or accounted for prohibited fees, it violated this prohibition.

313.    Wells Fargo's conduct was directed at consumers generally.

314.    Wells Fargo's conduct needlessly caused consumers, including Plaintiffs Nelson, L. Peterson, and M. Peterson and the Illinois Subclass members, considerable economic damages including the loss of equity in their home, the loss of their home, moving expenses, time associated with loss mitigation efforts and court appearances and other forms of economic loss.

315.    Wells Fargo's conduct also needlessly caused Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members to suffer significant, life-altering, non-economic harm that has defined their lives for years.

316.    All the needless harms suffered by Plaintiffs Nelson, L. Peterson, and M. Peterson and Illinois Subclass members are directly and proximately resulted from Wells Fargo's unfair acts and practices.

## COUNT FOUR
### VIOLATIONS OF THE PENNSYLVANIA UNIFORM TRADE PRACTICES ACT
### (Brought on behalf of Plaintiff Risconsin and the Pennsylvania Subclass)

317.    Plaintiff Risconsin incorporates by reference all prior allegations of paragraphs 1-252 as if fully restated herein.

318.    Plaintiff Risconsin brings this claim for relief on behalf of himself and the Pennsylvania Subclass.

319.    The Pennsylvania Uniform Trade Practices Act (the "Act") provides:

Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

section, costs and reasonable attorney fees.

73 P.S. § 201-9-2.

320.    "'Unfair methods of competition' and 'unfair or deceptive acts or practices' mean any one or more of the following [...] (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. C.S.§ 201-(4)(xxi).

321.    At all times herein, Plaintiff Risconsin and the Pennsylvania Subclass members were a "person" as that term is defined by the Act. 73 P.S. § 201-2.

322.    At all times herein, Plaintiff Risconsin and the Pennsylvania Subclass members were provided services and engaged in trade as defined in the Act. 73 P.S. § 201-2.

323.    Based on the allegations contained, *supra*, Wells Fargo engaged in unfair deceptive acts or practices in its dealings with Plaintiff Risconsin and Pennsylvania Subclass members in violation of law by failing to accurately calculate the amounts due and owing under loss mitigation options offered to Plaintiff Risconsin and Pennsylvania Subclass members and demanding wrongful amounts due and owing under the same.

324.    Specifically, Defendant provided Plaintiff Risconsin and Pennsylvania Subclass members with loan modification options which affirmatively misstated the total balances owed and the amounts of their monthly payments due to the systemic calculation errors referenced herein.

325.    Given that Defendant knew of the systemic calculation errors referenced herein, Defendant knew that the re-calculated loan terms offered to Plaintiff Risconsin and Pennsylvania Subclass members were incorrect at the time Defendant was offering loss mitigation options to Plaintiff Risconsin and Pennsylvania Subclass members, but nevertheless represented to Plaintiff Risconsin and Pennsylvania Subclass members that they were the actual amounts due on their respective loans.

326.    In reliance on the Defendant's false representations, Plaintiff Risconsin and Pennsylvania

Subclass members either (1) accepted loan modifications and made payments towards loans with inflated monthly payment amounts and balances due, (2) could not afford the loan modifications offered because the terms thereof were unaffordable and unnecessarily onerous, and lost their homes as a result, or (3) both.

327.    Wells Fargo's conduct, admitted to be improper, constitutes "trade" or "commerce" under the UTPCPL as such actions are services performed in relation to real property or thing of value and is commerce directly affecting the people of the Commonwealth of Pennsylvania. 73 Pa. C.S.§ 201-(3).

328.    Wells Fargo's conduct was directed at persons generally.

329.    Wells Fargo's conduct needlessly caused consumers, including Plaintiff Risconsin and the Pennsylvania Subclass members, considerable economic damages including the imposition and collection of unwarranted amounts, the loss of equity in their home, time associated with efforts to ascertain the nature of and seek proper restitution for Wells Fargo's misconduct, and other forms of economic loss.

330.    Wells Fargo's conduct also needlessly caused Plaintiff Risconsin and Pennsylvania Subclass members to suffer significant non-economic harm that has defined their lives for years.

331.    All the needless harms suffered by Plaintiff Risconsin and Pennsylvania Subclass members directly and proximately resulted from Wells Fargo's unfair acts and practices.

### COUNT FIVE
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (UDPTA)**
**(Brought on behalf of Plaintiff Kea and the North Carolina Subclass)**

332.    Plaintiff Kea incorporates by reference all prior allegations of paragraphs 1-252 as if fully restated herein.

333.    Plaintiff Kea brings this claim for relief on behalf of herself and the North Carolina Subclass.

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

334.    Defendant advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b).

335.    Defendant engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, as alleged herein.

336.    Specifically, Defendant provided Plaintiff Kea and North Carolina Subclass members with loan modification options which affirmatively misstated the total balances owed and the amounts of their monthly payments due to the systemic calculation error referenced herein.

337.    Given that Defendant knew of the systemic calculation errors referenced herein, Defendant knew that the re-calculated loan terms offered to Plaintiff Kea and North Carolina Subclass members were incorrect at the time Defendant was offering loss mitigation options to Plaintiff Kea and North Carolina Subclass members, but nevertheless represented to Plaintiff Kea and North Carolina Subclass members that they were the actual amounts due on their respective loans.

338.    In reliance on the Defendant's false representations, Plaintiff Kea and North Carolina Subclass members either (1) accepted loan modifications and made payments towards loans with inflated monthly payment amounts and balances due, (2) could not afford the loan modifications offered because the terms thereof were unaffordable and unnecessarily onerous, and lost their homes as a result, or (3) both.

339.    Under North Carolina Law, intent is irrelevant in a claim under the UDPTA and Plaintiff Kea is not required to establish a *prima facia* claim of fraud. *In Re: Freeway Foods of Greensboro Inc.*, 467 B.R. 853, 866 (Bankr. N.D. 2012). "Because ordinary unfairness and deception are gauged by consideration of the effect of the practice on the marketplace, it follows that the intent of the act is irrelevant…what is relevant is the effect of the act or conduct on the consumer…." *Perkins v. New York*

*Times Co.*, 2023 WL 3601489, *8 (S.D.N.Y. May 23, 2023). "No intent is required for actions brought under the Act." *Stewart v. Steel Creek Property Owners Association*, 816 S.E. 2d 268 (2018).

340.   Wells Fargo knew as early as August 2013 that the automated calculation errors were yielding inaccurate determinations as to the amounts borrowers, like Plaintiff Kea and the North Carolina Subclass members, were obligated to remit pursuant to loan modifications offered by Wells Fargo.

341.   Wells Fargo knew and intended that Plaintiff Kea and North Carolina Subclass members would reasonably rely upon its representations regarding the amounts borrowers, like Plaintiff Kea and the North Carolina Subclass members, were obligated to remit pursuant to loan modifications offered by Wells Fargo.

342.   Plaintiff Kea and North Carolina Subclass members reasonably believed Wells Fargo's offers of loan modifications and the representations regarding the amounts owed. They had no reason to know Wells Fargo based that determination on a software tool that had a material error in it.

343.   Had Wells Fargo disclosed the whole truth to Plaintiff Kea and North Carolina Subclass members, they would have been able to seek review of the incorrect calculations on their mortgage modifications by a competent third party, such as an attorney, agency, or other organization or individual with knowledge of mortgage modification requirements and processes. They would then have become aware that the modifications were miscalculated, and would have been able to mitigate or prevent other harm that flowed from Wells Fargo's error.

344.   Defendant acted intentionally, knowingly, and maliciously to violate North Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff Kea's and North Carolina Subclass members' rights.

345.   As a result of Wells Fargo's fraudulent representations, Plaintiff Kea and North Carolina

Subclass members have been injured in fact and suffered a loss of money and/or property. Plaintiff Kea and North Carolina Subclass members suffered damages, including loss of equity in their homes; loss of favorable interest rates or other favorable loan terms; opportunity costs due to higher mortgage payments; loss of money due to making improperly calculated higher payments; and loss of money due to paying improperly calculated higher balances due.

## COUNT SIX
### VIOLATIONS OF THE DISTRICT OF COLUMBIA
### CONSUMER PROTECTION PROCEDURES ACT (CPPA)
**(Brought on behalf of Plaintiff Forney and the Washington D.C. Subclass)**

346.    Plaintiff Forney incorporates by reference all prior allegations of paragraphs 1-252 as if fully restated herein.

347.    Plaintiff Forney brings this claim for relief on behalf of himself and the Washington D.C. Subclass.

348.    D.C. Code § 28–3904 prohibits any person to engage in an unfair or deceptive trade practice by making a misrepresentation as to a material fact which has a tendency to mislead; failing to state a material fact if such failure tends to mislead; or use innuendo or ambiguity as to a material fact, which has a tendency to mislead.

349.    The CPPA is a remedial statute to be applied liberally to promote its purpose.

350.    To meet pleading requirements associated with CPPA claims, Plaintiff Forney is not required to prove certain elements in common law fraud claims such as the Defendant's intent to deceive the Plaintiff. *Ft. Lincoln Civic Association v. Ft. Lincoln Newtown Corp.*, 994 A.2d 1055, 1073 (D.C.App. 2008).

351.    Plaintiff Forney need not allege or prove intentional misrepresentation and intentional failure to disclose to prevail under a claim of the CPPA. *Saucier v. Countrywide Homelands*, 64 A.3d 428, 442 (D.C. 2013).    In other words, a consumer need not prove that Defendant intentionally or

knowingly represented a nature of fact that was untrue to state a claim under the CPPA. *Ft. Lincoln*, 944 A.2d at 1073.

352.    Defendant engaged in unfair and deceptive acts and practices in or affecting the residents of Washington D.C., in violation of D.C. Code § 28–3904, as alleged herein.

353.    Specifically, Defendant provided Plaintiff Forney and the Washington D.C. Subclass members with loan modification options which affirmatively misstated the total balances owed and the amounts of their monthly payments due to the systemic calculation error referenced herein.

354.    Given that Defendant knew of the systemic calculation errors referenced herein, Defendant knew that the re-calculated loan terms offered to Plaintiff Forney and the Washington D.C. Subclass members were incorrect at the time Defendant was offering loss mitigation options to Plaintiff Forney and Washington D.C. Subclass members, but nevertheless represented to Plaintiff Forney and the Washington D.C. Subclass members that they were the actual amounts due on their respective loans.

355.    In reliance on the Defendant's false representations, Plaintiff Forney and the Washington D.C. Subclass members either (1) accepted loan modifications and made payments towards loans with inflated monthly payment amounts and balances due, (2) could not afford the loan modifications offered because the terms thereof were unaffordable and unnecessarily onerous, and lost their homes as a result, or (3) both.

356.    Wells Fargo knew as early as August 2013 that the automated calculation errors were yielding inaccurate determinations as to whether borrowers, like Plaintiff Forney and the Washington D.C. Subclass members qualified for a modification. Instead of admitting these errors, Wells Fargo sent Plaintiff Forney and each Washington D.C. Subclass member correspondence stating that his or her request for modification had been denied or, if approved, that the modification was not based on erroneous calculations, and made no mention of the real causes of the denial or miscalculation.

357.   Wells Fargo knew Plaintiff Forney and Washington D.C. Subclass members would reasonably rely upon its representations and intended that Plaintiff Forney and Washington D.C. Subclass members rely upon its statements that Plaintiff Forney and Washington D.C. Subclass members did not qualify for a mortgage modification or, if approved, the modifications were not based on erroneous calculations.

358.   Wells Fargo knew and intended that Plaintiff Forney and Washington D.C. Subclass members would reasonably rely upon its representations regarding the amounts borrowers, like Plaintiff Forney and Washington D.C. Subclass members, were obligated to remit pursuant to loan modifications offered by Wells Fargo.

359.   Plaintiff Forney and Washington D.C. Subclass members reasonably believed Wells Fargo's offers of loan modifications and the representations regarding the amounts owed. They had no reason to know Wells Fargo based that determination on a software tool that had a material error in it.

360.   Had Wells Fargo disclosed the whole truth to Plaintiff Forney and Washington D.C. Subclass members, they would have been able to seek review of the incorrect calculations on their mortgage modifications by a competent third party, such as an attorney, agency, or other organization or individual with knowledge of mortgage modification requirements and processes. They would then have become aware that the modifications were miscalculated, and would have been able to mitigate or prevent other harm that flowed from Wells Fargo's error.

361.   Defendant acted intentionally, knowingly, and maliciously to violate the CPPA, and recklessly disregarded Plaintiff Forney's and Washington D.C. Subclass members' rights.

362.   As a result of Wells Fargo's fraudulent representations, Plaintiff Forney and Washington D.C. Subclass members have been injured in fact and suffered a loss of money and/or property. Plaintiff Forney and Washington D.C. Subclass members suffered damages, including loss of equity in their

homes; loss of favorable interest rates or other favorable loan terms; opportunity costs due to higher mortgage payments; loss of money due to making improperly calculated higher payments; and loss of money due to paying improperly calculated higher balances due.

363.    D.C. Code § 28-3905(k)(1) provides civil penalties to recover treble damages, punitive damages and, as provided by statute, attorney's fees.

<u>**COUNT SEVEN**</u>
**VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 349**
**(Brought on behalf of Plaintiff Ferguson and the New York Subclass)**

364.    Plaintiff Ferguson incorporates by reference all prior allegations of paragraphs 1-252 as if fully restated herein.

365.    Plaintiff Ferguson brings this claim for relief on behalf of herself and the New York Subclass.

366.    Defendant conducts "business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 349(a).

367.    Plaintiff Ferguson and members of the New York Subclass are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

368.    Defendant, as part of its loan servicing responsibilities, also provides loan modifications to its customers who are having difficulties meeting their loan obligations.

369.    In an attempt to minimize foreclosures and assist struggling homeowners, Defendant, in accordance with HAMP and other loan modification programs, considered Plaintiff Ferguson and New York Subclass members for loan modifications.

370.    Defendant voluntarily engaged with Plaintiff Ferguson and New York Subclass members to determine whether mortgage loans in distress could be modified.

371.    Defendant contacted Plaintiff Ferguson and New York Subclass members to determine

their eligibility for a loan modification.

372.  Defendant represented to Plaintiff Ferguson and New York Subclass members that it would determine Plaintiff's and each New York Subclass member's eligibility for a loan modification.

373.  Defendant agreed to modify Plaintiff Ferguson's and New York Subclass members' loans, if they were eligible, in accordance with HAMP, Department of Treasury directives, FHA regulations, and binding GSE guidelines.

374.  Defendant voluntarily undertook a duty to Plaintiff Ferguson and New York Subclass members to accurately represent whether they were eligible for a loan modification.

375.  Defendant voluntarily undertook a duty to consider the loan modifications in accordance with the above federal and state regulations as well as its own policies.

376.  Defendant utilized proprietary software to determine Plaintiff Ferguson's and New York Subclass members' eligibility, rather than a personalized review of each person's file.

377.  After evaluating Plaintiff Ferguson's and New York Subclass members' eligibility for loan modifications, Defendant provided Plaintiff Ferguson and New York Subclass members with loan modification options which affirmatively misstated the total balances owed and the amounts of their monthly payments due to the systemic calculation errors referenced herein.

378.  Given that Defendant knew of the systemic calculation errors referenced herein, Defendant knew that the re-calculated loan terms offered to Plaintiff Ferguson and New York Subclass members were incorrect at the time Defendant was offering loss mitigation options to Plaintiff Ferguson and New York Subclass members, but nevertheless represented to Plaintiff Ferguson and New York Subclass members that they were the actual amounts due on their respective loans.

379.  In reliance on the Defendant's false representations, Plaintiff Ferguson and New York Subclass members either (1) accepted loan modifications and made payments towards loans with

inflated monthly payment amounts and balances due, (2) could not afford the loan modifications offered because the terms thereof were unaffordable and unnecessarily onerous, and lost their homes as a result, or (3) both

380.    Defendant has admitted to Plaintiff Ferguson and New York Subclass members that their loan modification offers were inaccurate, misleading, and not done in accordance with the above federal and state statutes, guidelines, and regulations, or its own policies.

381.    Defendant's failure to accurately represent to Plaintiff Ferguson and New York Subclass members their eligibility for a loan modification (as well as the terms of those modifications) was due, at least in part, to Defendant's utilization of faulty proprietary software to determine their eligibility, rather than a personalized review of each person's file.

382.    Defendant, in considering Plaintiff Ferguson's and New York Subclass members' loan modifications and failing to accurately represent their eligibility (as well as the terms of those modifications), did not meet industry standards.

383.    Under NYGBL, a plaintiff need not prove intent to defraud or reliance on a deceptive act. Plaintiff must only show it suffered an injury as a result of a deceptive act. *HV Abbott Lab'ys*, 727 F.Supp. 3d 194, 210 (N.D.N.Y. 2024) aff'd 2025 WL 65668 (2d Cir. Jan. 10, 2025).  It is not necessary that Plaintiff Ferguson demonstrate Defendant's intent to defraud; only that Plaintiff Ferguson suffered a loss as a result of deceptive information. *Amalfitano v. NBTY, Inc.*, 9 N.Y.S. 3d 352, 355 (2015).

384.    Defendant intentionally, recklessly, or negligently omitted, concealed, and misrepresented material information as to Plaintiff Ferguson's and New York Subclass members' loan modification options.

385.    Plaintiff Ferguson and New York Subclass members reasonably relied, to their detriment, on Defendant's false and deceptive representations as to their eligibility for loan modifications and (as

well as the terms of those modifications).

386.   Defendant employed deceptive acts or practices in the conduct of business, trade or commerce by:

    a.   Failing to properly consider whether Plaintiff Ferguson and New York Subclass members were entitled to a loan modification;

    b.   Failing to provide accurate loan modification assistance to Plaintiff Ferguson and New York Subclass members;

    c.   Affirmatively misrepresenting the total balances owed and the amounts of their monthly payments due on Plaintiff Ferguson's and New York Subclass members' loans;

    d.   Failing to oversee its procedures to ensure loan modifications were considered properly;

    e.   Failing to draft appropriate policies to ensure loan modification applications were considered properly;

    f.   Failing to ensure all models and programming utilized to assist in loan modifications were accurately utilized and functioning properly;

    g.   Failing to develop and audit its software to ensure loan modifications were considered properly;

    h.   Failing to oversee its employees to determine whether its policies were implemented appropriately to consider loan modifications;

    i.   Failing to train employees to consider loan modifications;

    j.   Failing to audit and review loan modification applications to ensure compliance with its policies and state and federal statutes, guidelines, and regulations;

    k.   Failing to accurately consider loan modifications for Plaintiff Ferguson and New York Subclass members when it undertook the obligation to do so; and

    l.   Failing to correct calculation errors in Plaintiff Ferguson's and New York Subclass members' loan applications.

387.   Defendant's acts and omissions have also been unfair because they have caused substantial injury to consumers without any countervailing benefit. The conduct has been unethical and

unscrupulous.

388.  Defendant knew or should have known that its conduct violated N.Y. Gen. Bus. Law § 349.

389.  Plaintiff Ferguson and New York Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information, including foreclosure, loss of time and money, and emotional distress.

390.  As a direct and proximate result of Defendant's actions described above, Plaintiff Ferguson and New York Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages, punitive damages, reasonable attorneys' fees, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**COUNT EIGHT**
**UNJUST ENRICHMENT**
**(Brought on behalf of the Plaintiffs and Unjust Enrichment Subclass)**

391.  Plaintiffs incorporate by reference all prior allegations of paragraphs 1-252 as if fully restated herein.

392.  This Count is pled in the alternative to the extent there is no contract between Defendant and Plaintiffs and Class members.  The equitable doctrine of unjust enrichment has been repeatedly held to be an appropriate vehicle for recovery in such instances.  *See e.g. Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762-63 (9th Cir. 2015).

393.  Plaintiffs and the Unjust Enrichment Subclass have conferred a benefit on the Defendants in the form of increased fees and interest to which Defendant was not entitled but for its calculation errors; thus, denying them the benefits of these funds without their consent.  Defendant also received a benefit from the government when providing modifications.

394.    All of the representative Plaintiffs, as well as the members of the Unjust Enrichment Subclass, can and will demonstrate that they paid Defendant more than Defendant was entitled to under the law.

395.    Defendant has acknowledged that it took more than it was entitled to, under the program that it elected to voluntarily participate in, by sending Apology Letters to the representative Plaintiffs and the other members of the Unjust Enrichment Subclass.

396.    Defendant appreciated and had knowledge of the benefits conferred upon it.

397.    Under principles of equity and good conscience, Defendant should not be permitted to retain these unjustly received monies.

398.    Plaintiffs, on behalf of themselves and the Unjust Enrichment Subclass, seek restitution and disgorgement of all amounts by which Defendant has been unjustly enriched.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendant Wells Fargo Bank, N.A. as follows:

A.    For an Order Certifying the Class and/or Subclasses pursuant to Rule 23(b)(3), and/or the issues pursuant to Rule 23(c)(4), appointing Plaintiffs as Representatives of the Class and/or Subclasses and Plaintiffs' counsel as Class Counsel;

B.    For entry of judgment in favor of Plaintiffs and members of the Class and/or Subclasses against Defendant for damages in an amount to be proven at trial, including statutory, treble and/or punitive damages in accordance with applicable law;

C.    For entry of judgment in favor of Plaintiffs and members of the Class and/or Subclasses against Defendant for reasonable attorneys' fees and costs;

D.    For entry of judgment in favor of Plaintiffs and members of the Class and/or Subclasses

for pre-judgment interest on all damages; and

      E.     For such other and further relief as the Court deems just and equitable.

### JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: January 20, 2025

Plaintiffs MYRON CURRY, DARRELL FORNEY, CHESTER NELSON, SAMUEL BELOFF, JOHN RISCONSIN, ADRENIA KEA, RUTH VERGARA, LAURENCE PETERSON, MARCIA PETERSON, BRADLEY LIGGETT, KYRA LIGGETT, BRIAN KEAVENY, DEANNA CLINGERMAN and RENEE BOUCHER FERGUSON, individually and on behalf of all others similarly situated,

By: /s/ Marc E. Dann
Marc E. Dann*
Brian D. Flick*
**DannLaw**
15000 Madison Avenue
Lakewood, OH 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
*notices@dannlaw.com*

Thomas A. Zimmerman, Jr.*
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
*tom@attorneyzim.com*

*Interim Co-Lead Class Counsel*

Alisa Rose Adams (Cal Bar #277697)
**The Dann Law Firm**
26100 Towne Center Drive
Foothill Ranch, CA 92610-3442
Telephone: (949) 200-8755
Facsimile: (866) 843-8308
*notices@dannlaw.com*
*aadams@dannlaw.com*

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

Mark Javitch (CA Bar #323729)
**Javitch Law Office**
480 S. Ellsworth Avenue
San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 645-0705
*mark@javitchlawoffice.com*

Charles E. Schaffer*
Pennsylvania Bar No. 76259
Daniel C. Levin*
Pennsylvania Bar No. 80013
**Levin Sedran & Berman LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500

D. Aaron Rihn*
PA Bar ID No.: 85752
**Robert Peirce & Associates, P.C.**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
Telephone: (412) 281-7229
Facsimile: (412) 281-4229
*arihn@peircelaw.com*

Jennifer S. Czeisler
**Sterlington, PLLC**
One World Trade Center, 85th Floor
New York, NY 10007
Telephone: (212) 433-2993
*jen.czeisler@sterlingtonlaw.com*

James M. Evangelista
**Evangelista Worley LLC**
10 Glenlake Parkway
South Tower Suite 130
Atlanta, GA 30328
Telephone: (404) 205-8400
Facsimile: (404) 205-8395
*jim@ewlawllc.com*

* Admitted Pro Hac Vice

*Attorneys for Plaintiffs and the Putative Class and Subclasses*

*THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*