DANNLAW
MARC E. DANN (*admitted pro hac vice*)
15000 Madison Avenue
Lakewood, OH 44107
Tel: 216/373-0539

ZIMMERMAN LAW OFFICES, P.C.
THOMAS A. ZIMMERMAN, JR.
(*admitted pro hac vice*)
77 W. Washington Street, Suite 1220
Chicago, IL 60602
Tel: 312/440-0020

*Interim Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Wells Fargo Mortgage Modification Litigation* | **Case No. 3:24-cv-01358-MMC**<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date: April 17, 2026<br>Time:<br>Place: San Francisco Courthouse<br>Courtroom 7 – 19th Floor<br>450 Golden Gate Avenue, San Francisco, CA 94102<br>Judge: Hon. Maxine M. Chesney<br><br>Compl. Filed: March 7, 2024<br>Consolidated Class Action Compl. Filed: July 8, 2024<br>Second Amended Consolidated Class Action Compl. Filed: January 9, 2025<br>Third Amended Consolidated Class Action Compl. Filed: January 20, 2026 |

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   RELEVANT FACTUAL BACKGROUND. ...........................................................1

III.  DEMONSTRATION OF HOW WELLS FARGO'S ERRORS MANIFESTED ...................3

IV.   LAW AND ARGUMENT ........................................................................................ 4

    A.    STANDARD OF REVIEW .......................................................................... 4

    B.    PLAINTIFFS STATE A CLAIM FOR BREACH OF CONTRACT .......................... 4

        1.    Plaintiffs Adequately Allege That Wells Fargo Breached Its
            Contracts With Plaintiffs and Class Members by Improperly
            Calculating and Including Unauthorized and Excessive Fees
            in Its Mortgage Loan Modifications ..................................................4

        2.    Plaintiffs' Breach of Contract Claim Is Not Exclusively Premised
            on a Third-Party Beneficiary Theory ..................................................8

        3.    Plaintiffs Properly Allege Wells Fargo's Breach of the Implied
            Covenant of Good Faith and Fair Dealing ...................................... 10

    C.    PLAINTIFFS STATE A CLAIM FOR A VIOLATION OF THE UCL ................... 12

        1.    Wells Fargo's Attempt to Strike Plaintiffs' Nationwide Class
            Is Premature.................................................................................. 12

        2.    Plaintiffs State a Claim Under the UCL's "Unfair" Prong .............................. 13

        3.    Plaintiffs State a Claim Under the UCL's "Deceptive" Prong........................ 15

    D.    DEFENDANT'S KNOWLEDGE IS IRRELEVANT WITH
        RESPECT TO PLAINTIFFS' ICFA, NCUDTPA, D.C. CPPA,
        AND NY GBL CAUSES OF ACTION ................................................. 16

    E.    DEFENDANT CAN BE HELD LIABLE UNDER THE D.C. CPPA. ................... 20

    F.    THE TAC ADEQUATELY ALLEGES A CAUSE OF ACTION
        FOR UNJUST ENRICHMENT. ................................................................ 21

V.    CONCLUSION ....................................................................................................... 22

*Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss*
*Third Amended Consolidated Class Action Complaint*, Case No. 3:24-cv-01358-MMC

i

## TABLE OF AUTHORITIES

### Cases

*Albillo v. Intermodal Container Services, Inc.*,
114 Cal.App.4th 190 (2003).................................................................................... 13

*Aliano v. Sears, Roebuck & Co.*,
2015 IL App (1st) 143367 ...................................................................................... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 4

*Astiana v. Hain Celestial Group, Inc.*,
783 F.3d 753 (9th Cir. 2015).................................................................................. 21

*Baines v. Carrington Mortgage Services, LLC*,
5:25-CV-297-BO, 2026 WL 554737 (E.D.N.C. Feb. 9, 2026) ........................................ 9

*Baker v. Countrywide Home Loans, Inc.*,
CIV A 308-CV-0916-B, 2009 WL 1810336 (N.D. Tex. June 24, 2009) ........................................ 9

*Barker v. Riverside Cty. Off. of Educ.*,
584 F.3d 821 (9th Cir. 2009)................................................................................... 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................ 4

*Breckenridge v. Cambridge Homes, Inc.*,
246 Ill.App.3d 810 (2nd Dist. 1993) ...................................................................... 17

*Bruton v. Gerber Products Co.*,
703 F.App'x 468 (9th Cir. 2017) ............................................................................ 21

*Cap. Res., LLC v. Chelda, Inc.*,
735 S.E.2d 203(N.C. App. 2012) ............................................................................ 17

*Caraccioli v. Facebook, Inc.*,
167 F.Supp.3d 1056 (N.D. Cal. 2016).................................................................... 5

*Celador Intern. Ltd. v. Walt Disney Co.*,
347 F.Supp.2d 846 (C.D. Cal. 2004) ..................................................................... 10

*Chow v. Aegis Mortg. Corp.*,
286 F.Supp.2d 956 (N.D. Ill. 2003) .............................................................. 17, 19

*Clear Channel Outdoor, Inc. v. Bently Holdings California LP,*
   C-11-2573 EMC, 2011 WL 6099394 (N.D. Cal. Dec. 7, 2011)...................................................... 22

*Colyear v. Rolling Hills Cmty. Assn. of Rancho Palos Verdes,*
   100 Cal.App.5th 110 (2024)................................................................................................. 7

*Corvello v. Wells Fargo Bank, NA,*
   728 F.3d 878 (9th Cir. 2013)................................................................................................. 8

*Dekel v. Unum Provident Corp.,*
   2007 WL 812986 (E.D.N.Y. Mar. 14, 2007) ............................................................. 19

*Diaz v. Intuit, Inc.,*
   5:15-CV-01778-EJD, 2017 WL 4386451 (N.D. Cal. Sept. 29, 2017) ............................ 15

*Dougherty v. City of Covina,*
   654 F.3d 892 (9th Cir. 2011).............................................................................................. 4

*Duran v. Leslie Oldsmobile, Inc.,*
   229 Ill.App.3d 1032 (2nd Dist. 1992) ......................................................................... 17

*Eclectic Props. E., LLC v. Marcus & Millichap Co.,*
   751 F.3d 990 (9th Cir. 2014).............................................................................................. 4

*Edwards v. JP Morgan Chase Bank,*
   2020 WL 1814423 (N.D.N.C. Apr. 9, 2020) .............................................................. 17

*Ehret v. Uber Techs., Inc.,*
   68 F.Supp.3d 1121 (N.D. Cal. 2014)............................................................................ 12

*Fernandez v. CoreLogic Credco, LLC.,*
   593 F.Supp.3d 974 (S.D. Cal. 2022)............................................................................ 12

*Frankeny v. Dist. Hosp. Partners, LP,*
   225 A.3d 999 (D.C. 2020)............................................................................................ 18, 19

*Griffin-Amiel v. Frank Terris Orchestras,*
   677 N.Y.S.2d 908 (N.Y. City Ct. 1998) ...................................................................... 18

*Hardnett v. Select Portfolio Servicing, Inc.,*
   800 F.Supp.3d 27 (D.D.C. 2025) ................................................................................ 20

*Hernandez v. Wells Fargo & Co.,*
   No. 18-cv-07354, 2019 WL 2359198 (N.D. Cal. June 3, 2019) ................................ 3, 14

*Immobiliare, LLC v. Westcor Land Title Ins. Co.,*
   424 F.Supp.3d 882 (E.D. Cal. 2019) .......................................................................... 19

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020)........................................................................... 4, 21

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*,
   754 F.Supp.2d 1145 (C.D. Cal. 2010) ................................................................. 20

*In re Toyota Motor Corp.*,
   785 F.Supp.2d 883 (C.D. Cal. 2011) ................................................................... 12

*Jackson v. Harkey*,
   704 P.2d 687 (Wash. App. 1985) ........................................................................ 19

*Javier v. Assurance IQ, LLC*,
   649 F.Supp.3d 891 (N.D. Cal. 2023 ...................................................................... 4

*Lindner v. Occidental Coll.*,
   CV 20-8481-JFW(RAOX), 2020 WL 7350212 (C.D. Cal. Dec. 11, 2020) ................................. 21

*Lipinski v. Martin J. Kelly Oldsmobile, Inc.*,
   325 Ill.App.3d 1139 (1st Dist. 2001).................................................................. 17

*Lorenzo v. Qualcomm Inc.*,
   08CV2124 WQH LSP, 2009 WL 2448375 (S.D. Cal. Aug. 10, 2009) ........................................ 13

*M & T Mortg. Corp. v. White*,
   736 F.Supp.2d 538 (E.D.N.Y. 2010)..................................................................... 18

*Marques v. Wells Fargo Home Mortg., Inc.*,
   No. 09-CV-1985-L RBB, 2010 WL 3212131 (S.D. Cal. Aug. 12, 2010)...................................... 10

*Mazonas v. Nationstar Mortg. LLC*,
   No. 16-cv-00660-RS, 2016 WL 2344196 (N.D. Cal. May 4, 2016) ........................................... 6

*McFadden v. Nationstar Mortg. LLC*,
   No. 20-cv-166, 2021 WL 3284794 (D.D.C. July 30, 2021) ................................................. 20

*McKenzie v. Wells Fargo Bank, N.A.*,
   931 F.Supp.2d 1028 (N.D. Cal. 2013).................................................................... 9

*Miller v. William Chevrolet/GEO, Inc.*,
   326 Ill.App.3d 642 (1st Dist. 2001).................................................................... 17

*Misha Consulting Grp., Inc. v. Core Educ. & Consulting Sols., Inc.*,
   No. C-13-04262-RMW, 2013 WL 6073362 (N.D. Cal. Nov. 15, 2013) ......................................... 6

*Nasseri v. Wells Fargo Bank, N.A.*,
   147 F.Supp.3d 937 (N.D. Cal. 2015)................................................................... 11

*Norwest Mortgage, Inc. v. Superior Court*,
   72 Cal.App.4th 214 (1999)................................................................................................ 12

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
   647 N.E.2d 741 (N.Y. 1995)............................................................................................. 19

*PG Ins. Co. of New York v. S.A. Day Mfg. Co.*,
   251 A.D.2d 1065(N.Y. 1998)...................................................................................... 18, 19

*Polanco v. HSBC Bank USA Nat'l Ass'n*,
   2019 WL 2590964 (W.D.N.C. June 21, 2019)............................................................... 18

*Reyes v. Saxon Mortg. Services, Inc.*,
   09CV1366 DMS (WMC), 2009 WL 3738177 (S.D. Cal. Nov. 5, 2009) ....................... 10

*Ritchie v. N. Leasing Sys., Inc.*,
   2016 WL 1241531 (S.D.N.Y. Mar. 28, 2016) ................................................................ 19

*Robalo LLC v. Ramey*,
   2:11-CV-02642-GEB, 2012 WL 244340 (E.D. Cal. Jan. 25, 2012) ............................. 11

*Rummans v. HSBC Bank USA Nat'l Ass'n as Tr. for MASTR Reperforming Loan Tr. 2005-2*,
   3:22-CV-02046-M-BT, 2024 WL 495955 (N.D. Tex. Jan. 23, 2024)............................. 9

*Sain v. Adams Auto Grp., Inc.*,
   781 S.E.2d 655 (N.C. App. 2016) .............................................................................. 17, 19

*Saroya v. Univ. of the Pac.*,
   503 F.Supp.3d 986 (N.D. Cal. 2020)............................................................................... 21

*Schertzer v. Bank of Am., NA*,
   109 F.4th 1200 (9th Cir. 2024)......................................................................................... 6

*Shapiro v. Berkshire Life Ins. Co.*,
   212 F.3d 121 (2nd Cir. 2000)........................................................................................... 19

*Short v. Hyundai Motor Co.*,
   C19-0318JLR, 2020 WL 6132214 (W.D. Wash. Oct. 19, 2020).................................... 12

*Sivakova v. Am. Honda Motor Co.*,
   No. CV 24-03354-MWF, 2025 U.S. Dist. LEXIS 33931 (C.D. Cal. Feb. 25, 2025) ..... 13

*South Bay Chevrolet v. Gen. Motors Acceptance Corporation*,
   72 Cal.App.4th 861 (1999)............................................................................................... 13

*Streamline Capital, L.L.C. v. Hartford Cas. Ins. Co.*,
   02 CIV. 8123 (NRB), 2003 WL 22004888 (S.D.N.Y. Aug. 25, 2003) .......................... 19

*Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss*
*Third Amended Consolidated Class Action Complaint*, Case No. 3:24-cv-01358-MMC

v

*Thorpe v. Hous. Auth. of City of Durham*,
393 U.S. 268 (1969) .......................................................................................................... 9

*Walker v. Bayview Loan Servicing, LLC*,
No. 20-CV-02944-LB, 2020 WL 13836133 (N.D. Cal. Aug. 13, 2020) ........................... 6

*Wiener v. Unumprovident Corp.*,
202 F.Supp.2d 116 (S.D.N.Y. 2002) .............................................................................. 19

*Wigod v. Wells Fargo Bank, N.A.*,
673 F.3d 547 (7th Cir. 2012) .......................................................................................... 17

*Wilkins v. Wells Fargo Bank, N.A.*,
2:15CV566, 2016 WL 6775692 (E.D. Va. Nov. 15, 2016) ................................................ 9

*Wolf v. Walt Disney Pictures & Television*,
162 Cal.App.4th 1107 (2008) ......................................................................................... 11

*Zamora v. Lyft, Inc.*,
No. 16-cv-02558-VC, 2016 U.S. Dist. LEXIS 155027 (N.D. Cal. Nov. 7, 2016) ......... 12

### **Statutes**

12 U.S.C. § 2609 .............................................................................................................. 7

N.Y. Gen. Bus. Law § 349 ............................................................................................. 18

### **Rules**

Fed.R.Civ.P. 8 ............................................................................................................ 5, 22

Fed.R.Civ.P.9 ................................................................................................................ 19

All Plaintiffs, individually and on behalf of all others similarly situated, submit this Memorandum in Opposition to Defendant Wells Fargo Bank, N.A.'s *Motion to Dismiss Plaintiffs' Third Amended Consolidated Complaint* ("Motion") (Doc. 129), and state as follows:

## I.    INTRODUCTION

This matter arises from Wells Fargo's use of automated processes and pre-set formulas, which—as more fully explained in Plaintiffs' Third Amended Consolidated Class Action Complaint ("TAC") (Doc. 127),[1] and summarized below—resulted in Plaintiffs and Class members being required to pay certain fees and costs (such as default servicing fees, attorneys' fees, escrow fees, etc.) that they did not actually owe. *See generally*, TAC. Although, in the Motion, Wells Fargo argues that Plaintiffs and Class members should be denied the ability to seek redress for its misconduct, those arguments are without merit, as explained below. Therefore, the Court should deny the Motion.

## II.    RELEVANT FACTUAL BACKGROUND.

In response to the 2008 mortgage crisis, the federal government adopted new statutory and regulatory measures designed to protect and assist homeowners who were at risk of losing their homes through foreclosure. TAC, ¶ 1. Relevant here, these measures required mortgage lenders and servicers, such as Wells Fargo, to identify residential mortgage loans that its mortgage customers are struggling to pay, and evaluate them for loan modifications that would assist them in avoiding foreclosure. TAC, ¶ 2.

To that end, Wells Fargo adopted and employed automated processes and pre-set formulas to identify and evaluate borrowers for loan modifications. *See, e.g.*, TAC, ¶¶ 3-5, 9, 45, 75-76. Although, in theory, automating the loan modification process made economic sense, Wells Fargo—as a result of its corporate policy of purposefully under-investing in its back-office operations, and out of a desire to prioritize its profits—repeatedly failed to adopt and employ adequate oversight, auditing, and testing to ensure that the automated processes and formulas it used to evaluate borrowers for loan modifications returned accurate and legally compliant results. *See, e.g.*, TAC, ¶¶ 3-5, 64-74.

---

[1] All references to "¶" throughout are references to the TAC, unless otherwise indicated. In addition, all defined terms set forth herein should be given the same meaning ascribed to them in the TAC.

As early as 2010, Wells Fargo *knew* that its oversight and testing procedures were inadequate and, in fact, had "agreed to adopt processes to better oversee, audit, and conduct ongoing testing of its loan servicing, modification, and foreclosure tools and practices and ensure legal and regulatory compliance." *See, e.g.*, TAC, ¶¶ 64-66. Despite this knowledge (and its agreement to do so), Wells Fargo did not, in fact, revamp its quality control processes. *See, e.g.*, TAC, ¶¶ 67-68. Predictably, Wells Fargo's disregard for the accuracy of its automated formulas and systems, and its failure to adopt and employ adequate oversight, auditing, and testing thereof, allowed calculation errors to proliferate. *See, e.g.*, TAC ¶¶ 8-9, 15, 69, 75, 77, 79, 81-83, 87, 102, 105.

Relevant here, one of these calculation errors caused certain fees and costs—such as default servicing fees, attorneys' fees, escrow fees, etc.—to be erroneously and improperly included in the outstanding balance of Plaintiffs' and Class members' mortgage loans. *Id.* To be clear, when the TAC refers to these fees and costs as being "erroneous," "improper," etc., it is because these fees and costs were *not* actually incurred by Wells Fargo in connection with servicing Plaintiffs' and Class members' mortgage loans, and were only included as part of Wells Fargo's calculation due to a flaw in its automated loan modification evaluation process. *See, e.g.*, TAC, ¶¶ 5, 9, 102, 258-59.

The improper inclusion of these fees and costs inflated the purportedly outstanding balance of Plaintiffs' and Class members' mortgage loans, and this inflated figure was then used to calculate the amount that Plaintiffs and Class members would be required to pay pursuant to the terms of the loan modifications that Wells Fargo offered them. *See, e.g.*, TAC ¶¶ 9, 15, 69, 74, 91, 102. As a result, Wells Fargo's loan modification offers to Plaintiffs and Class members were based on, and required repayment of, higher principal balances than Plaintiffs and Class members actually owed. *Id.*

Although, in the Motion, Defendant characterizes its calculation errors as isolated "mistakes," and not the result of intentional conduct, such is not the case. As alleged in the TAC, Wells Fargo *knew*, as early as 2010, that its oversight and testing procedures were inadequate, but failed to address these issues. *See, e.g.*, TAC, ¶¶ 64-68. The TAC further alleges that despite learning in 2013 that its lack of oversight had actually manifested in systemic calculation errors, Wells Fargo did nothing to ascertain the true scope of those errors or attempt fix them until 2015, when it implemented new "controls." TAC ¶¶ 8-9, 15, 69, 77, 79, 81-83, 87,

*Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss*
*Second Amended Consolidated Class Action Complaint*, Case No. 3:24-cv-01358-MMC

2

105. Even then, however, these new "controls" were ineffective, and the errors continued until at least April 30, 2018. *See, e.g.*, TAC ¶¶ 83-85.

To make matters worse, the TAC alleges that, in an attempt to minimize its potential liability, Wells Fargo actively concealed the true scope of its errors for years and only recently altered Plaintiffs to the fact that they, like so many others, had been harmed by Wells Fargo's unscrupulous business practices. *See, e.g.*, TAC, ¶¶ 8, 81-84, 104-110, 309, 340, 356, 386; *see also*, *Hernandez v. Wells Fargo & Co.*, No. 18-cv-07354, 2019 WL 2359198, at *6 (N.D. Cal. June 3, 2019) (discussed *infra*). But, now that the scope of Wells Fargo's errors has finally came to light, Plaintiffs, individually, and on behalf of the Class (and related Subclasses), are entitled to redress for the harm they suffered as a result of Wells Fargo's misconduct.

## III. DEMONSTRATION OF HOW WELLS FARGO'S ERRORS MANIFESTED.

Given the complexity of the TAC's allegations, and in light of this Court's ruling on the SAC, as well as the arguments raised in the Motion, Plaintiffs believe it would be helpful to provide a brief demonstration of how Wells Fargo's calculation errors manifested, and how they resulted in Plaintiffs and Class members being required to pay amounts that they did not actually owe.

Assume an individual named "Borrower A" owes an outstanding principal balance of $100,000 in connection with his unmodified mortgage loan.  After Borrower A falls into default, Wells Fargo evaluates him for a loan modification using its automated processes and pre-set formulas. Although Borrower A's outstanding principal balance of $100,000 *should* be the figure used to calculate the amount that Borrower A will be required to repay pursuant to the terms of his modified loan, the pre-set formula Wells Fargo uses to make this calculation erroneously adds $10,000 in attorneys' fees to Borrower A's outstanding balance, even though Wells Fargo never actually expended any attorneys' fees in connection with Borrower A's account.

After performing this calculation, Wells Fargo offers a loan modification to Borrower A, pursuant to which Borrower A will ultimately be required to repay $110,000 in principal—*i.e.*, the $100,000 in outstanding principal that Borrower A actually owes *plus* the $10,000 in attorneys' fees that were erroneously added by Wells Fargo's faulty formula. Relying on the figures Wells Fargo provided, and out of desire to avoid permanently losing his home, Borrower A accepts the loan modification offer, and begins making payments

on a modified mortgage with a principal balance of $110,000. As a result, Borrower A is now repaying Wells Fargo for attorneys' fees that Wells Fargo never actually incurred.

## IV.    LAW AND ARGUMENT

### A.    STANDARD OF REVIEW

The TAC survives Defendant's MTD if it alleges facts that "plausibly give rise to an entitlement to relief." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (quoting *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011)). In considering a motion to dismiss, a court must "accept as true the facts alleged in the complaint," and "draw inferences in the light most favorable to the plaintiff." *Barker v. Riverside Cty. Off. of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009).

"A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Javier v. Assurance IQ, LLC*, 649 F.Supp.3d 891, 895 (N.D. Cal. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Detailed factual allegations" are not necessary. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Further, even if Defendant put forward an alternative explanation for its alleged misconduct, the "tie goes to the plaintiffs." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999, n.8 (9th Cir. 2014).

### B.    PLAINTIFFS STATE A CLAIM FOR BREACH OF CONTRACT

#### 1.    Plaintiffs Adequately Allege That Wells Fargo Breached Its Contracts With Plaintiffs and Class Members by Improperly Calculating and Including Unauthorized and Excessive Fees in Its Mortgage Loan Modifications

The gravamen of Plaintiffs' breach of contract claim is that the modified mortgage payments Wells Fargo offered to Plaintiffs and Class members encompassed certain fees and costs—such as default servicing fees, attorneys' fees, escrow fees, etc.—that Wells Fargo was prohibited from imposing pursuant to the terms of Plaintiffs' and Class members' mortgage loans (the "Security Instruments"), the servicing guidelines to which Wells Fargo was required to adhere, and the provisions of HAMP and other federal regulations. As a result of Wells Fargo's improper inflation of the amounts of Plaintiffs' and Class members' modified mortgage payments, Plaintiffs and Class members either (a) could not afford their loan modifications, because the

calculated payment was too expensive, or (b) unknowingly paid these improperly inflated amounts and, by extension, fees and costs that Wells Fargo was prohibited from charging.

With respect to Plaintiffs' breach of contract claim, Wells Fargo first argues that the TAC fails to point to a provision in the Security Instruments that prohibited it from imposing the fees and costs at issue. Motion, at 7-8. However, this contention is both legally and factually incorrect, as it ignores the many specific allegations replete throughout the TAC regarding the contractual provisions that Defendant breached, and imposes a level of pleading detail that goes far beyond Fed.R.Civ.P. 8(a)(2)—which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."

In particular, the TAC alleges that, when Plaintiffs and Class members purchased their homes, they entered into uniform, standardized Security Instruments that contained substantially similar provisions articulating/limiting the circumstances and conditions under which Wells Fargo could impose certain fees and charges—such as default servicing fees, attorneys' fees, escrow fees, etc. *See, e.g.*, TAC ¶¶ 254-57. The TAC further alleges that, pursuant to those provisions of the Security Instruments, any fees, charges, and amounts imposed by Defendant were required to "be for services actually performed or amounts actually incurred to protect Defendant's or other assignees' interests." *Id.* Finally, Plaintiffs allege that Defendant breached these provisions of the Security Instruments by including fees and charges for services that were *not* actually performed or necessary to protect Defendant's interests in the amounts it claimed were due and owing under Plaintiffs' and Class members' modified loans. *Id.* at ¶¶ 258-60.

Tellingly, Defendant does not argue that the fees and charges it imposed were for services actually performed or were incurred in connection with actions necessary to protect its interests in Plaintiffs' and Class members' properties. Rather, Defendant claims that, because the phrase "for service actually performed or amounts actually incurred to protect [its] interest" does not appear verbatim in the portions of the Security Instruments quoted in the TAC, Plaintiffs have failed to "identify the specific provision of the contract allegedly breached by the defendant." Motion, at 8 (quoting *Caraccioli v. Facebook, Inc.*, 167 F.Supp.3d 1056, 1064 (N.D. Cal. 2016)). But, as courts within this District have uniformly held, the requirement that a complaint "identify the specific provision of the contract allegedly breached by the defendant," does **not** mean

that a complaint is "require[d] to attach the contract or recite the contract's terms verbatim." *E.g.*, *Misha Consulting Grp., Inc. v. Core Educ. & Consulting Sols., Inc.*, No. C-13-04262-RMW, 2013 WL 6073362, at *1 (N.D. Cal. Nov. 15, 2013); *Mazonas v. Nationstar Mortg. LLC*, No. 16-cv-00660-RS, 2016 WL 2344196, at *7 (N.D. Cal. May 4, 2016) (agreeing that identifying the specific provision breached "is not the same as a recitation of the contract's precise terms"); *Walker v. Bayview Loan Servicing, LLC*, No. 20-CV-02944-LB, 2020 WL 13836133, at *4 (N.D. Cal. Aug. 13, 2020) (same).

Instead, to "identify with specificity the contractual obligations allegedly breached by the defendant," a plaintiff need only "plead [them] according to [their] legal effect." *E.g.*, *Misha*, 2013 WL 6073362 at *1. Consistent with this standard, when the TAC alleges that the Security Instruments required any fees and charges imposed by Defendant to be for services actually performed or necessary to protect Defendant's interest, it is describing the *ultimate legal effect* of the several specific standardized provisions of the Security Instruments quoted in the TAC. *See, e.g.*, TAC ¶ 256, n.10, 11.

For example, the TAC quotes a standardized provision of Security Instruments for loans purchased by Fannie Mae/Freddie Mac, which provides that the "lender may charge [the] borrower fees **for services performed** in connection with [the] borrower's default, **for the purpose of protecting lender's interest in the property and rights under the Security Instrument**, including, but not limited to, attorneys' fees, property inspection and valuation fees." TAC ¶ 256, n.10 (emphasis added). Similarly, the TAC quotes a provision of the standardized Security Instruments promulgated by the FHA, which states that "if [a] borrower [defaults], then [the] lender may do and pay **whatever is necessary to protect the value of the property and [the] lender's rights in the property**, including payment of taxes, hazard insurance, and other items mentioned in paragraph 2." TAC ¶ 256, n.11 (emphasis added). If Defendant was permitted to impose fees even where services were not actually performed or where its actions were wholly unnecessary, these provisions of the Security Instruments would be rendered wholly superfluous, in violation of the well-settled principles of contractual construction. *See, e.g.*, *Schertzer v. Bank of Am., NA*, 109 F.4th 1200, 1208 (9th Cir. 2024) (noting that contracts must be read as a whole, and in a manner that gives effect to all of its provisions without rendering any superfluous); *Colyear v. Rolling Hills Cmty. Assn. of Rancho Palos Verdes*, 100 Cal.App.5th

110, 124 (2024) (similar). Thus, the legal effect of the Security Instruments' delineation of the circumstances under which Defendant is *permitted* to impose certain default fees and charges—*i.e.*, when those fees are incurred "for services performed" or "necessary to" (or "for the purpose of") protecting Defendant's interest in a given property—is that Defendant is *prohibited* from imposing default fees and charges where those requirements are not satisfied.

Similarly, the TAC cites provisions from the Security Instruments stating that the "lender may not charge fees that are expressly prohibited by…Applicable Law." TAC ¶ 256, n.10, 11. Although Defendant disputes whether the servicing guidelines promulgated by Fannie Mae, Freddie Mac, the FHA, the VA, etc. (the "Servicing Guidelines") constitute "Applicable Law"—an issue addressed *infra*—it readily admits that the term Applicable Law includes "controlling applicable federal, state, and local statutes." Motion, at 8. Thus, it cannot seriously be disputed that the requirements of 12 U.S.C. § 2609(a)—which prohibit lenders from requiring borrowers "to deposit in any escrow account…an aggregate sum" that exceeds the amounts actually necessary to pay taxes, insurance premiums, etc.—are incorporated into the terms of the Security Instruments.

Notably, the TAC expressly identifies improperly inflated escrow fees as one of the fees that was incorrectly incorporated into the amounts that Defendant claimed were due and owing when it offered loan modifications to Plaintiffs and Class members. *See, e.g.*, TAC ¶¶ 5, 9, 69, 255, 258. Accordingly, the ultimate legal effect of the Security Instruments' reference to "Applicable Law"—and, by extension, 12 U.S.C. § 2609(a)—is that Defendant was prohibited from imposing these inflated escrow fees (because, by definition, they went beyond what was necessary to protect a Defendant's interests in Plaintiffs' respective properties).

Moreover, the TAC also identifies *how* Defendant breached the foregoing provisions of the Security Instruments. For example, the TAC alleges that:

- [T]he **faulty automated formulas that Defendant used . . . overstated the amount of default servicing fees, attorneys' fees, escrow fees, etc. that Plaintiffs and Class members owed** in connection with their loans. In other words, t**he amounts Defendant claimed were due and owing for approved loss mitigation options for Plaintiffs' and Class members' loans included fees, charges, or other amounts that were not for services actually performed or amounts actually incurred**…." TAC ¶258 (emphasis added).

- **Defendant's use of faulty automated calculations** in determining the trial plan payments and/or permanent loss mitigation option payments **led to the inflation of the amounts due and owing on Plaintiffs' and Class members' loans (by including amounts that were not actually due and owing)**. The payments to be made by Plaintiffs and Class members under the approved loss mitigation options offered to them by Defendant were based on these inflated and miscalculated figures. Therefore, **Defendant's miscalculations resulted in Defendant imposing and collecting unearned/unwarranted fees and charges in violation of the express terms of Plaintiffs' and Class members' respective Security Instruments**. TAC ¶260 (emphasis added).

In light of the foregoing, Defendant's argument that the TAC fails to adequately identify the contractual provisions at issue, as well as its assertion that Plaintiffs "point to no provision of the Security Instrument…that [it] actually breached," are both without merit. Motion, at 7-8. For this reason alone, Plaintiffs' breach of contract claim is adequately pled.

### 2.     Plaintiffs' Breach of Contract Claim Is Not Exclusively Premised on a Third-Party Beneficiary Theory

Citing paragraph 264 of the TAC, Wells Fargo stridently argues that "Plaintiffs premise their contract claim on a breach of the Servicing Guidelines themselves." Motion, at 9-10. However, as just explained, Plaintiffs can maintain a breach of contract claim based solely on the express provisions of the Security Instruments themselves—*i.e.*, without regard to any Servicing Guidelines. *See*, Section IV-B-1, *supra*. Indeed, this is precisely why Plaintiffs' third-party beneficiary theory is alleged to be an "alternative" basis for contractual liability, and *not* the exclusive basis for liability. TAC, ¶ 264. Nevertheless, the Servicing Guidelines are still relevant to Plaintiffs' claims, as they impose *additional* duties/limitations that Defendant violated when it erroneously imposed improper fees in connection with Plaintiffs' mortgage modifications, or, at the very least, are instructive as to how the express terms of Plaintiffs' Security Instruments should be interpreted. *See, e.g.*, TAC, ¶¶ 261-70.

Although it is undisputed that Wells Fargo entered into binding agreements pursuant to which it agreed to adhere to the Servicing Guidelines (TAC, ¶¶ 55, 261 (citing *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 880 (9th Cir. 2013)), Defendant claims that this fact makes no difference because, in general, courts have held that borrowers lack the ability to enforce the duties imposed upon servicers by the Servicing Guidelines (Motion, at 10). But, as explained below, there are exceptions to this general rule.

First, Servicing Guidelines promulgated by federal agencies such as the FHA or the VA are of a different legal character than Servicing Guidelines promulgated by quasi-public, yet still privately owned, entities such as Fannie Mae or Freddie Mac. *Compare*, *McKenzie v. Wells Fargo Bank, N.A.*, 931 F.Supp.2d 1028, 1043 (N.D. Cal. 2013) (characterizing Freddie Mac's Servicing Guidelines as "a set of instructions from a lender-principal to a servicer-agent" which are contractual in nature) *with Baines v. Carrington Mortgage Services, LLC*, 5:25-CV-297-BO, 2026 WL 554737, at *15 (E.D.N.C. Feb. 9, 2026) (noting that "VA servicing guidelines are federal regulations"); *see also, Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 274-75 (1969) (noting that a HUD circular published pursuant to HUD's statutory rulemaking power had the force of law). Given their status as federal *regulations*, courts have held that Servicing Guidelines promulgated by the FHA or the VA *can* be incorporated into the terms of a borrowers' mortgage, such that a violation thereof "may form the basis of a breach of contract claim." *E.g.*, *Rummans v. HSBC Bank USA Nat'l Ass'n as Tr. for MASTR Reperforming Loan Tr. 2005-2*, 3:22-CV-02046-M-BT, 2024 WL 495955, at *8 (N.D. Tex. Jan. 23, 2024) (collecting cases); *Baker v. Countrywide Home Loans, Inc.*, CIV A 308-CV-0916-B, 2009 WL 1810336, at *5 (N.D. Tex. June 24, 2009); *Baines*, 2026 WL 554737 at *15.

Here, the TAC alleges that the standardized Security Instruments promulgated by the FHA or the VA expressly incorporate regulations of HUD's or the VA's respective Secretaries as contractual terms. *See, e.g.*, TAC, ¶ 261, n. 14, 15. Therefore, insofar as Plaintiffs' Security Instruments are subject to the FHA's or the VA's Servicing Guidelines, they can be enforced through a breach of contract cause of action.[2] *See, e.g.*, *Baker*, 2009 WL 1810336 at *5 ("Courts have recognized that claims for failure to comply with the HUD regulations in question are best classified as a breach of contract.") (collecting cases); *Wilkins v. Wells Fargo Bank, N.A.*, 2:15CV566, 2016 WL 6775692, at *6 (E.D. Va. Nov. 15, 2016) (incorporating VA Servicing Guidelines into terms of a mortgage).

Second, contrary to Defendant's claim, some courts have, in fact, held that Servicing Guidelines *can*

---

[2] Notably, under this legal theory, the Servicing Guidelines promulgated by the FHA or the VA would be incorporated into the express terms of Plaintiffs' Security Instruments, and thus, Defendant's breach thereof would be actionable under a *direct* breach of contract theory, as opposed to through a third-party beneficiary theory.

be enforced by borrowers under a third-party beneficiary theory. *E.g.*, *Marques v. Wells Fargo Home Mortg., Inc.*, No. 09-CV-1985-L RBB, 2010 WL 3212131, at *1 (S.D. Cal. Aug. 12, 2010) (under federal common law, plaintiff may assert breach of contract as intended third-party beneficiary of a HAMP Servicer Participation Agreement which, "on its face expresses a clear intent to directly benefit the eligible borrowers."); *Reyes v. Saxon Mortg. Services, Inc.*, 09CV1366 DMS (WMC), 2009 WL 3738177, at *2 (S.D. Cal. Nov. 5, 2009). Given this authority, Plaintiffs allege, *in the alternative* to the foregoing, that they are third-party beneficiaries of the Servicing Guidelines applicable to their respective Security Instruments, regardless of the entity/agency that promulgated them. TAC, ¶ 264. But, even if the Court disagrees with this authority, it makes no difference, as Plaintiffs have satisfactorily alleged that Defendant's imposition of inflated fees and costs violated the express terms of their Security Instruments, without regard to any Servicing Guidelines. Therefore, Defendant's argument that Plaintiffs' breach of contract claim fails because it is premised on a third-party beneficiary theory of liability is incorrect, and should be rejected.

### 3. Plaintiffs Properly Allege Wells Fargo's Breach of the Implied Covenant of Good Faith and Fair Dealing

As an alternative basis for their breach of contract claim, Plaintiffs allege that Wells Fargo breached the implied covenant of good faith and fair dealing by including fees and charges for services that were *not* actually performed or necessary to protect Defendant's interests in the amounts it claimed were due and owing under Plaintiffs' and Class members' modified loans. *See, e.g.*, TAC ¶¶ 271-81; *see also*, *Celador Intern. Ltd. v. Walt Disney Co.*, 347 F.Supp.2d 846 (C.D. Cal. 2004) (noting that, even if the plaintiffs failed on their breach of contract claim, they could prevail on their breach of the implied covenant claim).

With respect to this aspect of Plaintiffs' breach of contract claim, Wells Fargo notes that the Court previously rejected the applicability of the implied covenant of good faith and fair dealing on the grounds that Plaintiffs "fail[ed] to allege they have an express contractual right to have loan modification requests considered in a particular manner." Motion, at 11 (quoting Doc. 124, at 8). As detailed above, however, the essence of Plaintiffs' breach of contract claim is not *just* that Wells Fargo's handling of Plaintiffs' loan modification requests was improper, but instead that Wells Fargo's improper handling of those requests *resulted*

in the imposition of fees that Wells Fargo was contractually prohibited from charging—*i.e.*, a breach of the express terms of the Security Instruments. *See*, Section IV-B-1, *supra*.

Defendant also argues that Plaintiffs' implied covenant theory of Defendant's breach is duplicative of Plaintiffs' express breach of contract theory. This would be true, if Defendant agreed with Plaintiffs that the Security Instruments expressly prohibited its from imposing the fees and costs at issue. But, in the Motion, Defendant takes the position that nothing in the Security Instruments expressly prohibited it from imposing exorbitant and unnecessary costs and fees. Motion, at 8.

If the Court agrees with Defendant in this regard, Plaintiffs' fallback position would be that, notwithstanding the lack of an express limitation on what fees Defendant can impose, the implied covenant of good faith and fair dealing prohibits Defendant from imposing unearned and unnecessary costs and fees because the unfettered imposition of such fees would frustrate the purpose of Plaintiffs' Security Instruments. *See, e.g.*, *Wolf v. Walt Disney Pictures & Television*, 162 Cal.App.4th 1107, 1120 (2008) (noting that the implied covenant "is read into contracts in order to protect the express covenants or promises of the contract" and "further the contract's purpose") (internal quotations omitted); *Robalo LLC v. Ramey*, 2:11-CV-02642-GEB, 2012 WL 244340, at \*6 (E.D. Cal. Jan. 25, 2012) (similar). Indeed, the arbitrary imposition of excess fees is entirely inconsistent with the core purpose of a mortgage loan, which is to ensure repayment of a predetermined amount through a carefully structured and fixed payment schedule.

In other words, if, as Defendant claims, the Security Instruments did not expressly prohibit Defendant from imposing whatever fees it wanted to impose—regardless of whether they were actually incurred or necessary to protect its interests in Plaintiffs' properties—the implied covenant of good faith and fair dealing certainly did. Therefore, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is a proper supplement to Plaintiffs' express breach of contract claim. *See, e.g.*, *Nasseri v. Wells Fargo Bank, N.A.*, 147 F.Supp.3d 937, 943 (N.D. Cal. 2015) ("The separate claim based on the implied covenant of good faith and fair dealing will be treated as part of the contract claim.").

## C.    PLAINTIFFS STATE A CLAIM FOR A VIOLATION OF THE UCL

### 1.    Wells Fargo's Attempt to Strike Plaintiffs' Nationwide Class Is Premature

With respect to Plaintiffs' UCL claim, Wells Fargo first argues that this claim should be dismissed because it cannot be applied extraterritorially to non-California Plaintiffs and Class members. Motion, at 12-14. However, as this Court previously acknowledged, the UCL can be applied to the claims of "non-California residents if those persons are harmed by wrongful conduct occurring in California." *E.g.*, *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 916 (C.D. Cal. 2011); Doc. 124, at 13 (quoting *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 224-25 (1999)).

Here, the TAC, like the SAC, alleges that "WF&Co. engages in substantial sales and marketing activities in California, and that the "actions and omissions that give rise to this litigation were conceived, designed, facilitated, instigated, overseen, managed, and coordinated…in California." TAC ¶¶ 286-87. The TAC also adds more specific allegations that the erroneous loss mitigation formulas at the crux of this suit emanated from California. TAC ¶ 288. Although Defendant claims that these allegations should be disregarded because WF&Co. and Wells Fargo are distinct business entities, the salient issue is *where* the formulas at issue were created; the entity that created them is beside the point. As such, the TAC's allegations "are enough at the pleadings stage to create a plausible inference that the unlawful conduct emanated from California," such that non-California Plaintiffs and Class members can assert UCL claims. *E.g.*, *Fernandez v. CoreLogic Credco, LLC.*, 593 F.Supp.3d 974, 992 (S.D. Cal. 2022) (deeming sufficient allegations that the defendant's "information technology operations" and the "policies and procedures at issue" emanated from California); *Short v. Hyundai Motor Co.*, C19-0318JLR, 2020 WL 6132214, at *5 (W.D. Wash. Oct. 19, 2020) (deeming sufficient allegations that the defendants' misconduct emanated from their California headquarters); *Ehret v. Uber Techs., Inc.*, 68 F.Supp.3d 1121, 1131-322 (N.D. Cal. 2014) (similar); *see also*, *Zamora v. Lyft, Inc.*, No. 16-cv-02558-VC, 2016 U.S. Dist. LEXIS 155027, at *4 (N.D. Cal. Nov. 7, 2016) (concluding that "dismissing the nationwide UCL claim in its entirety would be premature," despite being "very skeptical of the plaintiffs' argument for applying the UCL to a nationwide class," which was based entirely on the fact that the defendant was headquartered in California).

Regardless, Wells Fargo's argument on this point does not apply to Curry and the Liggetts, as they are from California. TAC ¶¶ 23, 31; *Sivakova v. Am. Honda Motor Co.*, No. CV 24-03354-MWF, 2025 U.S. Dist. LEXIS 33931, at *42-43 (C.D. Cal. Feb. 25, 2025) ("Even if the Court were to hold that non-California plaintiffs could not bring claims under California law, that would not affect the fact that there is a Plaintiff here who is a resident of California and can therefore bring UCL and CLRA claims"). Therefore, as this Court previously held, Curry and the Liggetts may still assert a UCL claim. Doc. 124, at 14.

### 2.    Plaintiffs State a Claim Under the UCL's "Unfair" Prong

Plaintiffs' claim under the UCL's "unfair" prong (the "Unfairness Claim") arises under the test articulated in *South Bay*, pursuant to which a challenged business practice qualifies as unfair when it "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *South Bay Chevrolet v. Gen. Motors Acceptance Corporation*, 72 Cal.App.4th 861, 886-87 (1999). Under *South Bay*, "the test of whether a business practice is unfair involves an examination of that practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *Id.* at 886 (cleaned up). Thus, where a given practice causes "harm to [a] victim [which] outweighs any benefit," it is "unfair" for purposes of the UCL. *E.g.*, *Lorenzo v. Qualcomm Inc.*, 08CV2124 WQH LSP, 2009 WL 2448375, at *6 (S.D. Cal. Aug. 10, 2009) (quoting *Albillo v. Intermodal Container Services, Inc.*, 114 Cal.App.4th 190, 206 (2003)); *South Bay*, 72 Cal.App.4th at 886-87.

In the Motion, Wells Fargo myopically focuses on Wells Fargo's miscalculations, in and of themselves, as the conduct upon which Plaintiffs' Unfairness Claim is predicated. Motion, at 14-15. However, Plaintiffs' Unfairness Claim is much more broad, and relates to the business practices that caused the miscalculations to manifest, and Wells Fargo's failure to further investigate or fix them.

Specifically, the TAC alleges that Wells Fargo—consistent with its corporate policy of purposefully under-investing in its back-office operations, and out of a desire to "prioritize[e] profits over compliance"—repeatedly failed to adopt and employ "adequate oversight, auditing, and testing" to ensure that the automated formulas and systems it used to evaluate borrowers for loan modifications were accurate and complied with the law. *See, e.g.*, TAC, ¶¶ 3, 64-74. Although, as early as 2010, Wells Fargo *knew* that its oversight and testing

procedures were inadequate and, in fact, "agreed to adopt processes to better oversee, audit, and conduct ongoing testing of its loan servicing, modification, and foreclosure tools and practices and ensure legal and regulatory compliance," Wells Fargo failed to do so. *Id.* Not surprisingly, Wells Fargo's disregard for the accuracy of its automated formulas and systems led to errors, which inflated the amounts borrowers were required to pay by improperly including certain fees and charges in the amounts due and owning on their loans. *See, e.g.*, TAC ¶¶ 8-9, 15, 69, 75, 77, 79, 81-83, 87, 102, 105.

On top of that, when Wells Fargo learned of these systemic calculation errors in 2013, it did nothing to fix them, and waited until 2015 to implement new "controls." TAC ¶¶ 8-9, 15, 69, 77, 79, 81-83, 87, 102, 105. But, even then, these new "controls" were ineffective, and the errors continued until at least April 30, 2018. *See, e.g.*, TAC ¶¶ 83-85, 102.

Put another way, Plaintiffs allege that Wells Fargo knowingly and repeatedly engaged in a lack of oversight, testing, and auditing which made calculation errors extremely likely, if not inevitable, and then, even *after* becoming aware that calculation errors had manifested, exhibited deliberate indifference toward ascertaining the true scope of these errors and fixing them. As such, the "unfair" business practices of which Plaintiffs' complain are Wells Fargo's knowing and repeated failures to take proper action to prevent, discover, and fix its calculation errors; the specific calculation errors that affected Plaintiffs are merely symptoms of this larger disease.

Notably, these allegations are nearly identical to those present in *Hernandez*, wherein the plaintiffs alleged that Wells Fargo: (1) "repeatedly failed to test the automated decision-making tool it used to determine borrowers' eligibility for mortgage modifications, even in the face of a consent decree which put Wells Fargo on notice that it needed to implement such testing"; (2) "conceal[ed] its discovery of systemic errors from regulators and borrowers for several years"; (3) "knowingly and repeatedly refused to address these problems, deliberately deciding to put profits and growth over compliance"; and (4) "systematically turned homeowners out into the streets through an alleged pattern of reckless and heartless 'errors' and 'cover-ups.'" *Hernandez*, 2019 WL 2359198 at *6. Based on these allegations, the *Hernandez* court held that, "in prioritizing profits over adequate oversight, despite being on notice of deficiencies in its foreclosure practices, and causing hundreds

of unnecessary foreclosures, Wells Fargo plausibly engaged in unscrupulous behavior" that was actionable under the UCL's "unfair" prong. *Id.* at \*5. The court in *Diaz* also reached the same conclusion in connection with allegations that the defendant "implemented and carried out multiple policies that [it] knew were encouraging and enabling widespread tax fraud, and deliberately did so in order to generate additional fee revenue." *Diaz v. Intuit, Inc.*, 5:15-CV-01778-EJD, 2017 WL 4386451, at \*5 (N.D. Cal. Sept. 29, 2017). The Court should do the same here.[3]

In sum, Defendant's characterization of its calculation errors as isolated "mistakes," and not the result of "intentional conduct" giving rise to a viable Unfairness Claim is utterly without merit. Motion, at 15. For the same reason, insofar as Defendant argues it was unaware of the calculation errors, it is the result of Defendant's willful failures to ascertain the true scope of its calculation errors. Indeed, the reasonable response to learning of a systemic error that is harming consumers is to find it and fix it, and *not* burying one's head in the sand and hoping that nobody notices. If anything, Defendant's lack of knowledge makes its conduct even *more* unscrupulous, and does not absolve it from liability. Therefore, Plaintiffs' Unfairness Claim is adequately pled.[4]

### 3.    Plaintiffs State a Claim Under the UCL's "Deceptive" Prong

Defendant's argument with respect to Plaintiffs' claim under the UCL's "deceptive" prong also relies on its purported lack of knowledge regarding the existence of the calculation errors at issue. Motion, at 15-17. However, Plaintiffs plausibly allege Defendant *knew* as early as 2013 that "the re-calculated loan terms offered to Plaintiffs and Class members were incorrect at the time" they were made (TAC ¶ 293), but failed to take action to correct the error until at least April 2018 (TAC ¶¶ 84-87). Hence, Defendant knew of the

[3] Plaintiffs acknowledge that, in dismissing the SAC, the Court held that they were required "to plead facts to support a finding that Wells Fargo knew of the alleged 'errors' at the time it considered [their] respective loan modification requests." Doc. 125, at 16. However, since, like the plaintiffs in *Hernandez,* Plaintiffs' claim of unfairness relates to the business practices that caused the miscalculations to manifest in the first place, as well as Defendant's failure to further investigate or fix them, the salient issue is whether Defendant knew that its internal processes and procedures were inadequate (so as to give rise to a duty to identify and correct them), and *not* whether Defendant knew of the errors that affected Plaintiffs specifically.

[4] Defendant raises a similar argument with respect to the portion of Plaintiffs' ICFA claim that is grounded in unfairness. Motion, at 19-20. This argument should be rejected for the exact same reasons set forth herein.

"systemic calculation errors" in its underwriting tool at the time it offered the Liggets a loan modification in 2015 (TAC ¶¶ 197-198) and when it denied Mr. Curry's modification in 2016 (TAC ¶¶ 113-115).

Defendant also argues that the TAC's allegation that Plaintiffs either paid the amounts claimed to be due and owing, decided that they could not afford the payment offered, or both, insufficiently alleges reliance. Motion, at 17. This assertion defies common sense. Given Plaintiffs' respective financial situations, and the gravity of their decision to accept or reject Defendant's loan modification offers—which put them in jeopardy of permanently losing their homes—Plaintiffs obviously would have objected to the amounts claimed to be due and owing, if they did not believe those amounts to be accurate. The fact that Plaintiffs did not voice such an objection, and instead took (or refrained from taking) action based on the amounts claimed to be due and owing, means that they accepted, as true, Defendant's assertions as to the amounts claimed to be due and owing. *See, e.g.*, TAC ¶¶ 115-17 (alleging that Curry sold his property   after Defendant denied his loan modification request and initiated foreclosure proceedings), ¶¶ 197-198 (alleging that the Liggetts accepted the terms of the loan modification offered by Defendant and began making payments). As such, the allegation that Plaintiffs acted "in reliance on [Wells Fargo's] false representations" is sufficient to plead reliance, and Plaintiffs' claim under the UCL's "deceptive" prong is adequately pled. TAC ¶ 294.

### D.    DEFENDANT'S KNOWLEDGE IS IRRELEVANT WITH RESPECT TO PLAINTIFFS' ICFA, NCUDTPA, D.C. CPPA, AND NY GBL CAUSES OF ACTION[5]

Plaintiffs' ICFA, NCUDTPA, D.C. CPPA, and NY GBL are all premised on the allegation that the loan modification options Defendant presented to Plaintiffs "affirmatively misstated the total balances owed and the amounts of their monthly payments due to the systemic calculation error" at issue in this case. *See, e.g.*, TAC, ¶¶ 308, 336, 353, 378.  In the Motion, Defendant argues that, for purposes of Plaintiffs' ICFA, NCUDTPA, D.C. CPPA, and NY GBL causes of action, Plaintiffs are required to establish that Wells Fargo knew that the amounts it claimed to be due and owing were inaccurate. Motion, at 18, 21-22. This argument

[5] In light of Defendant's argument that Plaintiff Risconsin never received a loan modification, Plaintiffs intend to voluntarily dismiss Plaintiff Risconsin as a party to this action, and hereby withdraw Count IV of the TAC— *i.e.*, the Pennsylvania UTPCPL cause of action. Motion, at 20.

is based on the Court's order dismissing the SAC, wherein the Court held that such knowledge was required. Doc. 125 at 17-18, 20-21. However, as set forth below, Plaintiffs' respectfully submit that the Court erred in holding that such a requirement exists under the ICFA, NCUDTPA, D.C. CPPA, and NY GBL.

First, Illinois law is clear that, "innocent misrepresentations are actionable under the [ICFA]." *E.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574-75 (7th Cir. 2012); *Aliano v. Sears, Roebuck & Co.*, 2015 IL App (1st) 143367, ¶ 5 (citing *Duran v. Leslie Oldsmobile, Inc.*, 229 Ill.App.3d 1032, 1039 (2nd Dist. 1992)); *Lipinski v. Martin J. Kelly Oldsmobile, Inc.*, 325 Ill.App.3d 1139, 1145 (1st Dist. 2001); *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill.App.3d 642, 655 (1st Dist. 2001). "Nor need the defendant have intended to deceive the plaintiff"; instead, "the intent required by the [ICFA] 'is merely the defendant's intent that the plaintiff in the action rely on the…information the defendant gave to plaintiff.'" *Miller*, 326 Ill.App.3d at 655 (quoting *Breckenridge v. Cambridge Homes, Inc.*, 246 Ill.App.3d 810, 822 (2nd Dist. 1993)); *Wigod*, 673 F.3d at 575 ("To satisfy the ICFA's intent requirement, plaintiff need not show that defendant intended to deceive the plaintiff, but only that the defendant intended the plaintiff to rely on the (intentionally or unintentionally) deceptive information given.") (quoting *Chow v. Aegis Mortg. Corp.*, 286 F.Supp.2d 956, 963 (N.D. Ill. 2003)) (cleaned up).

Second, nowhere in the statutory language or case law interpreting the NCUDTPA is there a requirement that a plaintiff must plead a defendant's contemporaneous awareness. To the contrary, courts have found that "the intent and knowledge of the parties is generally irrelevant in [NCUDTPA] actions." *Cap. Res., LLC v. Chelda, Inc.*, 735 S.E.2d 203, 239 (N.C. App. 2012); *Sain v. Adams Auto Grp., Inc.*, 781 S.E.2d 655, 665 (N.C. App. 2016) (citing cases holding that a plaintiff does not have to prove fraud, bad faith, or intentional deception to sustain a NCUDTPA claim).[6] The best example of this comes from the decision in

---

[6] Although Defendant cites to *Edwards v. JP Morgan Chase Bank*, 2020 WL 1814423, at *6 (N.D.N.C. Apr. 9, 2020), for the proposition that, under the NCUDTPA, a plaintiff must plead that the defendant has intentionally and knowingly provided false statements to the plaintiff, *Edwards* does not stand for this proposition. Specifically, in *Edwards*, nothing that the defendant said was actually false; rather, the plaintiffs' allegations of falsity was based on their mistaken understanding of what the defendant told them. *Id.* at *7. As a result, the *Edwards* plaintiffs were harmed by their own misinterpretation of the (accurate) information they were given, as opposed to anything the defendant did, and thus, could not establish proximate causation. *Id.* Therefore, *Edwards* does not negate the holding in *Sain*, which makes clear that a plaintiff does *not* need to

*Polanco*, wherein the court denied a motion to dismiss a NUCDTPA claim arising from a coding error that led to a miscalculation of the amount of the plaintiff's mortgage payments, even though the plaintiff did not allege that the defendant was aware of the coding error at the time it was sending her the incorrect account statements, and, in fact, it was the defendant who discovered the error after months of sending incorrect notices to the plaintiff. *Polanco v. HSBC Bank USA Nat'l Ass'n*, 2019 WL 2590964, at *1-2, 6 (W.D.N.C. June 21, 2019).

Third, courts interpreting the D.C. CPPA have similarly held that, "in light of the plain language and the legislative intent of the CPPA, a consumer need not allege intentional misrepresentation of a material fact or an intentional failure to disclose a material fact under [the CPPA]." *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1004 (D.C. 2020). Instead, a consumer only needs to establish that the merchant made a material misrepresentation or failed to make a material disclosure. *Id.* Indeed, because the D.C. CPPA is a strict liability statute, it does not require pleading that a defendant knowingly passed along misrepresentations, but rather, merely requires that incorrect information was provided to the consumer and the consumer was injured as a result. *Id.*

Fourth, the statutory language and case law interpreting the NY GBL do not include a requirement that Plaintiffs must allege contemporaneous knowledge. N.Y. Gen. Bus. Law § 349; *M & T Mortg. Corp. v. White*, 736 F.Supp.2d 538, 570 (E.D.N.Y. 2010) ("A Section 349 claim need not include proof of intent to deceive, scienter, or justifiable reliance"); *PG Ins. Co. of New York v. S.A. Day Mfg. Co.*, 251 A.D.2d 1065, 1066 (N.Y. 1998) (defendant could be found liable under GBL even absent knowing conduct); *Griffin-Amiel v. Frank Terris Orchestras*, 677 N.Y.S.2d 908, 912 (N.Y. City Ct. 1998) ("There is no requirement under GBL § 349 that plaintiff prove that defendant's practices and acts were intentional, fraudulent *or even reckless*.") (emphasis added). Tellingly, Defendant cites to no statutory authority or case law for its statement that "Plaintiffs must allege contemporaneous knowledge or awareness of the information allegedly withheld" (Motion, at 22), nor could it, as New York courts have adopted an objective definition of "deceptive acts and practices," defining

---

plead intentional acts or knowledge of the fasilty to state a claim under NCUDTPA. *Sain*, 781 S.E.2d at 665; Instead, only a misstatement (whether innocent or otherwise) and causation is all that is required. *Id.*

them as "those [acts and practices] likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995).

For this reason, when considering whether an act is deceptive, the NY GBL requires that a defendant's acts or practices have a broad impact on consumers. *Ritchie v. N. Leasing Sys., Inc.*, 2016 WL 1241531, *22 (S.D.N.Y. Mar. 28, 2016). Here, in contrast to the cases involving isolated instances of human error upon which Defendant relies,[7] Plaintiff has alleged systematic errors by Wells Fargo, which occurred hundreds of times for nearly a decade, which cannot plausibly be characterized as isolated mistakes. *See, e.g.*, TAC ¶¶ 64, 77, 78. Thus, the inaccurate, automated processing of hundreds of consumers' home mortgages in the case at hand is the type of broad impact that the NY GBL was intended to remedy, even in the absence of specific knowledge regarding the inaccuracy of Plaintiffs' modification offers. *See, e.g.*, *Jackson v. Harkey*, 704 P.2d 687, 476-80 (Wash. App. 1985) (finding liability under consumer protection statute where the defendant engaged in a "protracted course…of damaging conduct").

Based on the foregoing, for purposes of Plaintiffs' ICFA, NCUDTPA, D.C. CPPA, and NY GBL causes of action, it is enough to allege that the amounts Defendant claimed to be due and owing when it offered loan modifications to Plaintiffs were incorrect, even if Defendant did not know that was the case. *E.g.*, *Chow*, 286 F.Supp.2d at 963; *Sain*, 781 S.E.2d at 665; *Frankeny*, 225 A.3d at 1004; *PG Ins.*, 251 A.D.2d at 1066. The TAC meets this standard, as it alleges that the amounts Defendant claimed to be due and owing were incorrect because they overstated the actual amount that Plaintiffs owed. *See, e.g.*, TAC, ¶¶ 308, 336, 353, 378.

Finally, even assuming, *arguendo*, that some degree of knowledge is required, the TAC is still adequately pled. It is well-established that "knowledge may be pleaded generally under Rule 9(b)," so long as it is coupled with facts from which knowledge "might reasonably be inferred." *See, e.g.*, *Immobiliare, LLC v. Westcor Land*

---

[7] For example, in *Streamline*, the plaintiff made a single allegation that the defendant insurer's calculation of a "restoration period" under the insurance contract was "baseless." *Streamline Capital, L.L.C. v. Hartford Cas. Ins. Co.*, 02 CIV. 8123 (NRB), 2003 WL 22004888, at *3 (S.D.N.Y. Aug. 25, 2003). Similarly, *Wiener*, *Dekel*, and *Shapiro*, all involved isolated, as opposed to systemic, denials of benefits allegedly due. *Wiener v. Unumprovident Corp.*, 202 F.Supp.2d 116, 121 (S.D.N.Y. 2002); *Dekel v. Unum Provident Corp.*, 2007 WL 812986 (E.D.N.Y. Mar. 14, 2007); *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 127 (2nd Cir. 2000).

*Title Ins. Co.*, 424 F.Supp.3d 882, 890 (E.D. Cal. 2019). In addition, "Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge [because], in such situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts." *Id.*

Here, the TAC alleges not only that Defendant knew as early as August 2013 that its automated calculations were inaccurate, but also that Defendant actively concealed the true scope of its errors for years. *See, e.g.*, TAC, ¶¶ 81-84, 104-110, 309, 340, 356, 386. Defendant's furtive conduct is entirely *inconsistent* with what would be expected if its misrepresentations were truly innocent at the time they were made, and raises an inference that it knew its representations were false all along. *See, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, 754 F.Supp.2d 1145, 1192 (C.D. Cal. 2010) (allegations that a defendant was on notice of a product defect, but hid it from regulators and consumers, repeatedly denied and rejected consumer complaints, and then lied about the real reason for its subsequent product recall raised an inference of active concealment). Therefore, Plaintiffs' ICFA, NCUDTPA, D.C. CPPA, and NY GBL claims are more than adequately pled.

## E.    DEFENDANT CAN BE HELD LIABLE UNDER THE D.C. CPPA

With respect to Plaintiffs' D.C. CPPA cause of action, Defendant also argues that it is exempted from the CPPA because it is a loan servicer. Motion, at 21. However, D.C. courts have found that loan servicers can qualify as merchants under the CPPA, if they provide services such as "paying taxes and insurance from escrow accounts, modifying mortgages, and [assisting with] property preservation." *Hardnett v. Select Portfolio Servicing, Inc.*, 800 F.Supp.3d 27, 35-37 (D.D.C. 2025) (quoting *McFadden v. Nationstar Mortg. LLC*, No. 20-cv-166, 2021 WL 3284794, at *14 (D.D.C. July 30, 2021)). Put another way, there is a difference between servicers who passively collect monthly payments from borrowers (and do nothing else), and servicers who actively provide other services to borrowers. *Hardnett*, 800 F.Supp.3d at 36 (specifically rejecting the contention that *Busby v. Capital One*—upon which Wells Fargo relies—creates a "categorical ruling that a mortgage-loan servicer can never be a merchant"). Since the allegations here arise from Defendant's mortgage modification activities, Defendant is a merchant for purposes of the D.C. CPPA. *Hardnett*, 800 F.Supp.3d at 36 (quoting *McFadden*, 2021 WL 3284794 at *14).

**F.    THE TAC ADEQUATELY ALLEGES A CAUSE OF ACTION FOR UNJUST ENRICHMENT**

Defendant's final argument is that the TAC fails to allege facts establishing that Plaintiffs paid increased fees and interest to Defendant. Motion, at 24. But, as already explained, the TAC adequately alleges that the fees and costs included in the amounts Wells Fargo claimed were due and owing in connection with Plaintiffs' loans were not, in fact, due and owing because they were for services never performed or necessary to protect Defendant's interests. Thus, when Plaintiffs paid those amounts, they conferred a benefit on Defendant to which it was not entitled. *See, e.g.*, TAC, ¶ 393.

Defendant further argues that Plaintiffs cannot simultaneously pursue a contractual claim and an unjust enrichment claim unless they specifically disavow the existence of a valid contract in connection with their unjust enrichment claim. Motion, at 25 (citing *Saroya v. Univ. of the Pac.*, 503 F.Supp.3d 986, 998 (N.D. Cal. 2020)). However, as demonstrated by Defendant's own assertion that it was *not* contractually obligated to offer loan modifications to Plaintiffs, or ensure that those modifications were properly processed and accurately reflected the amounts due and owing, this is *not* case where the existence of a valid contract and a claim for unjust enrichment are mutually exclusive. *See, e.g.*, Motion, at 7-10; *Lindner v. Occidental Coll.*, CV 20-8481-JFW(RAOX), 2020 WL 7350212, at *9 (C.D. Cal. Dec. 11, 2020) (dismissing unjust enrichment claim where it was "undisputed that the parties' relationship is governed by a contract"). Indeed, it is entirely possible that the contracts—*i.e.*, the Security Instruments—are valid, but simply do not speak to the duties at issue, in which case Defendant's wrongdoing would arise from an *extracontractual* undertaking separate and apart from any contractual obligations it owed Plaintiffs. *See, e.g.*, *In re Facebook*, 956 F.3d at 600; *see also Bruton v. Gerber Products Co.*, 703 F.App'x 468, 470 (9th Cir. 2017); *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).

Since the viability of Plaintiffs' unjust enrichment claim is *not* solely dependent upon the validity of the Security Instruments—and depends on the *scope* of the Security Instruments' obligations as well—it is unnecessary for Plaintiffs to allege that the Security Instruments are unenforceable to plausibly allege an unjust enrichment claim. Therefore, Plaintiffs may assert their claim for unjust enrichment in the alternative to their contractual claims. *E.g.*, *Clear Channel Outdoor, Inc. v. Bently Holdings California LP*, C-11-2573 EMC, 2011 WL

6099394, at *9 (N.D. Cal. Dec. 7, 2011) ("Even though a plaintiff may not ultimately prevail under both unjust enrichment and breach of contract, it may plead both in the alternative.") Fed.R.Civ.P. 8(d)(2) (permitting causes of action to be pled in the alternative).

## V.    CONCLUSION.

For the reasons set forth herein, the Court should deny the Motion.

DATED: March 20, 2026                              **THE DANN LAW FIRM**
                                                   **ZIMMERMAN LAW OFFICES, P.C.**

                                                   /s/ *Thomas A. Zimmerman, Jr.*
                                                   Thomas A. Zimmerman, Jr.*
                                                   **Zimmerman Law Offices, P.C.**
                                                   77 W. Washington Street, Suite 1220
                                                   Chicago, IL 60602
                                                   Telephone: (312) 440-0020
                                                   *tom@attorneyzim.com*

                                                   Marc E. Dann*
                                                   **DannLaw**
                                                   15000 Madison Avenue
                                                   Lakewood, OH 44107
                                                   Telephone: (216) 373-0539
                                                   *notices@dannlaw.com*

                                                   *Admitted Pro Hac Vice*

                                                   *Interim Co-Lead Class Counsel*

                                                   Timothy G. Blood (CA Bar #149343)
                                                   **Blood Hurst & O'Reardon, LLP**
                                                   501 West Broadway, Suite 1490
                                                   San Diego, CA 92101
                                                   Telephone (619) 338-1100
                                                   *tblood@bholaw.com*

                                                   Alisa Rose Adams (CA Bar #277697)
                                                   **The Dann Law Firm**
                                                   26100 Towne Center Drive
                                                   Foothill Ranch, CA 92610-3442
                                                   Telephone: (949) 200-8755
                                                   *notices@dannlaw.com*
                                                   *aadams@dannlaw.com*

Mark Javitch (CA Bar #323729)
**Javitch Law Office**
480 S. Ellsworth Avenue
San Mateo, CA 94401
Telephone: (650) 781-8000
  *mark@javitchlawoffice.com*

Charles E. Schaffer*
Daniel C. Levin*
**Levin Sedran & Berman LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
*cschaffer@lfsblaw.com*
*dlevin@lfsblaw.com*

D. Aaron Rihn*
**Robert Peirce & Associates, P.C.**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
Telephone: (412) 281-7229
*arihn@peircelaw.com*

*\* Admitted Pro Hac Vice*

*Attorneys for Plaintiffs and the Putative Class and Subclasses*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 20, 2026, at Chicago, Illinois.

/s/ Thomas A. Zimmerman, Jr.
Thomas A. Zimmerman, Jr.*

*Interim Co-Lead Class Counsel for Plaintiffs
and the Putative Class and Subclasses*